## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **Walter McGahey**, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. |
| | ) |
| **Federal National Mortgage Association** | ) |
| | ) |
| **PHH Mortgage Corporation,** | ) |
| | ) |
| Defendants | ) |
| | ) |

## <u>COMPLAINT</u>

### I.      Introduction

Walter McGahey bought his parents' home in 2006 to ensure they would be able to live there the remainder of their lives.  He built an apartment above the garage and moved in.  In 2009, Mr. McGahey fell on hard financial times and fell behind on the mortgage.  He applied for a loan modification and after completing a trial plan, was given a standard Fannie Mae modification with an inflated, unaffordable monthly payment that was more than his monthly income.  He could not sustain the payment and applied for another modification in 2011 and again in 2015. Each time he was denied an affordable modification under the Making Home Affordable Program (HAMP) and provided instead an unaffordable, unsustainable modification.  The reason PHH provided for denying him the HAMP modification each time was that he already had received, and failed to complete, a HAMP modification.  This reason given for each denial was wrong.  Mr. McGahey has never been provided the opportunity to perform under an affordable HAMP modification but instead, has continually been given modifications with monthly

payments much higher than they would be under HAMP. Even when PHH finally acknowledged recently that Mr. McGahey had never been provided a permanent HAMP modification, they did nothing to correct the wrongful denials. Mr. McGahey has struggled and sacrificed both financially and mentally to sustain these unaffordable modifications so that his parents could live out the remainder of their lives in the home. Mr. McGahey was able to fulfill his promise to his mother who passed away in the home in December 2015 but his 93-year-old father still lives in the home with him and needs his constant care. PHH's conduct was unfair and deceptive in violation of the Maine Unfair Trade Practices Act 5 M.R.S.A. § 205-A et. seq.; constituted Fraud toward Mr. McGahey for three years, caused Intentional Infliction of Emotional Distress, violated the Real Estate Settlement Procedures Act 12 U.S.C. § 2605 et seq., and violated the Maine Consumer Credit Code, 9-A M.R.S. §9-401.

## II.      Jurisdiction and Venue

1.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1367.

2.      Venue is proper here pursuant to 28 U.S.C. § 1391, as Plaintiff is a resident of York County, Maine, all relevant events giving rise to Plaintiff's claims occurred in this District, and Defendant was doing business in Maine during all relevant times.

## III.      Parties

3.      Plaintiff Walter McGahey is a natural person residing in Saco, Maine.

4.      Defendant, PHH Mortgage Corporation ("PHH") is a corporation organized under the laws of New Jersey.

5.      At all relevant times to this complaint, PHH was and is the servicer of Mr. McGahey's mortgage loan on property located at 42 McKenney Road in Saco, Maine ("loan").

6.  Federal National Mortgage Association ("Fannie Mae") is the owner of the loan on 42 McKenney Road in Saco, Maine.

7.  Fannie Mae is, and at all times relevant hereto was the owner of the loan and engaged in business throughout the State of Maine, with a corporate address of 3900 Wisconsin Avenue, NW, Washington, DC 20016-2892.

8.  Fannie Mae retained PHH to service the loan and PHH has acted under the direction and authority of Fannie Mae.

### IV.    Facts

9.  Walter McGahey is the owner of certain real property located at 42 McKenney Road, Saco, ME, by virtue of a deed from his parents George L. McGahey and Helen I. McGahey dated April 20, 2006 and recorded in the York County Registry of Deeds on April 27, 2006 in Book 14818, Page 53.

10. He bought the home from his parents and moved in so that they could live in the home for the remainder of their lives.

11. On May 22, 2006, Walter W. McGahey executed and delivered to TD Banknorth, N.A., a certain promissory note in the original principal amount of $170,000.00 (the "Note").

12. To secure the Note, Walter W. McGahey executed and delivered to Mortgage Electronic Registration Systems, Inc., as nominee for TD Banknorth, N.A., its successors and assigns, a mortgage in the amount of $170,000.00 which mortgage was recorded on June 7, 2006 in the York County Registry of Deeds in Book 14860, Page 847 (the "Mortgage"). Together the Mortgage and Note are hereinafter referred to as the loan.

13. From the closing date of the loan on May 22, 2006 to the present, Fannie Mae has been the owner of the Loan.

14. From at least July 2009 to the present, PHH has been the servicer of the subject loan.

15. PHH has worked under the direction and authority of Fannie Mae in servicing the Loan.

16. PHH is required to follow Fannie Mae regulations and guidelines in servicing the Loan.

17. In 2008, due to medical issues and job loss, Mr. McGahey fell behind on the mortgage and applied for loss mitigation.

18. At the time he applied, his monthly income was around $3,387.67.

19. His monthly principal, interest, taxes, and insurance (PITI) payment on the loan in 2009 was about $1500.

20. PHH delivered a Trial Payment Plan (TPP) offer per the Home Affordable Modification Program (HAMP) on or around July 2009. A true and accurate copy of the TPP is attached hereto as Exhibit 1.

21. The TPP required Mr. McGahey to make payments in the amount of $1031.79 on August 5, September 1, and October 1, 2009.

22. Mr. McGahey timely signed and returned the TPP and timely made all payments required by the TPP.

23. Mr. McGahey successfully completed the HAMP TPP. *See* Exhibits 19, 26.

24. In or around December 21, 2009, PHH delivered to Mr. McGahey a Loan Modification Agreement.  A copy of the Cover letter and fully executed Loan Modification Agreement is attached hereto as Exhibit 2.

25. The Loan Modification was not provided pursuant to HAMP.

26. The loan was not modified under HAMP.

27. The monthly principal, interest, and escrow payment under the Loan Modification was $1456.49.

28. At the time, Mr. McGahey's income was $979.33 per month due to a recent job loss.

29. The Loan Modification required an initial contribution amount of $1987.07.

30. Believing this was the only way to save his home, Mr. McGahey timely signed and returned the modification and provided the contribution payment.

31. With the help of his parents, he made the monthly payments for about a year- until December 2011.

32. He also sold his car to help make the mortgage payments.

33. After that it was just too difficult to come up with the unaffordable amount.

34. PHH knew or should have known this was an unaffordable payment amount based on Mr. McGahey's submitted financial information.

35. In June, 2012, PHH delivered a notice of intention to foreclose to Mr. McGahey.

36. Shortly thereafter, Mr. McGahey retained and paid counsel to represent him in the foreclosure and help him apply for a more affordable loan modification.

37. Mr. McGahey submitted a complete loss mitigation application to PHH requesting to be reviewed for HAMP on August 31, 2012.

38. At that time, Mr. McGahey was experiencing a change in circumstances from the 2009/2010 modification in that he was receiving SSDI income and not wages and was unable to make the monthly modified payment.  He explained this in his hardship letter to PHH as part of his loss mitigation application.

39. As of August 12, 2012, the estimated fair market value of the property was between $180,000 and $200,000.  A true and accurate copy of a comparative market analysis from August 10, 2012 is attached here as Exhibit 3 and incorporated herein by reference.

40. Mr. McGahey's income as submitted to PHH, together with his father's contribution, equated to $3819 per month when adding a multiplier of 1.25 as required by Fannie Mae for the non-taxed income.

41. On September 25, 2012, PHH sent Mr. McGahey a letter stating that they were unable to offer him a HAMP modification but provided no reason for the denial. A true and accurate copy of the September 25, 2012 letter is attached here as Exhibit 4 and incorporated herein by reference.

42. PHH is required to follow the Fannie Mae Single Family Servicing Guide.

43. On September 25, 2012, Mr. McGahey was eligible for a HAMP modification.  He met all the eligibility criteria under Fannie Mae HAMP.

   a.  The loan is a first-lien conventional mortgage loan originated on or before January 1, 2009;

   b.  The loan was never previously modified under HAMP;

   c.  The mortgage loan was delinquent or default;

   d.  The mortgage loan is secured by a one- to four-unit property, which is Mr. McGahey's principal residence;

   e.  The property securing the mortgage loan is not vacant or condemned;

   f.  Mr. McGahey documented a financial hardship and represented that he does not have sufficient liquid assets to make the monthly mortgage payments by completing a Request for Modification and Affidavit (RMA) and providing the required income documentation. The documentation supporting income was not more than 90 days old;

   g.  Mr. McGahey agreed to set up an escrow account for taxes, hazard insurance, and flood insurance prior to the beginning of the trial; and

      h.  Mr. McGahey had a monthly mortgage payment ratio greater than 31 percent.

44. Even though Mr. McGahey was evaluated for HAMP in 2009/2010 and was not offered a HAMP after he completed the HAMP TPP due to his change in income, he can still request and be provided reconsideration for HAMP at a future time if experiencing a change in circumstances.

45. As a servicer for Fannie Mae, when evaluating for workout options to prevent foreclosure, PHH was required to first evaluate Mr. McGahey for eligibility for HAMP and, if not eligible, then determine whether Mr. McGahey was eligible for an alternative foreclosure prevention option.

46. Fannie Mae HAMP provides a target monthly mortgage payment ratio as close as possible to 31 percent of the borrower's gross monthly income.

47. For purposes of a Fannie Mae HAMP, the loan can be modified by capitalizing arrears, reducing the interest rate to a floor of 2%, extending the term to 40 years, and/or forbearing principal to reach the target ratio of 31 percent of the borrower's gross monthly income.

48. Part of the Fannie Mae HAMP evaluation consists of using a standardized Net Present Value (NPV) test to determine eligibility.

49. PHH did not evaluate the loan for HAMP using an NPV.

50. Mr. McGahey never failed a HAMP TPP nor had he ever received a HAMP permanent modification and lost good standing per the Fannie Mae Servicing Guide.

51. Per an NPV calculation, a HAMP modification as of September 25, 2012, would have provided a monthly principal, interest, and escrow payment of about $1183.89, a new capitalized principal balance of about $182,500 and an initial modified interest rate of 2%.

52. Based on payments made to counsel for assistance with a loan modification and to PHH in monthly mortgage payments from November 1, 2012 to the present, Mr. McGahey would have been able to sustain a monthly payment of $1183.89 per month.

53. PHH did not provide any other written response regarding evaluation or eligibility for any other loss mitigation program besides HAMP to Mr. McGahey from August 31, 2012 to January 1, 2013.

54. In a letter dated September 28, 2012, PHH, through counsel, stated they would continue with the foreclosure on the loan. A true and accurate copy of the September 28, 2012 letter is attached here as Exhibit 5 and incorporated herein by reference.

55. Through counsel, Mr. McGahey appealed the HAMP denial on October 2, 2012. A true and accurate copy of the October 2, 2012 letter is attached here as Exhibit 6 and incorporated herein by reference.

56. Through counsel, on October 4, 2012, Mr. McGahey sent a request to escalate the appeal of the HAMP denial and seeking they cease any further foreclosure activity on the Loan. . A true and accurate copy of the October 4, 2012 letter is attached here as Exhibit 7 and incorporated herein by reference.

57. Neither PHH nor their counsel responded to the October 2 or October 4, 2012 appeal and request to escalate the appeal of the HAMP loan modification denial.

58. PHH did not review the appeal or the request for escalation of the appeal denial.

59. Mr. McGahey sought assistance from York County Community Action (YCCA), in collaboration with his counsel, regarding his denial for a HAMP modification near the end of October 2012.

60. Michael Alexandre, a HUD-certified housing counselor with YCCA, contacted PHH with Mr. McGahey.

61. PHH misstated that Mr. McGahey did not complete the HAMP TPP and therefore was not eligible for another HAMP modification offer.

62. On or around November 4, 2012, PHH filed a Complaint for Foreclosure against Mr. McGahey.

63. The case was captioned *PHH Mortgage Corporation v. Walter McGahey*, Docket No. RE-12-181, State of Maine District Court.

64. Mr. McGahey answered the complaint and requested to be placed in the Maine Foreclosure Diversion Program.

65. In a letter dated December 3, 2012, PHH stated that Mr. McGahey "for some reason" was not eligible for a HAMP modification but did not provide the reason.  PHH offered Mr. McGahey a trial payment plan with a monthly payment of $1,633.47 beginning on January 1, 2013. A true and accurate copy of the December 3, 2012 letter is attached here as Exhibit 8 and incorporated herein by reference.

66. In an effort to continue to try and save his home with an affordable monthly payment, Mr. McGahey submitted another complete loss mitigation application for a HAMP modification to PHH, via their counsel, and also to Fannie Mae on December 4, 2012.

67. PHH acknowledged receipt of the application in a letter dated January 31, 2013.

68. The December 4, 2012 loss mitigation application included changed income, when accounting for a 1.25 multiplier for non-taxed income, equaling $4012.75 from Mr. McGahey's social security disability and his father's contribution of retirement income plus food stamps.

69. Mr. McGahey was eligible at this time for a HAMP modification.

70. PHH delivered to Mr. McGahey a notice dated February 13, 2013, offering a Trial Period
    Plan in the amount of $1501.68 per month beginning March 1, 2013.  A true and accurate
    copy of the February 13, 2013 offer letter is attached here as Exhibit 9 and incorporated
    herein by reference.

71. In a second letter dated February 13, 2013, PHH offered Mr. McGahey a Trial Period
    Plan with a monthly payment of $1625.19.   A true and accurate copy of the second
    February 13, 2013 offer letter is attached here as Exhibit 10 and incorporated herein by
    reference.

72. Neither of the February 13, 2013 TPP offers indicated they were provided pursuant to
    HAMP.

73. Believing that this was the only way to save his home, Mr. McGahey timely accepted the
    first February 13, 2012 offer with a monthly payment of $1501.68 and timely sent in the
    first TPP payment.

74. In a letter dated February 18, 2013, PHH offered Mr. McGahey another TPP with
    monthly payments of $1,591.63 beginning April 1, 2013.   A true and accurate copy of
    the February 18, 2013 offer letter is attached here as Exhibit 11 and incorporated herein
    by reference.

75. Mr. McGahey continued to send in timely payments per the $1501.68 per month TPP and
    completed the TPP.

76. In a letter dated June 5, 2013, PHH offered Mr. McGahey a Loan Modification with a
    monthly principal, interest, and escrow payment of $1630.73 beginning June 1, 2013.  A

true and accurate copy of the 2013 cover letter and Loan Modification is attached here as Exhibit 12 and incorporated herein by reference.

77. $28,678.00 in escrow advances, attorneys' fees and costs, recoverable advances, interest, and a payment were added to the modified loan balance on which Mr. McGahey would pay 6.675% interest.

78. The June 2013 Loan Modification was not offered pursuant to HAMP.

79. Mr. McGahey was not offered a permanent loan modification pursuant to HAMP.

80. After 2010, PHH never completed a full evaluation, including an NPV, of the loan for a HAMP modification.

81. Desperate to save his home and believing this was the only offer he qualified for, Mr. McGahey timely signed and returned the 2013 Loan Modification Agreement to PHH.

82. Mr. McGahey timely signed and returned the 2013 Loan Modification Agreement and made timely payments per the Agreement.

83. On August 28, 2013, Mr. McGahey delivered a Qualified Written Request (QWR) to PHH requesting information regarding the loan including information regarding any modifications made to the loan.   A true and accurate copy of the August 28, 2013 letter and proof of delivery is attached here as Exhibit 13 and incorporated herein by reference.

84. PHH responded to the August 28, 2013 letter in a letter dated September 10, 2013 but did not provide information regarding the 2010 Loan Modification.  A true and accurate copy of the September 10, 2013 letter is attached here as Exhibit 14 and incorporated herein by reference.

85. In September 2013, PHH requested Mr. McGahey execute a new modification agreement with similar terms with a monthly payment of $1625.22 and a capitalization of

$27,756.55 in fees, costs, advanced escrow, and interest to the loan. A true and accurate copy of the September 2013 Loan Modification is attached here as Exhibit 15 and incorporated herein by reference.

86.   The September 2013 Loan Modification was not a HAMP modification.

87. Mr. McGahey timely signed and returned the September 2013 Loan Modification and made timely payments per the Agreement.

88. Mr. McGahey struggled for over two years to make the monthly payments on the 2013 TPP and Loan Modification.

89. He had bought a used car but now had to sell it to help make the payments.

90. PHH knew or should have known that $1625.22 was an unaffordable payment amount based on Mr. McGahey's submitted financial information.

91. In May 2015, Mr. McGahey connected with Michael Alexandre again and submitted another complete loss mitigation application, hoping to get a more affordable payment.

92. Again Mr. McGahey had changed circumstances in that he could not maintain the modification payments and had unexpected housing expenses as outlined in his hardship letter submitted to PHH.

93. In a letter dated June 4, 2015, PHH misstated that Mr. McGahey did not qualify for a HAMP modification because he did not "successfully complete a previous HAMP offer…."   A true and accurate copy of the June 4, 2015 offer letter is attached here as Exhibit 16 and incorporated herein by reference.

94. In June 2015, PHH did offer Mr. McGahey a TPP with three monthly payments of $1339.98 beginning July 1, 2015. A true and accurate copy of the TPP offer is attached hereto as Exhibit 17 and incorporated herein by reference.

95. PHH knew or should have known this was an unaffordable payment amount based on Mr. McGahey's submitted financial information.

96. Believing this was the only option he qualified for to save his home, Mr. McGahey accepted the TPP and made all three monthly payments on time.

97. The TPP was not pursuant to HAMP.

98. As of June 1, 2015, Mr. McGahey was eligible for a HAMP modification with a monthly payment of around $1177.70 based on his income at the time of $1374 in SSDI and a $1665 per month contribution from his father.

99. On June 12, 2015 Mr. McGahey delivered to PHH a Qualified Written Request (QWR) and Notice of Error (NOE) pursuant to 12 C.F.R. 1024.35 of the Real Estate Settlement Procedures Act (RESPA) regarding the wrongful denial of HAMP and explaining that he was never offered a permanent HAMP modification.  He included copies of the modifications and denials.  A true and accurate copy of the June 12, 2015 NOE is attached here as Exhibit 18 and incorporated herein by reference.

100.     Mr. McGahey also submitted a similar complaint on June 12, 2015 to the Consumer Financial Protection Bureau (CFPB).

101.     PHH responded to the CFPB complaint in a letter dated July 10, 2015 acknowledging Mr. McGahey's successful completion of the 2009 HAMP TPP and also stating Mr. McGahey was offered a HAMP Modification Agreement. A true and accurate copy of the July 10, 2015 letter is attached here as Exhibit 19 and incorporated herein by reference.

102.     The Agreement referred to, and enclosed with the letter, is the same as Exhibit 2 (2010 Loan Mod) above and is not a HAMP modification.

103.     PHH again claimed that, due to Mr. McGahey's previous default under the

HAMP program, he would not be eligible for another HAMP program. Exhibit 19.

104.     Mr. McGahey delivered a complaint to Fannie Mae on August 12, 2015 regarding

the wrongful HAMP denial.  A true and accurate copy of the August 12, 2015 Fannie

Mae complaint is attached here as Exhibit 20 and incorporated herein by reference.

105.     In a letter dated August 3, 2015, PHH offered Mr. McGahey a permanent

modification with a monthly payment of $1,336.91 beginning November 1, 2015.   A true

and accurate copy of the 2015 cover letter and Loan Modification Agreement is attached

here as Exhibit 21 and incorporated herein by reference.

106.     The 2015 Loan Modification was not under HAMP.

107.     Believing this was the only offer PHH he qualified for, Mr. McGahey timely

executed and returned the 2015 Loan Modification and began making timely monthly

payments.

108.     $8,372.61 in interest, advanced escrow, and a payment were added to the 2015

modified loan on which Mr. McGahey now pays 4% interest.

109.     PHH did not conduct a full evaluation of Mr. McGahey for a HAMP

modification.

110.     Mr. McGahey was eligible for a HAMP modification

111.     In emails between Michael Alexandre and Jack Maloney, Senior Business

Manager of Fannie Mae, in September and October 2015, Maloney again represented that

Mr. McGahey did not qualify for a HAMP because of a previous HAMP modification

failure.  A true and accurate copy of September and October 2015 emails between

Alexandre and Maloney are attached here as Exhibit 22 and incorporated herein by reference.

112.     On October 30, 2015, Mr. McGahey sent another QWR under RESPA to PHH requesting information regarding his loan, particularly the 2009 TPP and Modification  A true and accurate copy of the October 30, 2015 letter is attached here as Exhibit 23 and incorporated herein by reference.

113.     PHH responded to Mr. McGahey's QWR in a letter dated December 1, 2015 stating that Mr. McGahey successfully completed the 2009 TPP but, due to his decrease in income, was provided a Standard Loan Modification, not a HAMP modification.  A true and accurate copy of the December 1, 2015 letter is attached here as Exhibit 24 and incorporated herein by reference.

114.     PHH did not address or correct the 2012 and 2015 wrongful denials based incorrectly on the alleged unsuccessful completion of a HAMP.

115.     Mr. McGahey again retained and paid counsel $100 to deliver another QWR/ NOE on January 27, 2016 to PHH.   A true and accurate copy of the January 27, 2016 letter with proof of delivery is attached here as Exhibit 25 and incorporated herein by reference.

116.     PHH responded to the January 27, 2016 QWR in a letter dated March 7, 2016.   A true and accurate copy of the March 7, 2016 letter is attached here as Exhibit 26 and incorporated herein by reference.

117.     In the March 7, 2016 response, PHH stated that the 2009 modification was a Standard Loan Modification, not a HAMP modification but did not address or correct the subsequent wrongful denials for a HAMP modification.

118.     On March 24, 2016, Mr. McGahey, through counsel, delivered a demand letter pursuant to the Maine Unfair Trade Practices Act (UTPA) 5 M.R.S. §213 to PHH.

119.     PHH responded in a letter dated April 8, 2016 that they received the March 24, 2016 letter but that, because the issues were the same as those raised in previous letters and to which PHH had previously responded, they would not take any action regarding the account.

120.     Mr. McGahey again is struggling to make his monthly payment under the current modification.

121.     Mr. McGahey suffered monetary damages due to PHH's wrongful denial of him for a HAMP modification.

122.     Had PHH provided Mr. McGahey the HAMP modification he was eligible for in September 2012, he would have had a loan with a 2% initial interest rate with monthly payment of $1183.89.  Instead, he was provided a modification in 2013 with a monthly payment, first $1,501.68 for the TPP for five months, then the permanent modification payment of $1630.73 and then $1625.22 which he struggled to pay.  The 2013 permanent Loan Modification had a higher interest rate and longer term then a HAMP would have had.

123.     As a result of the inflated payment amount, Mr. McGahey was not able to sustain the 2013 Loan Modification.  He was wrongfully denied a HAMP modification again in 2015 and, on the non-HAMP modification he was offered and accepted in 2015, he has to pay an additional $8,372.61 in escrow, interest, and a payment to the loan that had accrued per the non-HAMP modification terms.  He is also paying 4% interest on that money.  In addition, his monthly payment is $1336.91 instead of $1183.89.

124.    Upon information and belief, PHH does not have proper policies and procedures in place to process and properly report on a loan when a HAMP TPP is completed but a non-HAMP modification is then offered to borrowers.

125.    Upon information and belief, PHH and Fannie Mae do not have proper policies and procedures in place to evaluate and correct the problem when a wrongful denial of a loan modification has occurred.

126.    Upon information and belief, PHH and Fannie Mae have engaged in a pattern and practice of failing to process a loan when a HAMP TPP is completed but a non-HAMP modification is then offered to borrowers.

127.    Upon information and belief, PHH and Fannie Mae have engaged in a pattern and practice of failing to correct the problem when a wrongful denial of a loan modification has occurred.

128.    Mr. McGahey suffered financially by having to make higher monthly payments than he would have under a HAMP.  Mr. McGahey also suffered a loss in equity in the property as his past due amounts were capitalized into the 2015 loan modification, increasing his principal balance. The loan also accrued interest at a higher rate than it would have under a HAMP modification and now he is paying interest on that interest at a higher rate than under a HAMP modification.

129.    He had to pay an attorney to assist him with the 2012-2013 loan modification application and denial and to send an additional QWR to PHH when they failed to address and correct the wrongful HAMP denials.   He was also forced to travel to Sanford and Biddeford several times to meet with Michael Alexandre and his attorney.

130.     Mr. McGahey has also suffered harm to his credit by his predictable inability to sustain the inflated monthly payments offered.

131.     PHH's wrongful conduct caused Mr. McGahey's home to be at risk.  The stress and pressure of losing his home and having to make inflated mortgage payments each month was extreme and severe.  Mr. McGahey could not understand why PHH kept misrepresenting that he failed a HAMP modification when he never had a HAMP modification, telling him he did not qualify for a more affordable loan payment and had to pay up to $500 extra per month, and would not adjust the loan even when they admitted he had never had a HAMP.  Mr. McGahey struggled each month to come up with the money to make the payment.  He cut back on everything he could; groceries, heat, hot water, gifts, and going out.  Mr. McGahey felt worthless and overcome with guilt that he could not make the payments on the house.  He saw that his mother suffered from anxiety around losing the home too and that made him feel increased guilt and shame.  He tried to keep the situation away from his ageing, ailing father.  He was always irritable, impatient, and fought with his father and two sons.  He became reclusive because of lack of money but also because he was depressed and over time, he grew distant from all of his friends.  He would only leave the house to buy groceries.  At his lowest point, about two years ago, the sense of failure and distress of losing the home became intolerable and he began to have suicidal ideations.  Mr. McGahey continues to suffer from anxiety and distress over the fact that his home is at risk and is dependent on him making an unaffordable mortgage payment each month.  He fears constantly that he will lose the home, displacing his elderly father who now suffers from dementia, which would cause him undue turmoil and utter confusion.

## IV.    CLAIMS

### Count I: Violation of the Unfair Trade Practices Act, 5 M.R.S.A. § 205-A et. seq. (PHH and Fannie Mae)

132.    The Plaintiff repeats and realleges and incorporates by reference the paragraphs above as if fully set out herein.

133.    The Defendants violated the Maine Unfair Trade Practices Act by engaging in unfair and deceptive conduct, including but not limited to: (a) providing Mr. McGahey with an unaffordable, unsustainable modification in 2010; (b) failing to evaluate him fully for a HAMP modification in 2012/2013; (c) failing to provide the reasons why he was denied in 2012/2013; (d) misrepresenting that he was not eligible for a HAMP modification because he had failed to complete a prior HAMP modification; (e) providing him a modification that was less advantageous than a HAMP modification with unaffordable monthly payments; (f) continuing with a foreclosure action against him while he was appealing the wrongful HAMP denial; (g) failing to correct the error when it was brought to PHH's attention several times and then even after PHH admitted there had never been a HAMP modification; (h) failing again in 2015/2016 to fully evaluate Mr. McGahey for a HAMP modification and again wrongfully denying him a HAMP modification and offering him only a more expensive, less affordable modification; and (i) failing to comply with the Fannie Mae Servicing Guide.

134.    Such conduct was unfair and deceptive as it was likely to mislead the average consumer and did mislead Mr. McGahey into accepting and paying on the more expensive modifications, believing he did not qualify for a HAMP modification that would have been more affordable.

135.     Based on PHH's misrepresentations of the material terms of the loan modifications available and not available to Mr. McGahey, Mr. McGahey was misled to believe the only way to save his house was to pay under the unaffordable loan modifications offered.

136.     PHH's conduct was also likely to cause consumers, and did cause Mr. McGahey substantial injury in having to pay more each month on his mortgage than he should have. Such injury was not avoidable as PHH presented the loan modifications as the only option to save his home and misrepresented that he was not eligible for the more affordable HAMP modification.

137.     Mr. McGahey suffered substantial actual damages as a result of PHH's conduct as described above and by, including but not limited to 1) paying more than he should have each month on the loan at a higher interest 2) having interest accrue at a higher rate than it would have under a HAMP modification 3) incurring and paying late fees and costs when he inevitably fell behind and 4) paying interest on the capitalized interest, fees, and costs at a higher rate when the past due interest, fees, and costs were added to his modified loan.

138.     In addition to the actual loss of money, Mr. McGahey's actual damages include the physical and emotional damages described above as a direct result of PHH's unfair and deceptive conduct.

139.     As the principal of PHH, Fannie Mae is jointly and severally liable for PHH's conduct.

140.     The Plaintiff is entitled to judgment for actual damages, attorneys' fees and costs, equitable and/or injunctive relief in ordering PHH and Fannie Mae to implement a

HAMP modification retroactively to 2012 and apply all payments made to date per that modification, pre-judgment and post-judgment interest at the legal rate, and such other relief the Court does deem just, equitable, and proper.

**Count II: Violation of the Real Estate Settlement Procedures Act 12 U.S.C. § 2605 et seq. (PHH)**

141.     The Plaintiff repeats and realleges and incorporates by reference the paragraphs above as if fully set out herein.

142.     Mr. McGahey, individually and through counsel, delivered qualified written requests (QWRs) to PHH on August 28, 2013, June 12, 2015, October 15, 2015, and January 27, 2016 all of which were to PHH's designated address. The name of the borrower, the account number, and a statement of the reasons why Mr. McGahey believed the account was in error were included in the NOEs.

143.     PHH failed to provide the information requested in the August 28, 2013 QWR, particularly information related to the problem at issue in this complaint- the existence of previous modifications.

144.     PHH failed to correct the errors alleged by Mr. McGahey in the June 12, 2016 QWR/ NOE regarding the wrongful denials of HAMP modifications in 2012/13 and 2015/16.

145.     Due to PHH's failure to correct the errors regarding the wrongful HAMP denial, Mr. McGahey paid an attorney $100 to deliver another QWR/NOE to PHH.

146.     PHH failed to correct the errors alleged by Mr. McGahey in the January 27, 2016 QWR/ NOE regarding the wrongful denials of HAMP modifications in 2012/13 and 2015/16.

147.     PHH failed to respond per the statute on at least three separate occasions, which

constitutes a pattern and practice of violation of RESPA.

148.     Had PHH provided the information requested, investigated the issues and

corrected the account, Mr. McGahey would not have had to incur fees with counsel to

help fix the error and he would have received an affordable, sustainable modification in

2012 under HAMP instead of having to sacrifice to pay an inflated monthly payment.

149.     Mr. McGahey also would not have suffered the emotional distress described

above as he would have been able to afford the mortgage payments under a HAMP

modification, would not have struggled to pay an inflated amount each month, and would

have felt secure in his home.

150.     Mr. McGahey is entitled to actual and statutory damages, as well as attorneys'

fees and costs, and any other relief the Court deems appropriate.

## Count III: Intentional Infliction of Emotional Distress
### (PHH and Fannie Mae)

151.     The Plaintiff repeats and realleges and incorporates by reference the paragraphs

above as if fully set out herein.

152.     PHH engaged, and continues to engage, in reckless, extreme, and outrageous

conduct by continuing to misrepresent that Mr. McGahey is not eligible for a HAMP

based on a previous HAMP modification failure when PHH knows and now admits that

he never had a previous HAMP modification.  Exhibits 19, 24, 26.

153.     PHH's reckless conduct includes offering Mr. McGahey only loan modifications

that were significantly more expensive than HAMP modifications would have been, on

which they stood to profit.

154.     Despite his, his counsel's, and his housing advocate's efforts to correct the error, PHH and Fannie Mae refused to evaluate Mr. McGahey fully for a HAMP modification. Instead, they repeatedly misstated that Mr. McGahey failed to complete a HAMP modification but then only recently agreed he completed the HAMP TPP in 2009 and that the modification he received in 2010 was not under HAMP.  Yet they have done nothing the correct the past harm and wrongful denials to Mr. McGahey.

155.     PHH and Fannie Mae had the 2010 modification in their possession and records since 2010.  Yet they refused to provide it in response to a QWR and then refused to correct their wrongful denials when they realized the modification was not under HAMP.

156.     PHH and Fannie Mae represented in 2012/13 and 2015 that the only modification Mr. McGahey qualified for was one that required significantly higher monthly payments and less advantageous loan terms than a HAMP modification would have provided.

157.     Meanwhile, PHH and Fannie Mae made more money on the loan as interest accrued at a higher rate than a HAMP and all past due interest was capitalized into the subsequent modifications to be paid with interest- again at a rate higher than HAMP.

158.     PHH and Fannie Mae knew or should have known Mr. McGahey would rely on their misrepresentations in accepting the inflated modifications to save his home from foreclosure.  They also knew or should have known someone with Mr. McGahey's fixed income would have to struggle and sacrifice to make the inflated monthly mortgage payments and that such struggle would lead to both financial and emotional hardship.

159.     PHH and Fannie Mae's conduct did cause Mr. McGahey severe emotional distress described above including but not limited to constantly worrying about losing his home and displacing his elderly parents, always worrying about how to make the next

mortgage payment, feeling worthless, guilty and ashamed for failing to make the inflated payments, and suffering from extreme anxiety and depression leading to suicidal ideations.  The emotional distress was so severe that no reasonable person could be expected to endure it and in fact, Mr. McGahey reached the point where he believed he could no longer endure it and had a plan to end his life.

160.     PHH and Fannie Mae's conduct of knowingly and recklessly misrepresenting ineligibility for an affordable modification that Mr. McGahey could sustain and instead, placing him in unaffordable modifications that would set him up for failure, all the while making more and more money on the loan, is so extreme and outrageous as to exceed the bounds of decency and is intolerable in our civilized society.

161.     Had PHH and Fannie Mae placed Mr. McGahey in a HAMP modification in 2012/13, he would have been current today and would have avoided over three years of anxiety, depression, shame, and suicidal ideations.

162.     As stated above, upon information and belief PHH has engaged in a pattern and practice of the conduct alleged here.

163.     Upon information and belief, PHH and Fannie Mae have inadequate policies and procedures to process a HAMP TPP that has converted to a non-HAMP permanent modification and to process wrongful denials of HAMP modifications.

164.     Such misconduct was done knowingly, willfully, wantonly, and with implied or actual malice.

165.     The Defendants are liable to the Plaintiff for damages for emotional distress and punitive damages, and for such other and further relief as may be just and proper.

**Count IV: Fraud**
**(PHH/ Fannie Mae)**

166.     The Plaintiff repeats and realleges and incorporates by reference the paragraphs above as if fully set out herein.

167.     PHH and Fannie Mae engaged in fraud against the Plaintiff.

168.     PHH and Fannie Mae made false statements about material facts when they represented that Mr. McGahey was not eligible for HAMP based on a prior HAMP failure and when they offered him a more expensive, less affordable modification options instead.  PHH and Fannie Mae knew or should have known Mr. McGahey did not fail a prior HAMP; they had a copy of the 2010 modification that was clearly not a HAMP modification.

169.     PHH and Fannie Mae made such misrepresentations to induce Mr. McGahey into the more expensive 2013 and 2015 loan modifications.

170.     Mr. McGahey justifiably relied on the denials for HAMP when entering into and paying on the more expensive loan modifications.

171.     Mr. McGahey suffered financially and emotionally as detailed above as a result of PHH and Fannie Mae's fraud.

172.     Such conduct by PHH and Fannie Mae was calculated to benefit PHH and Fannie Mae financially.

173.     As stated above, upon information and belief PHH and Fannie Mae have engaged in a pattern and practice of the conduct alleged here.

174.     Upon information and belief, PHH and Fannie Mae have inadequate policies and procedures to process a HAMP TPP that has converted to a non-HAMP permanent modification and to process wrongful denials of HAMP modifications.

175.     PHH and Fannie Mae's conduct was deliberate, knowing, intentional, and so outrageous and egregious as to constitute malice or at least to imply malice.

176.     As such, the Plaintiff is entitled to actual, compensatory, and punitive/exemplary damages, and to any other relief this Court finds just and appropriate.

### Count V: Violation of 9-A M.R.S. §9-401: Misrepresentation
### (PHH and Fannie Mae)

177.     The Plaintiff repeats and realleges and incorporates by reference the paragraphs above as if fully set out herein.

178.     PHH and Fannie Mae induced Mr. McGahey into the 2013 and 2015 loan modifications by misrepresenting he was not eligible for a HAMP modification.

179.     Mr. McGahey's eligibility for a HAMP modification was a material fact in his determination to accept the more expensive modifications he was offered.  He was desperate to save his home and, if he did not qualify for a HAMP modification, he had to accept what was offered even though it was unaffordable.

180.     Mr. McGahey suffered financial and emotional harm as outlined above including but not limited to paying out each month more than he would have under a HAMP, accruing interest at a higher rate, having interest capitalized into the 2015 loan modification and paying on accrued interest at a higher rate, loss of equity in the home, harm to his credit, and suffering from depression, anxiety, shame, and suicidal ideations.

181.     Mr. McGahey is entitled to rescission of the loan modifications, actual damages, statutory damages, and attorneys' fees and costs of this action.

### DEMAND FOR JURY TRIAL

Please take notice that Plaintiff demands a trial by jury in this action.


Dated at Portland, Maine, this 26ht day of April, 2016.


/s/*Andrea Bopp Stark*
Andrea Bopp Stark, Esq.
Counsel for the Plaintiff
Molleur Law Office
419 Alfred Street
Biddeford, Maine 04005
Andrea@molleurlaw.com
(207)283-3777