# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| **Walter McGahey,** | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No.   2:16-cv-00219-JDL |
| | ) |
| **Federal National Mortgage Association** | ) |
| | ) |
| **PHH Mortgage Corporation,** | ) |
| | ) |
| Defendants | ) |
| | ) |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### I.      Introduction

Walter McGahey bought his parents' home in 2006 to ensure they would be able to live there

the remainder of their lives.  He built an apartment above the garage and moved in.  In 2009, Mr.

McGahey fell on hard financial times and fell behind on the mortgage.  He applied for a loan

modification and after completing a trial plan, was given a standard Fannie Mae modification

with an unaffordable monthly payment that was more than his monthly income.  He could not

sustain the payment and applied for another modification in 2011 and again in 2015.  Each time

PHH misrepresented that he was not eligible for a modification under the Making Home

Affordable Program (HAMP) and provided him instead a more expensive, unsustainable

modification.  The reason PHH provided for denying him the HAMP modification each time was

that he already had received, and failed to complete, a HAMP modification.  This reason given

for each denial was wrong.  Mr. McGahey has never been provided the opportunity to perform

under an affordable permanent HAMP modification but instead, has continually been given

modifications with monthly payments and interest rates much higher than they would be under HAMP. Even when PHH finally acknowledged recently, after repeatedly being informed of the error, that Mr. McGahey had never been provided a permanent HAMP modification, they did nothing to correct the wrongful denials. Mr. McGahey has struggled and sacrificed both financially and mentally to sustain these unaffordable modifications so that his parents could live out the remainder of their lives in the home. Mr. McGahey was able to fulfill his promise to his mother who passed away in December 2015 but his 93-year-old father still lives in the home with him and needs his constant care. PHH's conduct was unfair and deceptive in violation of the Maine Unfair Trade Practices Act 5 M.R.S.A. § 205-A et. seq.; constituted Fraud toward Mr. McGahey, violated the Real Estate Settlement Procedures Act 12 U.S.C. § 2605 et seq., and violated the Maine Consumer Credit Code, 9-A M.R.S. §9-401.

## II.     Jurisdiction and Venue

1.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1367.

2.     Venue is proper here pursuant to 28 U.S.C. § 1391, as Plaintiff is a resident of York County, Maine, all relevant events giving rise to Plaintiff's claims occurred in this District, and Defendant was doing business in Maine during all relevant times.

## III.     Parties

3.     Plaintiff Walter W. McGahey is a natural person residing in Saco, Maine.

4.     Defendant, PHH Mortgage Corporation ("PHH") is a corporation organized under the laws of New Jersey.

5.     At all relevant times to this complaint, PHH was and is the servicer of Mr. McGahey's mortgage loan on property located at 42 McKenney Road in Saco, Maine ("loan").

6. Federal National Mortgage Association ("Fannie Mae") is the owner of the loan on 42 McKenney Road in Saco, Maine.

7. Fannie Mae is, and at all times relevant hereto was the owner of the loan and engaged in business throughout the State of Maine, with a corporate address of 3900 Wisconsin Avenue, NW, Washington, DC 20016-2892.

8. Fannie Mae retained PHH to service the loan and PHH has acted under the direction, control and authority of Fannie Mae.

## IV.    Facts

9. Walter McGahey is the owner of certain real property located at 42 McKenney Road, Saco, Maine, by virtue of a deed from his parents George L. McGahey and Helen I. McGahey dated April 20, 2006 and recorded in the York County Registry of Deeds on April 27, 2006 in Book 14818, Page 53.

10. He bought the home from his parents and moved in so that they could live in the home for the remainder of their lives.

11. On May 22, 2006, Walter W. McGahey executed and delivered to TD Banknorth, N.A., a certain promissory note in the original principal amount of $170,000.00 (the "Note").

12. To secure the Note, Walter W. McGahey executed and delivered to Mortgage Electronic Registration Systems, Inc., as nominee for TD Banknorth, N.A., its successors and assigns, a mortgage in the amount of $170,000.00 which mortgage was recorded on June 7, 2006 in the York County Registry of Deeds in Book 14860, Page 847 (the "Mortgage"). Together the Mortgage and Note are hereinafter referred to as the loan.

13. From the closing date of the loan on May 22, 2006 to the present, Fannie Mae has been the owner of the Loan.

14. From at least July 2009 to the present, PHH has been the servicer of the subject loan.

15. PHH has worked under the direction, control and authority of Fannie Mae in servicing the Loan.

16. PHH is required to follow Fannie Mae regulations and guidelines, particularly the Fannie Mae Servicing Guide, in servicing the Loan.

17. In 2009, due to medical issues and job loss, Mr. McGahey fell behind on the mortgage and applied for loss mitigation.

18. At the time he applied, his monthly income was around $3,387.67.

19. His monthly principal, interest, taxes, and insurance (PITI) payment on the loan in 2009 was less than $1500.

20. PHH delivered a Trial Payment Plan (TPP) offer per the Fannie Mae Home Affordable Modification Program (HAMP) on or around July 2009. A true and accurate copy of the TPP is attached hereto and incorporated herein as Exhibit 1.

21. The TPP required Mr. McGahey to make payments in the amount of $1031.79 on August 5, September 1, and October 1, 2009. *See* Exhibit 1. Exhibits 2 and 3 attached hereto and incorporated herein are PHH letters acknowledging the TPP.

22. Mr. McGahey timely signed and returned the TPP and timely made all payments required by the TPP. *See* Exhibit 1, 2 (PHH acknowledging Mr. McGahey's "successful completion of the trial plan").

23. Mr. McGahey successfully completed the HAMP TPP. *See* Exhibits 2, 22, 34.

24. On or around December 21, 2009, PHH delivered to Mr. McGahey a Loan Modification Agreement. A copy of the Cover letter and fully executed Loan Modification Agreement is attached hereto as Exhibit 4.

25. The Loan Modification was not provided pursuant to Fannie Mae HAMP.

26. The loan was not modified under Fannie Mae HAMP.

27. The monthly principal, interest, and escrow payment under the Loan Modification was $1,456.49.

28. At the time, Mr. McGahey's income was $979.33 per month due to a recent job loss.

29. The Loan Modification required an initial contribution amount of $1,987.07.

30. Believing this was the only way to save his home, Mr. McGahey timely signed and returned the modification and provided the contribution payment.

31. With the help of his parents, he made the monthly payments for about a year, until December 2011.

32. He also sold his car to help make the mortgage payments.

33. After that it was just too difficult to come up with the unaffordable amount.

34. PHH knew or should have known this was an unaffordable payment amount based on Mr. McGahey's submitted financial information.

35. In June, 2012, PHH delivered a notice of intention to foreclose to Mr. McGahey.

36. Shortly thereafter, Mr. McGahey retained counsel to help him apply for a more affordable loan modification to prevent the foreclosure.

37. Mr. McGahey submitted a complete loss mitigation application to PHH requesting to be reviewed for HAMP on August 31, 2012.

38. At that time, Mr. McGahey was experiencing a change in circumstances from the 2009/2010 modification in that he was receiving SSDI income and not wages and was unable to make the monthly modified payment. He explained this in his hardship letter to PHH as part of his loss mitigation application.

39. As of August 12, 2012, the estimated fair market value of the property was between $180,000 and $200,000. A true and accurate copy of a comparative market analysis from August 10, 2012 is attached here as Exhibit 5 and incorporated herein by reference.

40. Mr. McGahey's income as submitted to PHH, together with his father's contribution, equated to around $3,819 per month when adding a multiplier of 1.25 as required by Fannie Mae for the non-taxed income.

41. On September 25, 2012, PHH sent Mr. McGahey a letter stating that they were unable to offer him a HAMP modification but provided no reason for the denial. A true and accurate copy of the September 25, 2012 letter is attached here as Exhibit 6 and incorporated herein by reference.

42. PHH knew or should have known Mr. McGahey was eligible to at least be evaluated for, if not offered, a HAMP at that time as they possessed the original non-HAMP modification and Mr. McGahey's complete loss mitigation packet.

43. PHH is required to follow the Fannie Mae Single Family Servicing Guides which can be found at https://www.allregs.com/tpl/Main.aspx.[1]

44. The Servicing Guide in place at the time of the 2012 loan modification evaluation was the 2012 Servicing Guide and the most applicable provisions are at Part VII: Delinquency Management and Default Prevention.

45. PHH was and is required to participate in HAMP for Fannie Mae Loans. *See* The Fannie Mae Single Family 2012 Servicing Guide, Part VII, §609 attached hereto as Exhibit 7.

46. PHH was required to evaluate Mr. McGahey's loan first for a HAMP modification and if found ineligible, then for a Fannie Mae standard mortgage loan modification. *See* The

---

[1] The Fannie Mae Single Family Servicing Guides are extensive and therefore not entirely included herewith but are available upon the Court's request.

Fannie Mae Single Family 2012 Servicing Guide, Part VII, §602.02 attached hereto as Exhibit 8.

47. On September 25, 2012, Mr. McGahey was eligible for a Fannie Mae HAMP modification. He met all the eligibility criteria under Fannie Mae HAMP.

    a. The loan is a first-lien conventional mortgage loan originated on or before January 1, 2009;

    b. The loan was never previously modified under HAMP;

    c. The mortgage loan was delinquent or in default;

    d. The mortgage loan is secured by a one- to four-unit property, which is Mr. McGahey's principal residence;

    e. The property securing the mortgage loan is not vacant or condemned;

    f. Mr. McGahey documented a financial hardship and represented that he does not have sufficient liquid assets to make the monthly mortgage payments by completing a Request for Modification and Affidavit (RMA) and providing the required income documentation. The documentation supporting income was not more than 90 days old;

    g. His current monthly mortgage payment ratio was greater than 31%;

    h. Mr. McGahey agreed to set up an escrow account for taxes, hazard insurance, and flood insurance prior to the beginning of the trial;

    i. His loan was not a "full recourse," "MSB" or "portfolio" loan; and

    j. PHH had the required functionality to process the HAMP loan modification.

48. The Fannie Mae Single Family 2012 Servicing Guide, Part VII, §609.01, attached hereto as Exhibit 9, recites the HAMP loan modification eligibility criteria.

49. Even though Mr. McGahey was evaluated for HAMP in 2009/2010 and was not offered a Fannie Mae HAMP after he completed the HAMP TPP due to his change in income, he can still request and be provided reconsideration for HAMP at a future time if experiencing a change in circumstances. The Fannie Mae Single Family 2012 Servicing Guide, Part VII, §602.02.02 attached hereto as Exhibit 10.

50. PHH was obligated under the Fannie Mae Single Family Servicing Guide to evaluate Mr. McGahey's application for a HAMP modification. *See* Exhibits 8 and 9.

51. Had PHH evaluated the application properly, pursuant to the Fannie Mae Guide, they would have found Mr. McGahey eligible for a HAMP modification and would have had to offer him a trial plan under Fannie Mae HAMP. *See* The Fannie Mae Single Family 2012 Servicing Guide, Part VII §205.08 attached hereto as Exhibit 11.

52. Mr. McGahey would have been able to afford and pay the Fannie Mae HAMP trial payments.

53. Fannie Mae HAMP provides a target monthly mortgage payment ratio as close as possible to 31 percent of the borrower's gross monthly income. *See* The Fannie Mae Single Family 2012 Servicing Guide, Part VII, §609.02.06 attached hereto as Exhibit 12.

54. For purposes of a Fannie Mae HAMP, the loan can be modified by capitalizing arrears, reducing the interest rate to a floor of 2%, extending the term to 40 years, and/or forbearing principal to reach the target ratio of 31 percent of the borrower's gross monthly income. *Id.*

55. Part of the Fannie Mae HAMP evaluation consists of using a standardized Net Present Value (NPV) test to determine eligibility. *See* The Fannie Mae Single Family 2012 Servicing Guide, Part VII, §609.02.04 attached hereto as Exhibit 13.

56. PHH did not evaluate the loan for Fannie Mae HAMP using an NPV.

57. Mr. McGahey never failed a HAMP TPP nor had he ever received a HAMP permanent modification and lost good standing per the Fannie Mae Servicing Guide.

58. Per an NPV calculation, a HAMP modification as of September 25, 2012, would have provided a monthly principal, interest, and escrow payment of about $1,183.89, a new capitalized principal balance of about $182,500 and an initial modified interest rate of 2%.

59. Based on payments made to counsel for assistance with a loan modification and to PHH in monthly mortgage payments from November 1, 2012 on, Mr. McGahey would have been able to sustain a monthly payment of $1,183.89 per month.

60. PHH did not provide any other written response regarding evaluation or eligibility for any other loss mitigation program besides HAMP to Mr. McGahey from August 31, 2012 to January 1, 2013.

61.  In a letter dated September 28, 2012, PHH, through counsel, stated they would continue with the foreclosure on the loan. A true and accurate copy of the September 28, 2012 letter is attached here as Exhibit 14 and incorporated herein by reference.

62. Mr. McGahey paid his counsel over $1,000 after that date to prevent the foreclosure and eventually appear in the foreclosure action, including participation in the foreclosure diversion program.

63. Through counsel, Mr. McGahey appealed the HAMP denial on October 2, 2012. A true and accurate copy of the October 2, 2012 letter is attached here as Exhibit 15 and incorporated herein by reference.

64. Through counsel, on October 4, 2012, Mr. McGahey sent a request to escalate the appeal of the HAMP denial and seeking they cease any further foreclosure activity on the Loan.

A true and accurate copy of the October 4, 2012 letter is attached here as Exhibit 16 and incorporated herein by reference.

65. Neither PHH nor their counsel responded to the October 2 or October 4, 2012 appeal and request to escalate the appeal of the HAMP loan modification denial.

66. PHH did not review the appeal or the request for escalation of the appeal denial.

67. PHH did not re-review Mr. McGahey's loan for a HAMP nor did they review this loan for other loss mitigation options. Further, PHH failed to provide any determination on any other loss mitigation evaluations they performed on the loan.

68. Mr. McGahey sought assistance from York County Community Action (YCCA), in collaboration with his counsel, regarding his denial for a HAMP modification near the end of October 2012.

69. Michael Alexandre, a HUD-certified housing counselor with YCCA, contacted PHH with Mr. McGahey on October 26, 2012.

70. PHH provided a false and misleading representation that Mr. McGahey did not complete a HAMP in 2009 and therefore was not eligible for another HAMP modification offer.

71. PHH further represented they were going to seek an exception through Fannie Mae for another modification.

72. On November 2, 2012, through counsel, Mr. McGahey emailed PHH to check on the status of the appeal but received no response.

73. On or around November 4, 2012, PHH filed a Complaint for Foreclosure against Mr. McGahey.

74. The case was captioned *PHH Mortgage Corporation v. Walter McGahey*, Docket No. RE-12-181, State of Maine District Court, Biddeford, York County.

75. PHH and Fannie Mae charged Mr. McGahey's account for their attorneys' fees related to the foreclosure action.

76. Mr. McGahey answered the complaint and requested to be placed in the Maine Foreclosure Diversion Program.

77. In a call on November 7, 2012 between Mr. Alexandre and PHH, PHH misrepresented again that Mr. McGahey did not qualify for a HAMP and the denial would stand.

78. In a letter dated December 3, 2012, PHH falsely and misleadingly represented that Mr. McGahey "for some reason" was not eligible for a HAMP modification but did not provide the reason. PHH offered Mr. McGahey a trial payment plan with a monthly payment of $1,633.47 beginning on January 1, 2013. A true and accurate copy of the December 3, 2012 letter is attached here as Exhibit 17 and incorporated herein by reference.

79. In an effort to continue to try and save his home with an affordable monthly payment, Mr. McGahey submitted another complete loss mitigation application for a HAMP modification to PHH, via their counsel, and also to Fannie Mae on December 4, 2012.

80. PHH acknowledged receipt of the application in a letter dated January 31, 2013.

81. The December 4, 2012 loss mitigation application included changed income, when accounting for a 1.25 multiplier for non-taxed income, equaling about $4,012.75 from Mr. McGahey's social security disability and his father's contribution of retirement income plus food stamps.

82. Mr. McGahey was eligible at this time for a Fannie Mae HAMP modification.

83. PHH knew or should have known Mr. McGahey was eligible to at least be evaluated for, if not offered, a HAMP at that time as they possessed the original non-HAMP modification and Mr. McGahey's complete loss mitigation packet.

84. PHH delivered to Mr. McGahey a notice dated February 13, 2013, offering a Trial Period Plan in the amount of $1,501.68 per month beginning March 1, 2013.  A true and accurate copy of the February 13, 2013 offer letter is attached here as Exhibit 18 and incorporated herein by reference.

85. In a second letter dated February 13, 2013, PHH offered Mr. McGahey a Trial Period Plan with a monthly payment of $1,625.19.   A true and accurate copy of the second February 13, 2013 offer letter is attached here as Exhibit 19 and incorporated herein by reference.

86. Neither of the February 13, 2013 TPP offers indicated they were provided pursuant to Fannie Mae HAMP.

87. Based on PHH's repeated false and misleading representations regarding his ineligibility for a Fannie Mae HAMP modification, Mr. McGahey forwent taking steps to pursue the HAMP at that time such as furthering an appeal, submitting another HAMP application, sending a demand letter, or pursuing litigation that could and should have resulted in a HAMP TPP modification and he accepted the first February 13, 2012 offer with a monthly payment of $1,501.68 and timely sent in the first TPP payment.

88. He was led to believe that if he did not take the modification offered, he would lose his home because he was not eligible for a better modification option: HAMP.

89. Mr. McGahey entered into the offer after given the misleading impression that he did not qualify for a HAMP.

90. In a letter dated February 18, 2013, PHH offered Mr. McGahey yet another TPP with monthly payments of $1,591.63 beginning April 1, 2013. A true and accurate copy of the February 18, 2013 offer letter is attached here as Exhibit 20 and incorporated herein by reference.

91. Mr. McGahey continued to send in timely payments per the $1,501.68 per month TPP and completed the TPP.

92. In a letter dated June 5, 2013, PHH offered Mr. McGahey a permanent Loan Modification with a monthly principal, interest, and escrow payment of $1,630.73 beginning June 1, 2013. The interest rate remained at 6.67% and the term of the loan was extended to 40 years. A true and accurate copy of the 2013 cover letter and Loan Modification is attached here as Exhibit 21 and incorporated herein by reference.

93. $28,678.00 in escrow advances, attorneys' fees and costs, recoverable advances, and interest were added to the modified loan balance on which Mr. McGahey would pay 6.675% interest. The new capitalized principal balance was $198,216.01. Exhibit 21.

94. The interest, fees, and costs accrued at the rate of 6.67% from the date of Mr. McGahey's wrongful denial of a Fannie Mae HAMP, September 2012, to June 1, 2013, which is a much higher rate than Mr. McGahey would have had under a Fannie Mae HAMP.

95. In the non-HAMP June 1, 2013 modification, Mr. McGahey paid 6.67% interest on that interest, fees, and costs that were capitalized into the principal balance. Exhibit 21.

96. The June 2013 Loan Modification was not offered pursuant to Fannie Mae HAMP and Mr. McGahey was not offered a permanent loan modification pursuant to HAMP.

97. PHH failed to evaluate Mr. McGahey for a Fannie Mae HAMP per the Fannie Mae guidelines.

98. PHH knew or should have known Mr. McGahey was eligible to at least be evaluated for, if not offered, a HAMP at that time as they possessed the original non-HAMP modification and Mr. McGahey's complete loss mitigation packet.

99. After 2010, PHH never completed a full evaluation, including an NPV, of the loan for a HAMP modification per the Fannie Mae guidelines.

100.     PHH's failure to follow the Fannie Mae guidelines caused them to misrepresent that Mr. McGahey was not eligible for a HAMP modification.

101.     Had PHH evaluated the application properly, pursuant to the Fannie Mae Guide, they would have found Mr. McGahey eligible for a HAMP modification and would have had to offer him a trial plan under Fannie Mae HAMP. *See* Exhibits 7-13, 37.

102.     Based on PHH's repeated misrepresentations regarding his ineligibility for a Fannie Mae HAMP modification, Mr. McGahey forwent taking steps to pursue the HAMP at that time such as furthering an appeal, sending a demand letter, submitting a new HAMP application, or pursuing litigation that could and should have resulted in a HAMP modification and he timely signed and returned the 2013 Loan Modification Agreement to PHH.

103.     He was led to believe that if he did not take the modifications offered, he would lose his home because he was not eligible for a better modification option under HAMP.

104.     Mr. McGahey entered into the offer after being given the misleading impression that he did not qualify for a HAMP.

105.     Mr. McGahey made at least 20 payments under the terms of the June 1, 2013 loan modification. *See* Exhibit 22 pp. 4-10.

106. Upon information and belief, including the payment history found at Exhibit 22 pp. 4-10, part of the payments Mr. McGahey made each month went to cover PHH and Fannie Mae's attorneys' fees involved in the 2012 foreclosure action, interest that accrued at a higher rate than a HAMP and 6.67% interest on that interest that had accrued from September 25, 2012 to June 1, 2013 and "recoverable advance" fees and the interest on those fees that accrued during September 25, 2012 to June 1, 2013.

107. These are costs Mr. McGahey would not have had to pay if PHH and Fannie Mae had properly managed the loan, including following Fannie Mae guidelines and accurately evaluating Mr. McGahey for eligibility under Fannie Mae HAMP.

108. PHH signed and returned the permanent agreement to Mr. McGahey on July 16, 2013.

109. On August 27, 2013, PHH called Mr. McGahey and alleged the permanent modification was not effective because it was signed in the wrong place. They would send a new modification for Mr. McGahey to sign.

110. Mr. McGahey feared PHH had not implemented the modification and was not applying his payment per the modification. He also feared they may continue the foreclosure against him.

111. On August 28, 2013, Mr. McGahey delivered a Qualified Written Request (QWR) to PHH requesting information regarding the loan including information regarding any modifications made to the loan. A true and accurate copy of the August 28, 2013 letter and proof of delivery is attached here as Exhibit 23 and incorporated herein by reference.

112. PHH responded to the August 28, 2013 letter in a letter dated September 10, 2013 but did not provide information regarding the 2010 Loan Modification. A true and

accurate copy of the September 10, 2013 letter is attached here as Exhibit 24 and incorporated herein by reference.

113.      In September 2013, PHH requested Mr. McGahey execute a new revised modification agreement with similar terms with a monthly payment of $1,625.22 and a capitalization of $27,756.55 in attorneys' fees, recoverable advances, advanced escrow, and interest to the loan. A true and accurate copy of the September 2013 Loan Modification is attached here as Exhibit 25 and incorporated herein by reference.

114.      The September revised 2013 Loan Modification was not a HAMP modification.

115.      Again, based on PHH's misrepresentations regarding his HAMP ineligibility, Mr. McGahey timely signed and returned the 2013 revised Loan Modification.

116.      PHH knew or should have known Mr. McGahey was eligible to at least be evaluated for, if not offered, a HAMP at that time as they possessed the original non-HAMP modification and Mr. McGahey's complete loss mitigation packet.

117.      Again, part of the payments made under the terms of the 2013 revised loan modification agreement went to cover PHH and Fannie Mae's attorneys' fees involved in the 2012 foreclosure action, interest that accrued at a higher rate than a HAMP and interest on that interest that had accrued from September 25, 2012 to June 1, 2013, "recoverable advance" fees, and interest on those fees that accrued during September 25, 2012 to June 1, 2013 that was all capitalized into the loan modification balance.

118.      These are costs Mr. McGahey would not have had to pay if PHH and Fannie Mae had properly managed the loan, including following Fannie Mae guidelines and accurately evaluating Mr. McGahey for eligibility under Fannie Mae HAMP.

119.     Mr. McGahey struggled for over two years to make the monthly payments on the 2013 TPP and Loan Modification.

120.     He had bought another used car but now had to sell it to help make the payments.

121.     PHH knew or should have known that $1,625.22 was an unaffordable payment amount based on Mr. McGahey's submitted financial information.

122.     In May 2015, Mr. McGahey connected with Michael Alexandre again and submitted another complete loss mitigation application, seeking again a modification under HAMP.

123.     Throughout the process of working with Mr. Alexandre in 2015, Mr. McGahey had to travel roundtrip at least two times from Saco to Sanford, paying gas and mileage expenses.  Each roundtrip was about 45 miles.

124.     Again Mr. McGahey had changed circumstances in that he could not maintain the modification payments and had unexpected housing expenses as outlined in his hardship letter submitted to PHH.

125.     In a letter dated June 4, 2015, PHH falsely and misleadingly represented that Mr. McGahey did not qualify for a HAMP modification because he did not "successfully complete a previous HAMP offer…."   A true and accurate copy (minus the handwritten notes) of the June 4, 2015 offer letter is attached here as Exhibit 26 and incorporated herein by reference.

126.     In June 2015, PHH offered Mr. McGahey a non-HAMP TPP with three monthly payments of $1,339.98 beginning July 1, 2015. A true and accurate copy of the TPP offer is attached hereto as Exhibit 27 and incorporated herein by reference.

127.    PHH knew or should have known Mr. McGahey was eligible to at least be evaluated for, if not offered, a HAMP at that time as they possessed the original non-HAMP modification and Mr. McGahey's complete loss mitigation packet.

128.    Had PHH evaluated the application properly, pursuant to the Fannie Mae Guide, they would have found Mr. McGahey eligible for a HAMP modification and would have had to offer him a trial plan under Fannie Mae HAMP. The Fannie Mae Single Family 2015 Servicing Guide, D2-3.2-07 is attached hereto as Exhibit 28.

129.    Mr. McGahey would have been able to afford and paid the Fannie Mae HAMP trial payments.

130.    PHH knew or should have known the modification payment offered was an unaffordable payment amount based on Mr. McGahey's submitted financial information.

131.    Based on PHH's repeated and persistent misrepresentations regarding his ineligibility for a Fannie Mae HAMP modification, Mr. McGahey forwent taking steps to pursue the HAMP at that time such as furthering an appeal, submitting another HAMP application, sending a demand letter, or pursuing litigation that could and should have resulted in a HAMP TPP modification and he accepted the TPP and made all three monthly payments on time.

132.    He was led to believe that if he did not take the modification offered, he would lose his home because he was not eligible for a better modification option: HAMP.

133.    Mr. McGahey entered into the offer after being given the misleading impression that he did not qualify for a HAMP.

134.    As of June 1, 2015, Mr. McGahey was eligible for a HAMP modification with a monthly payment of around $1,177.70 based on his income at the time of $1,374 in SSDI

and a $1,665 per month contribution from his father.  *See* The Fannie Mae Single Family

2015 Servicing Guide, Part D, D2-3.2-07, attached hereto as Exhibit 28.

135.        PHH was still required to abide by the Fannie Mae Single Family Servicing

Guide.  At this time it was the 2015 Guide.

136.        PHH was required to evaluate Mr. McGahey for a HAMP modification and

communicate that decision to Mr. McGahey.  The Fannie Mae Single Family 2015

Servicing Guide, Part F-2-12 and Part D, D2-2-05 are attached hereto as Exhibits 29 and

30.

137.        The provisions and requirements cited from the 2012 Servicing Guide above

remained the same or similar in the 2015 Guide.

138.        On June 12, 2015 Mr. McGahey delivered to PHH a Qualified Written Request

(QWR) and Notice of Error (NOE) pursuant to 12 C.F.R. 1024.35 of the Real Estate

Settlement Procedures Act (RESPA) regarding the wrongful denial of HAMP and

explaining that he was never offered a permanent HAMP modification.  He included

copies of the modifications and denials.  A true and accurate copy of the June 12, 2015

NOE is attached here as Exhibit 31 and incorporated herein by reference.

139.        Mr. McGahey also submitted a similar complaint on June 12, 2015 to the

Consumer Financial Protection Bureau (CFPB).

140.        PHH responded to the CFPB complaint, not the NOE, in a letter dated July 10,

2015 acknowledging Mr. McGahey's successful completion of the 2009 HAMP TPP and

also misrepresenting that Mr. McGahey was offered a HAMP Modification Agreement.

A true and accurate copy of the July 10, 2015 letter is attached here as Exhibit 2 and

incorporated herein by reference.

141.     The Agreement referred to, and enclosed with the letter, the same as Exhibit 4 (2010 Loan Mod) above and is not a HAMP modification.

142.     PHH again misrepresented that, due to Mr. McGahey's previous default under the HAMP program, he would not be eligible for another HAMP program. Exhibit 2.

143.     Mr. McGahey delivered a complaint to Fannie Mae on August 12, 2015 regarding the wrongful HAMP denial.  A true and accurate copy of the August 12, 2015 Fannie Mae complaint is attached here as Exhibit 32 and incorporated herein by reference.

144.     In a letter dated August 3, 2015, PHH offered Mr. McGahey a non-HAMP permanent modification with a monthly payment of $1,336.91 beginning November 1, 2015.   The interest rate was 4% and with a 40-year term. A true and accurate copy of the 2015 cover letter and Loan Modification Agreement is attached here as Exhibit 33 and incorporated herein by reference.

145.     The 2015 Loan Modification was not under Fannie Mae HAMP.

146.     The new capitalized principal balance on the 2015 modification was $203,832.61. Exhibit 33.

147.     Based on information and belief, the fair market value of the property around October 2015 ranged from $208,000 to $259,500.

148.     The increase in the principal balance cut into equity Mr. McGahey had in the property.

149.     $8,372.61 was added to the principal balance for Escrow advances and accrued interest. $6,866.23 of that was the accrued interest at the old 6.67% rate.  The new interest rate was 4%. Exhibit 33.

150.     Based on PHH's repeated and persistent false and misleading representations regarding his ineligibility for a Fannie Mae HAMP modification, Mr. McGahey forwent taking steps to pursue the HAMP at that time such as furthering an appeal, submitting another HAMP application, sending a demand letter, or pursuing litigation that could and should have resulted in a HAMP modification and he timely executed and returned the 2015 Loan Modification and began making timely monthly payments.

151.     He was led to believe that if he did not take the modifications offered, he would lose his home because he was not eligible for a better modification option under HAMP.

152.     Mr. McGahey made several payments under the terms of the 2015 modification. Upon information and belief, including the payment history found at Exhibit 22, part of the payments Mr. McGahey made went to cover PHH and Fannie Mae's attorneys' fees involved in the 2012 foreclosure matter, interest that accrued at a higher rate than HAMP and interest on the interest that had accrued from September 25, 2012 to June 1, 2013, "recoverable advance" fees, interest on those fees that accrued during September 25, 2012 to June 1, 2013, and interest that accrued at a higher rate than HAMP plus interest on the interest that accrued under the 2013 loan modification terms that was capitalized into the 2015 loan modification balance.

153.     These are costs Mr. McGahey would not have paid if PHH and Fannie Mae had properly managed the loan, including following Fannie Mae guidelines and accurately evaluating Mr. McGahey for eligibility under Fannie Mae HAMP in 2012.

154.     PHH did not conduct a full evaluation of Mr. McGahey for a Fannie Mae HAMP modification.

155.     In emails between Michael Alexandre and Jack Maloney, Senior Business Manager of Fannie Mae, in September and October 2015, Maloney misrepresented that Mr. McGahey did not qualify for a HAMP because of a previous HAMP modification failure.  A true and accurate copy of September and October 2015 emails between Alexandre and Maloney are attached here as Exhibit 34 and incorporated herein by reference.

156.     On October 30, 2015, Mr. McGahey sent another QWR under RESPA to PHH requesting information regarding his loan, particularly the 2009 TPP and Modification  A true and accurate copy of the October 30, 2015 letter is attached here as Exhibit 35 and incorporated herein by reference.

157.     PHH responded to Mr. McGahey's QWR in a letter dated December 1, 2015 stating that Mr. McGahey successfully completed the 2009 TPP but, due to his decrease in income, was provided a Standard Loan Modification, not a HAMP modification.  A true and accurate copy of the December 1, 2015 letter is attached here as Exhibit 22 and incorporated herein by reference.

158.     PHH did not address or correct the 2012 and 2015 wrongful denials based incorrectly on the alleged unsuccessful completion of a HAMP.

159.     Mr. McGahey again retained and paid counsel $100 to deliver another QWR/ NOE on January 27, 2016 to PHH.   A true and accurate copy of the January 27, 2016 letter with proof of delivery is attached here as Exhibit 36 and incorporated herein by reference.

160.     PHH responded to the January 27, 2016 QWR in a letter dated March 7, 2016.   A true and accurate copy of the March 7, 2016 letter is attached here as Exhibit 3 and incorporated herein by reference.

161.     In the March 7, 2016 response, PHH stated that the 2009 modification was a Standard Loan Modification, not a HAMP modification but did not address or correct the subsequent wrongful denials for a HAMP modification.  Exhibit 3.

162.     On March 24, 2016, Mr. McGahey, through counsel, delivered a demand letter pursuant to the Maine Unfair Trade Practices Act (UTPA) 5 M.R.S. §213 to PHH.

163.     PHH responded in a letter dated April 8, 2016 that they received the March 24, 2016 letter but that, because the issues were the same as those raised in previous letters and to which PHH had previously responded, they would not take any action regarding the account.

164.     Mr. McGahey again is struggling to make his monthly payment under the current modification.

165.     On July 14, 2016, through counsel and the help of York County Community Action, Mr. McGahey submitted a new loan modification application seeking a HAMP modification.  He has not received a response on the application.

166.     PHH engaged in persistent misprocessing and mismanagement of Mr. McGahey's loan including failing to follow Fannie Mae guidelines, failing to evaluate him properly for a Fannie Mae HAMP modification, and persistently making false and misleading representations that he was not eligible for a HAMP modification.

167.    Had PHH properly serviced and managed Mr. McGahey's loan, they would have found Mr. McGahey eligible for a Fannie Mae HAMP loan modification in 2012 and would have offered him a Fannie Mae HAMP TPP loan modification in September 2012.

168.    Instead, Mr. McGahey made payments toward increased interest each month due to higher interest rates, interest on interest that accrued from September 2012 to June 2013, interest on the interest arrears added to the 2015 modification, PHH and Fannie Mae's attorneys' fees to pursue the 2012 foreclosure matter plus interest on those fees, and fees and costs from September 2012 to June 2013 and interest on those fees and costs. Mr. McGahey also had to pay his own attorney to defend against the 2012 foreclosure action that would have been unnecessary with a Fannie Mae HAMP modification.

169.    PHH and Fannie Mae benefited financially from the increased payments toward interest, fees, and costs that Mr. McGahey made from 2012-2016.

170.    In addition, through the non-HAMP loan modifications, with interest, fees, and costs accruing at a higher rate than a HAMP modification, the principal balance grew to strip equity in Mr. McGahey's property.

171.    Mr. McGahey has also suffered harm to his credit by his inability to sustain the inflated monthly payments offered.

172.    Upon information and belief, PHH does not have proper policies and procedures in place to process and properly report on a loan when a HAMP TPP is completed but a non-HAMP modification is then offered to borrowers.

173.    Upon information and belief, PHH and Fannie Mae do not have proper policies and procedures in place to evaluate and correct the problem when a wrongful denial of a loan modification has occurred.

174.    PHH was repeatedly informed by Mr. McGahey of the misprocessing of the loan modification applications but failed to take any corrective action.

175.    Upon information and belief, PHH and Fannie Mae have engaged in a pattern and practice of mismanagement of loans in default by failing to properly evaluate for loss mitigation options, and misrepresenting ineligibility of loan modification options to borrowers.

176.    Upon information and belief, PHH and Fannie Mae have engaged in a pattern and practice of failing to process a loan when a HAMP TPP is completed but a non-HAMP modification is then offered to borrowers.

177.    Upon information and belief, PHH and Fannie Mae have engaged in a pattern and practice of failing to correct the problem when a wrongful denial of a loan modification has occurred.

178.    Mr. McGahey suffered financially as detailed above.

179.    PHH's wrongful conduct caused Mr. McGahey's home to be at risk.  The stress and pressure of losing his home and having to make inflated mortgage payments each month was extreme and severe.  Mr. McGahey could not understand why PHH kept misrepresenting that he failed a HAMP modification when he never had a HAMP modification, telling him he did not qualify for a more affordable loan payment and had to pay up to $500 extra per month, and would not adjust the loan even when they admitted he had never had a HAMP.  Mr. McGahey struggled each month to come up

with the money to make the payment. He cut back on everything he could; groceries, heat, hot water, gifts, and going out. Mr. McGahey felt worthless and overcome with guilt that he could not make the payments on the house. He saw that his mother suffered from anxiety around losing the home too and that made him feel increased guilt and shame. He tried to keep the situation away from his ageing, ailing father. He was always irritable, impatient, and fought with his father and two sons. He became reclusive because of lack of money but also because he was depressed and over time, he grew distant from all of his friends. He would only leave the house to buy groceries. At his lowest point, about two years ago, the sense of failure and distress of losing the home became intolerable and he began to have suicidal ideations. He continues to suffer from anxiety and distress over the fact that his home is at risk and is dependent on him making an unaffordable mortgage payment each month. He fears constantly that he will lose the home, displacing his elderly father who now suffers from dementia, which would cause him undue turmoil and utter confusion.

## IV.  CLAIMS

### Count I: Violation of the Unfair Trade Practices Act, 5 M.R.S.A. § 205-A et. seq. (PHH)

180.     The Plaintiff repeats and realleges and incorporates by reference the paragraphs above as if fully set out herein.

181.     The Defendants violated the Maine Unfair Trade Practices Act by engaging in unfair and deceptive conduct outlined above, including but not limited to: 1) failing to abide by the Fannie Mae Single Family Servicing Guide by at least

    a.   failing to evaluate Mr. McGahey's loan for a Fannie Mae HAMP in 2012 and 2015 (Exhibit 7 VII, 609;  Exhibit 29  F-2-12, Exhibit 30 D2-2-05);

b.   Failing to evaluate for other loss mitigation options between September 25, 2012 and December 3, 2012  and pursuing foreclosure (Exhibit 11 VII 205.08);

c.   misrepresenting that Mr. McGahey was not eligible for HAMP (Exhibit 9 VII, 609.1; Exhibit 28  D2-3.2-07);

d.   failing to send accurate evaluation notices of denial to Mr. McGahey (Exhibit 37 VII 609.03.02; Exhibit  11 VII, 205.08; Exhibit  30 D2-2-05);

e.   failing to first review Mr. McGahey for a HAMP modification before a Fannie Mae Standard Modification (Exhibit 12  VII, 609.02.06; Exhibit 11 VII, 205.08; Exhibit 28 D2-3.2-07) and

f.   failing to conduct an NPV test on the loan (Exhibit 13 VII, 609.02.04; Exhibit  28 D2-3.2-07);

2). Persistently misprocessing and mismanaging Mr. McGahey's loan; 3) repeatedly providing false and misleading representations regarding Mr. McGahey's eligibility for Fannie Mae HAMP when PHH knew Mr. McGahey was eligible to be fully evaluated for, if not offered, a modification; 4) failing to take any corrective action after being repeatedly informed of the misconduct; 5) filing a foreclosure action in 2012 after incorrectly denying Mr. McGahey for HAMP and then after ignoring his appeal of the denial;  6) failing to provide Mr. McGahey with a Fannie Mae HAMP TPP offer in 2012 and 2015; 7) providing Mr. McGahey modifications that were less advantageous than a Fannie Mae HAMP modification with inflated monthly payments that included increased interest and costs; 8) charging and applying part of his monthly payments to increased interest, interest on interest, fees, and  interest on fees; 9) charging and applying his payments toward PHH and Fannie Mae's attorneys' fees for pursuing the 2012

foreclosure; 10) offering Mr. McGahey multiple trial plan payments in 2013 all containing different amounts; 11) setting Mr. McGahey up for failure by providing him with knowingly unaffordable loan modification options; and 12) offering a permanent modification in 2013, accepting Mr. McGahey's signed offer, signing the offer, and then requiring Mr. McGahey to sign a new permanent modification months later with different amounts and terms of the loan.

182.    Each violation of the Fannie Mae Servicing Guide, as well PHH's additional mismanagement of the loan, is in itself unfair and deceptive as the underlying conduct served to mislead Mr. McGahey and caused him injury as described above.

183.    Had PHH evaluated the application properly, and in accordance with the Fannie Mae Servicing Guides, they would have found Mr. McGahey eligible for a HAMP modification and would have had to offer him a trial plan under Fannie Mae HAMP. Exhibits 7-13, 28-30, 37.

184.    All of PHH's unfair and deceptive acts demonstrate a pattern and practice of PHH's mismanagement and misprocessing of Mr. McGahey's loan.

185.    PHH's conduct, including violations of the Fannie Mae Servicing Guide, was deceptive as it was a material misrepresentation, act, and practice that is likely to mislead the average consumer and did mislead Mr. McGahey.  He entered into non-HAMP modifications and forwent pursuing that HAMP that could and should have resulted in a HAMP modification, based on PHH's repeated material misrepresentations that he did not qualify for a HAMP modification.  PHH's misrepresentations directly influenced Mr. McGahey's conduct in taking the non-HAMP modifications as he was led to believe he did not qualify for the HAMP.

186.     PHH's conduct was also unfair as it was likely to, and did, cause substantial

injury as detailed above.  PHH's conduct caused: a) Mr. McGahey to pay inflated

interest, fees (including PHH's attorneys' fees for the foreclosure action that never should

have been filed), and costs and increased interest on that interest, fees and costs, b) a

decrease of equity in his property, c) damage to his credit, and d) to incur expenses

related to legal representation (for foreclosure defense) and travel.

187.     Such injury was not reasonably avoidable as PHH made the decision regarding

eligibility and was unwilling to change that decision even after repeatedly being informed

of the errors and admitting it had custody and knowledge of the non-HAMP modification.

188.     Such conduct provides no countervailing benefits to consumers or competition

and only serves to benefit PHH and Fannie Mae financially.

189.     Mr. McGahey suffered substantial actual damages as a result of PHH's conduct as

described above and by, including but not limited to 1) paying increased interest, 2)

paying PHH and Fannie's Mae's attorneys' fees for the 2012 foreclosure; 3) incurring

and paying late fees and costs when he inevitably fell behind; 4) paying interest on the

capitalized interest, fees, attorneys' fees and costs at a higher rate; 5) paying for his

attorney to prevent the 2012 foreclosure, 6) harm to his credit, 7) gas and mileage; and 8)

loss of equity in his property.

190.     The Plaintiff is entitled to judgment for actual damages, attorneys' fees and costs,

equitable and/or injunctive relief, pre-judgment and post-judgment interest at the legal

rate, and such other relief the Court does deem just, equitable, and proper.

**Count II: Violation of the Real Estate Settlement Procedures Act 12 U.S.C. § 2605 et seq. (PHH)**

191.    The Plaintiff repeats and realleges and incorporates by reference the paragraphs above as if fully set out herein.

192.    Mr. McGahey, individually and through counsel, delivered qualified written requests (QWRs) to PHH on August 28, 2013, June 12, 2015, October 30, 2015, and January 27, 2016 all of which were to PHH's designated address. The name of the borrower, the account number, and a statement of the reasons why Mr. McGahey believed the account was in error were included in the NOEs.  Exhibits 23, 31, 35, 36.

193.    PHH failed to provide the information requested in the August 28, 2013 QWR, particularly information related to the problem at issue in this complaint- the existence of previous modifications.

194.    PHH failed to correct the errors alleged by Mr. McGahey in the June 12, 2016 QWR/ NOE regarding the wrongful denials of HAMP modifications in 2012/13 and 2015/16.

195.    Due to PHH's failure to provide the information requested and correct the errors regarding the wrongful HAMP denial, Mr. McGahey paid an attorney $100 to deliver another QWR/NOE to PHH.

196.    PHH failed to provide information sought regarding information on the modified loan and calculations of principal on the loan account and properly investigate and correct the errors alleged by Mr. McGahey in the January 27, 2016 QWR/ NOE regarding the wrongful denials of HAMP modifications in 2012/13 and 2015/16.

197.    PHH failed to respond per the statute on at least three separate occasions, which constitutes a pattern and practice of violation of RESPA.

198.    Had PHH provided the information requested, investigated the issues and corrected the account, Mr. McGahey would not have had to incur fees with counsel to help fix the error and he would have been evaluated and approved for a HAMP modification which PHH would have had to offer him under the Fannie Mae Servicing Guide in 2012 instead of having to sacrifice to pay inflated monthly interest, fees, and costs as detailed repeatedly above. Exhibits 7-13, 28-30, 37.

199.    Mr. McGahey also would not have suffered the emotional distress described above as he would have been able to afford the mortgage payments under a HAMP modification, would not have struggled to pay an inflated amount each month, and would have felt secure in his home whereby alleviating his distress, fear, anxiety, humiliation and despair over losing his, and his elderly parents' home.

200.    Mr. McGahey is entitled to actual and statutory damages, as well as attorneys' fees and costs, and any other relief the Court deems appropriate.

**Count III: Fraud**
**(PHH/ Fannie Mae)**

201.    The Plaintiff repeats and realleges and incorporates by reference the paragraphs above as if fully set out herein.

202.    PHH and Fannie Mae engaged in fraud against the Plaintiff.

203.    PHH and Fannie Mae made false statements about material facts when they represented that Mr. McGahey was not eligible for HAMP based on a prior HAMP failure and when they offered him more expensive, less affordable modification options instead.

204.     PHH and Fannie Mae knew at the time of each wrongful denial Mr. McGahey did not fail a prior HAMP; they admitted he completed the HAMP trial plan and had a copy of the 2010 modification that was clearly not a HAMP modification. Exhibit 22, 34.

205.     PHH and Fannie Mae made such misrepresentations to induce Mr. McGahey into the more expensive 2013 and 2015 loan modifications, intending that he act on the misleading and false representations.

206.     PHH and Fannie Mae knew that the modifications offered were unaffordable for Mr. McGahey based on his submitted financial information and would lead to further default.

207.     PHH and Fannie Mae benefited financially from the higher interest, fees, and costs payments.  Such conduct by PHH and Fannie Mae was calculated to benefit PHH and Fannie Mae financially.

208.     Mr. McGahey justifiably relied on the denials for HAMP when entering into and paying on the more expensive loan modifications. He forwent pursuing the HAMP each time.

209.     He was led to believe that if he did not take the modifications offered, he would lose his home because he was not eligible for a better modification option: HAMP.

210.     Mr. McGahey suffered financially (paying interest, fees, and costs he otherwise would not have owed) and emotionally (feeling humiliation, guilt, and despair over the possible loss of his home) as detailed above as a result of PHH and Fannie Mae's fraud.

211.     As stated above, upon information and belief PHH and Fannie Mae have engaged in a pattern and practice of the conduct alleged here and a scheme of fraudulent intent.

212.     PHH and Fannie Mae persisted in misprocessing and mismanaging Mr.

McGahey's loan even after repeatedly being informed of the misconduct and even after

admitting that Mr. McGahey had fulfilled the 2009 TPP and had not had a prior

permanent HAMP modification.  Exhibit 22, 34.

213.     Upon information and belief, PHH and Fannie Mae have inadequate policies and

procedures to process a HAMP TPP that has converted to a non-HAMP permanent

modification and to process wrongful denials of HAMP modifications.

214.     PHH and Fannie Mae's conduct was deliberate, knowing, intentional, and so

outrageous and egregious as to constitute malice or at least to imply malice.

215.     As such, the Plaintiff is entitled to actual, compensatory, and punitive/exemplary

damages, and to any other relief this Court finds just and appropriate.

## Count IV: Violation of 9-A M.R.S. §9-401: Misrepresentation
## (PHH and Fannie Mae)

216.     The Plaintiff repeats and realleges and incorporates by reference the paragraphs

above as if fully set out herein.

217.     PHH and Fannie Mae induced Mr. McGahey into the 2013 and 2015 loan

modifications by misrepresenting he was not eligible for a HAMP modification.

218.     Mr. McGahey's eligibility for a HAMP modification was a material fact in his

determination to accept the more expensive modifications he was offered.  He forwent

other options to pursue HAMP that could and should have resulted in a HAMP

modification based on PHH's misleading and false representations regarding his

eligibility.  He believed that if he did not take the modifications offered, he would lose

his home because he was not eligible for the other modification option: HAMP.

219.    Mr. McGahey suffered financial and emotional harm as outlined above including but not limited to paying increased interest, fees, and costs and interest on the interest, fees, and costs, loss of equity, harm to his credit, costs for travel and legal representation for the foreclosure that should not have been filed, and suffering from depression, anxiety, shame, and suicidal ideations.

220.    Mr. McGahey is entitled to rescission of the loan modifications, actual damages, statutory damages, and attorneys' fees and costs of this action.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff demands a trial by jury in this action.

Dated at Portland, Maine, this 4th day of August, 2016.


/s/*Andrea Bopp Stark*
Andrea Bopp Stark, Esq.
Counsel for the Plaintiff
Molleur Law Office
419 Alfred Street
Biddeford, Maine 04005
Andrea@molleurlaw.com
(207)283-3777


Gary Goldberg, Esq.
482 Congress Street, Suite 402
Portland, ME 04101-3424
(207)899-4644
ggoldberg@garmeylaw.com

## CERTIFICATE OF SERVICE

I, Susan Black, hereby certify that I am over eighteen years old and that I filed the

Plaintiff's First Amended Complaint with the Clerk of Court using the CM/ECF system, which

will send notification of such filing to all counsel of record in the above-captioned matter.

Dated:  August 4, 2016

By: /s/ *Susan Black*
Susan Black, Paralegal
MOLLEUR LAW OFFICE
419 Alfred St.
Biddeford, ME 04005
207-283-3777
susan@molleurlaw.com