### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **WALTER McGAHEY,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **No. 2:16-cv-00219-JDL** |
| | ) | |
| **FEDERAL NATIONAL MORTGAGE** | ) | |
| **ASSOCIATION, et al.,** | ) | |
| | ) | |
| **Defendants** | ) | |

### RECOMMENDED DECISION ON DEFENDANTS' MOTION TO DISMISS
### AND PLAINTIFF'S MOTION TO AMEND COMPLAINT

In this action arising from plaintiff Walter McGahey's unsuccessful attempts to obtain a loan modification pursuant to the Home Affordable Modification Program ("HAMP"), defendants Federal National Mortgage Association ("Fannie Mae") and PHH Mortgage Corporation ("PHH") move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all four counts of McGahey's first amended complaint for failure to state a claim upon which relief can be granted. *See* Defendants' Renewed Motion To Dismiss ("Motion To Dismiss") (ECF No. 19) at 9-30; Plaintiff's First Amended Complaint ("First Amended Complaint") (ECF No. 16) ¶¶ 180-220.[1] McGahey separately moves pursuant to Federal Rule of Civil Procedure 15 to amend his First Amended Complaint to add certain facts and to press Counts I and II against Fannie Mae as well as PHH. *See* Plaintiff's Motion for Leave To Amend Complaint ("Motion To Amend") (ECF No. 23) at 1.[2]

---

[1] McGahey alleges that PHH violated the Maine Unfair Trade Practices Act ("UTPA"), 5 M.R.S.A. § 205-A *et seq.* (Count I) and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605 *et seq.* (Count II) and that both PHH and Fannie Mae engaged in fraud (Count III) and made misrepresentations in violation of 9-A M.R.S.A. § 9-401 (Count IV). *See* First Amended Complaint ¶¶ 180-220.

[2] The Supreme Court recently held that Fannie Mae's "sue and be sued clause" does not grant federal district courts jurisdiction over cases involving Fannie Mae. *Lightfoot v. Cendant Mortg. Corp.*, __ U.S. __, 137 S. Ct. 553, 556 (Jan. 18, 2017). However, it clarified that "[t]he doors to federal court remain open to Fannie Mae through diversity

1

For the reasons that follow, I recommend that the court grant the Motion To Dismiss and deny the Motion To Amend.

## I.   Motion To Dismiss

### A.   Applicable Legal Standards

The Supreme Court has stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and internal punctuation omitted).  This standard requires the pleading of "only enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"In ruling on a motion to dismiss under Rule 12(b)(6), a court assumes the truth of all of the well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff.  *Román-Oliveras v. Puerto Rico Elec. Power Auth*., 655 F.3d 43, 45 (1st Cir. 2011).  Ordinarily, in weighing a Rule 12(b)(6) motion, "a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment."  *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).  "There is, however, a narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."  *Id.* (citation and internal

---

and federal-question jurisdiction." *Id*. at 564.  McGahey invokes federal-question jurisdiction, as well as supplemental jurisdiction over his closely related state-law claims.  *See* First Amended Complaint ¶ 1; 28 U.S.C. §§ 1331, 1367(a).

quotation marks omitted).  "[T]he burden is on the moving party to prove that no legally cognizable

claim for relief exists."  5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

*Procedure* § 1357, at 462 (3d ed. 2004) (footnote omitted).

### B.  Factual Background

The First Amended Complaint, together with documents appended thereto and referenced

by the parties, reveal the following facts relevant to the Motion To Dismiss:[3]

At all relevant times, Fannie Mae owned, and PHH serviced, McGahey's mortgage loan

on property located at 42 McKenney Road in Saco, Maine (the "Property").  First Amended

Complaint ¶¶ 5-7.  Fannie Mae retained PHH to service the loan under Fannie Mae's direction,

control, and authority.  *Id*. ¶ 8.  PHH is required to follow Fannie Mae regulations and guidelines,

particularly the Fannie Mae Servicing Guide, including the Fannie Mae Single Family Servicing

Guides (the "Fannie Mae Guidelines").  *Id*. ¶¶ 16, 43.  PHH was and is required to participate in

HAMP for Fannie Mae loans.  *Id*. ¶ 45.

McGahey owns the Property by virtue of a deed from his parents, George L. McGahey and

Helen I. McGahey, dated April 20, 2006, and recorded in the York County Registry of Deeds on

April 27, 2006, at Book 14818, Page 53.  *Id*. ¶ 9.  McGahey bought the home from his parents and

moved in so that they could live in the home for the remainder of their lives.  *Id*. ¶ 10.

On May 22, 2006, McGahey executed and delivered to TD Banknorth, N.A. ("TD Bank")

a certain promissory note in the original principal amount of $170,000 (the "Note").  *Id*. ¶ 11.  The

Note provided for repayment at a fixed annual interest rate of 7.868 percent.  Exh. 24 (ECF No.

---

[3] The First Circuit has instructed that, in reviewing a complaint for sufficiency pursuant to Rule 12(b)(6), a court "should begin by identifying and disregarding statements in the complaint that merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action."  *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (citation and internal punctuation omitted).  "Non-conclusory factual allegations in the complaint must then be treated as true, even if seemingly incredible."  *Id*.  "If that factual content, so taken, allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, the claim has facial plausibility."  *Id*. (citation and internal quotation marks omitted).

16-24) to First Amended Complaint at Page ID # 757.  To secure repayment of the Note, McGahey executed and delivered to Mortgage Electronic Registration Systems, Inc., as nominee for TD Bank, its successors and assigns, a mortgage in the amount of $170,000 (the "Mortgage"), which was recorded on June 7, 2006, in the York County Registry of Deeds at Book 14860, Page 847. First Amended Complaint ¶ 12.

### 1.   2010 Loan Modification

In 2009, due to medical issues and job loss, McGahey fell behind on payments on the Note and applied for loss mitigation.  *Id*. ¶ 17.  At that time, his monthly income was $3,387.67, and his monthly payment for principal, interest, taxes, and insurance was less than $1,500.  *Id*. ¶¶ 18-19. In or about July 2009, PHH offered McGahey a HAMP modification contingent on his successful completion of a Trial Payment Plan ("TPP") and income verification.  *Id*. ¶ 20 & Exh. 1 (ECF No. 16-1) thereto.  The TPP required McGahey to make payments in the amount of $1,031.79 on August 5, September 1, and October 1, 2009.  First Amended Complaint ¶ 21.  McGahey timely signed and returned the TPP and timely made the required payments.  *Id*. ¶ 22.  He successfully completed the HAMP TPP.  *Id*. ¶ 23.

On or about December 21, 2009, PHH delivered a loan modification agreement to McGahey, which he signed in early 2010 (the "2010 Loan Modification").  *Id*. ¶ 24 & Exh. 4 (ECF No. 16-4) thereto at Page ID # 556.  The 2010 Loan Modification, which called for a monthly principal, interest, and escrow payment of $1,456.49, was not provided pursuant to HAMP.  *Id*. ¶¶ 25-27.  Pursuant to that modification, the principal and interest portion of McGahey's monthly payment dropped from $1,231.80 to $1,175.80.  *Compare* Exh. 24 at Page ID # 757 *with* Exh. 4 at Page ID # 553.  At the time, McGahey's income was $979.33 monthly due to a recent job loss. First Amended Complaint ¶ 28.  The 2010 Modification Agreement required an initial contribution

of $1,987.07.  *Id.* ¶ 29.  Believing that this was the only way to save his home, McGahey signed and returned the agreement and provided the contribution payment.  *Id.* ¶ 30.

### 2.   2013 Loan Modifications

With the help of his parents, and by selling his car, McGahey made the monthly payments until December 2011, after which it was too difficult to come up with the unaffordable amount. *Id.* ¶¶ 31-33.  In June 2012, PHH delivered a notice of intention to foreclose to McGahey.  *Id.* ¶ 35. Shortly thereafter, McGahey retained counsel to help him apply for a more affordable loan modification to prevent the foreclosure.  *Id.* ¶ 36.  On August 31, 2012, he submitted a complete loss mitigation application to PHH requesting to be reviewed for a HAMP modification.  *Id.* ¶ 37. He explained that he had experienced a change in circumstances since 2009-10 in that he was receiving Social Security Disability ("SSD") income rather than wages and was unable to make the modified monthly payment.  *Id.* ¶ 38.  As of August 12, 2012, the estimated fair market value of the Property was between $180,000 and $200,000.  *Id.* ¶ 39.  McGahey's income, as submitted to PHH, together with his father's contribution, totaled about $3,819 per month when adding a multiplier of 1.25 as required by Fannie Mae for non-taxed income.  *Id.* ¶ 40.

On September 25, 2012, PHH sent McGahey a letter stating that it was unable to offer a HAMP modification but provided no reason for the denial.  *Id.* ¶ 41.  PHH knew or should have known that McGahey was eligible to be evaluated for, if not offered, a HAMP modification as it possessed the original non-HAMP modification and McGahey's complete loss mitigation packet. *Id.* ¶ 42.  PHH was required to evaluate McGahey's loan first for a HAMP modification and, if he was found ineligible, then for a Fannie Mae standard mortgage loan modification.  *Id.* ¶ 46.

On September 25, 2012, McGahey met all of the criteria to be eligible for a HAMP modification pursuant to the Fannie Mae Guidelines.  *Id.* ¶¶ 47-48.  Even though McGahey was

evaluated for a HAMP modification in 2009-10 and was not offered one after he completed the HAMP TPP due to his change in income, he could still request and be provided reconsideration for a HAMP modification at a future time if he had a change in circumstances.  *Id*. ¶ 49.  McGahey had neither failed a HAMP TPP nor received a HAMP permanent modification and lost good standing per the Fannie Mae Guidelines.  *Id*. ¶ 57.  Pursuant to those guidelines, PHH was obligated to evaluate McGahey's application for a HAMP modification.  *Id*. ¶ 50.

Had PHH evaluated McGahey's application properly, it would have found him eligible for a HAMP modification and would have had to offer him a HAMP trial plan.  *Id*. ¶ 51.  McGahey would have been able to afford and pay the HAMP trial payments.  *Id*. ¶ 52.  For purposes of a Fannie Mae HAMP, a loan can be modified by capitalizing arrears, reducing the interest rate to a floor of 2 percent, extending the term to 40 years, and/or forbearing principal to reach the target ratio of 31 percent of the borrower's gross monthly income.  *Id*. ¶¶ 53-54.  As of September 25, 2012, a HAMP modification would have provided a monthly principal, interest, and escrow payment of about $1,183.89, a new capitalized principal balance of about $182,500, and an initial modified interest rate of 2 percent.  *Id*. ¶ 58.  McGahey would have been able to sustain that monthly payment.  *Id*. ¶ 59.

Apart from its September 25, 2012, letter, PHH provided no other written response regarding evaluation or eligibility for any other loss mitigation program besides HAMP from August 31, 2012, through January 1, 2013.  *Id*. ¶ 60.

In a letter dated September 28, 2012, PHH, through counsel, stated that it would continue with the foreclosure on the loan.  *Id*. ¶ 61.  McGahey paid his counsel more than $1,000 to prevent the foreclosure and eventually appear in the foreclosure action, including participating in the foreclosure diversion program.  *Id*. ¶ 62. Through counsel, McGahey appealed the HAMP denial

on October 2, 2012. *Id*. ¶ 63. On October 4, 2012, through counsel, he requested that PHH escalate his appeal of the HAMP denial and cease further foreclosure activity on the loan. *Id*. ¶ 64. PHH did not respond to either the appeal or the request to escalate the appeal and cease foreclosure efforts, and did not reevaluate McGahey's application for a HAMP modification or review his loan for other loss mitigation options. *Id*. ¶¶ 65-67.

McGahey, in collaboration with his counsel, sought assistance from York County Community Action ("YCCA") regarding the denial of his application for a HAMP modification. *Id*. ¶ 68. YCCA housing counselor Michael Alexandre contacted PHH with McGahey on October 26, 2012. *Id*. ¶ 69. PHH falsely stated that McGahey did not complete a HAMP in 2009 and, therefore, was not eligible for another HAMP modification offer. *Id*. ¶ 70. PHH represented that it was going to seek an exception through Fannie Mae for another modification. *Id*. ¶ 71. On November 2, 2012, McGahey, through counsel, emailed PHH to check on the status of his appeal but received no response. *Id*. ¶ 72.

On or about November 4, 2012, PHH filed a complaint for foreclosure against McGahey in the Maine District Court in Biddeford, Maine. *Id*. ¶¶ 73-74. PHH and Fannie Mae charged McGahey's account for their attorney fees related to the foreclosure action. *Id*. ¶ 75. McGahey answered the complaint and requested to be placed in the Maine Foreclosure Diversion Program. *Id*. ¶ 76. In a November 7, 2012, call between Alexandre and PHH, PHH again falsely stated that McGahey did not qualify for a HAMP modification and informed Alexandre that the denial would stand. *Id*. ¶ 77. In a letter dated December 3, 2012, PHH misrepresented that McGahey "for some reason" was not eligible for a HAMP modification, but it provided no reason. *Id*. ¶ 78. PHH offered McGahey a non-HAMP TPP with a monthly payment of $1,633.47 beginning on January 1, 2013. *Id*.

In an effort to continue to try to save his home with an affordable monthly payment, McGahey submitted another complete loss mitigation application for a HAMP modification to both PHH and Fannie Mae on December 4, 2012.  *Id.* ¶ 79.  PHH acknowledged receipt of the application in a letter dated January 31, 2013.  *Id.* ¶ 80.  In the application, McGahey reported a change in income, which, combining his SSD payments and his father's contribution of retirement income plus food stamps and accounting for a 1.25 multiplier for non-taxed income, totaled $4,012.75.  *Id.* ¶ 81.  McGahey was eligible at that time for a HAMP modification.  *Id.* ¶ 82.  PHH knew or should have known that he was eligible to be at least evaluated for, if not offered, a HAMP modification at that time as it possessed the original non-HAMP modification and McGahey's complete loss mitigation packet.  *Id.* ¶ 83.

PHH delivered McGahey a notice dated February 13, 2013, offering a TPP in the amount of $1,501.68 per month beginning March 1, 2013.  *Id.* ¶ 84.   In a second letter dated February 13, 2013, PHH offered McGahey a TPP with a monthly payment of $1,625.19.  *Id.* ¶ 85.  Neither letter indicated that the TPP offers were provided pursuant to HAMP.  *Id.* ¶ 86.  Based on PHH's repeated misrepresentations that he was ineligible for a HAMP modification, McGahey forewent taking steps at that time to pursue a HAMP modification, such as furthering an appeal, submitting another HAMP application, sending a demand letter, or pursuing litigation, and he accepted the first February 13, 2013, offer of a monthly payment of $1,501.68 and made a timely first TPP payment.  *Id.* ¶ 87.[4]  McGahey was led to believe that if he did not take the modification offered, he would lose his home because he was not eligible for a better modification offer: HAMP.  *Id.* ¶ 88.

---

[4] My recitation corrects a typographical error in the date, February 13, "2012."  First Amended Complaint ¶ 87.

By letter dated February 18, 2013, PHH offered McGahey yet another TPP with monthly payments of $1,591.63 beginning April 1, 2013. *Id.* ¶ 90. He continued to send timely payments per the prior offer of a monthly payment of $1,501.68 and completed that TPP. *Id.* ¶ 91. By letter dated June 5, 2013, PHH offered McGahey a permanent loan modification with a monthly principal, interest, and escrow payment of $1,630.73 beginning June 1, 2013 (the "2013 Loan Modification"). *Id.* ¶ 92. The interest rate remained 6.67 percent, and the term of the loan was extended to 40 years. *Id.* A total of $28,678 in escrow advances, attorney fees and costs, recoverable advances, and interest was added to the modified loan balance, creating a new capitalized principal balance of $198,216.01. *Id.* ¶ 93.

The 6.67 percent interest rate was a higher rate than McGahey would have had pursuant to a HAMP offer. *Id.* ¶ 94. McGahey was not offered a permanent HAMP modification in June 2013. *Id.* ¶ 96. Although PHH again knew or should have known that McGahey was eligible to be evaluated for, if not offered, a HAMP modification at that time, it failed to evaluate him for such a modification per the Fannie Mae Guidelines. *Id.* ¶¶ 97-98. Had PHH evaluated McGahey's application properly, it would have found him eligible for a HAMP modification and would have had to offer him a HAMP trial plan. *Id.* ¶ 101. Based on PHH's repeated misrepresentations that he was ineligible for a better HAMP modification, McGahey again forewent taking steps to pursue the HAMP option, believing that if he did not take the modification offered, he would lose his home. *Id.* ¶¶ 102-04. He signed and returned the 2013 Loan Modification agreement to PHH, which signed and returned it to him on July 16, 2013. *Id.* ¶¶ 102, 108.

McGahey made at least 20 payments pursuant to the 2013 Loan Modification (as later revised). *Id.* ¶ 105. A portion of those payments went to cover (i) attorney fees incurred by PHH and Fannie Mae in the 2012 foreclosure action, (ii) higher interest (6.67 percent) than would have

been charged pursuant to a HAMP loan modification, (iii) interest on that interest accruing from September 25, 2012, through June 1, 2013, and (iv) "recoverable advance" fees, as well as interest on those fees accruing during that period.  *Id*. ¶ 106.  McGahey would not have had to pay these costs if PHH had properly managed his loan, including following Fannie Mae Guidelines and accurately evaluating his eligibility for a HAMP modification.  *Id*. ¶ 107.

On August 27, 2013, PHH called McGahey, stating that the permanent loan modification was not effective because it was signed in the wrong place and that it would send a new modification agreement for him to sign.  *Id*. ¶ 109.  On August 28, 2013, McGahey's counsel delivered a letter to PHH, characterized as a Qualified Written Request ("QWR") pursuant to RESPA, requesting information regarding McGahey's loan, including any modifications made to it.  *Id*. ¶ 111; Exh. 23 (ECF No. 16-23) thereto.  The letter stated:

> In order to determine the amount due and owing on my client's account, I need all information about the costs, accounting, escrow procedures, and application of payments in connection with this loan.  Due to the complicated nature of mortgage account servicing, accounts frequently contain errors in the form [of] misapplied payments, excess fees, or unwarranted/unauthorized charges.  I have reason to believe that this account may contain such errors.

Exh. 23 at Page ID # 728.  The letter made 10 demands for documents or information.  *Id*. at Page ID ## 728-30.

PHH responded by letter dated September 10, 2013, but did not provide information regarding the 2010 Loan Modification.  First Amended Complaint ¶ 112.  PHH disputed that the August 28, 2013, letter was a QWR in that it failed to identify an actual error in McGahey's account.  Exh. 24 at Page ID # 733.  However, it provided copies of McGahey's Mortgage, Note, HUD-1 Settlement Statement, Truth in Lending ("TIL") disclosures, Assignment Notice, Payment History, and a key to interpret the Payment History, and provided the contact information of a PHH employee.  *Id*. at Page ID ## 733, 735-71.

In September 2013, PHH asked McGahey to execute a revised modification agreement with similar terms with a monthly payment of $1,625.22 and capitalization of $27,756.55 in attorney fees, recoverable advances, advanced escrow, and interest (the "Revised 2013 Loan Modification"). First Amended Complaint ¶ 113. This was not a HAMP modification. *Id*. ¶ 114. Again, based on PHH's misrepresentations regarding his HAMP eligibility, McGahey timely signed and returned the Revised 2013 Loan Modification agreement. *Id*. ¶ 115. Again, PHH knew or should have known McGahey was eligible to at least be evaluated for, if not offered, a HAMP modification at that time. *Id*. ¶ 116.

Again, a portion of the payments made pursuant to the Revised 2013 Loan Modification agreement went to cover (i) attorney fees incurred by PHH and Fannie Mae in the 2012 foreclosure action, (ii) higher interest (6.67 percent) than would have been charged pursuant to a HAMP loan modification, (iii) interest on that interest accruing from September 25, 2012, through June 1, 2013, and (iv) "recoverable advance" fees, as well as interest on those fees accruing during that period. *Id*. ¶ 117. McGahey would not have had to pay these costs if PHH had properly managed his loan, including following Fannie Mae Guidelines and accurately evaluating his eligibility for a HAMP modification. *Id*. ¶ 118.

### 3. 2015 Loan Modification

McGahey struggled for over two years to make the monthly payments on the 2013 TPP and loan modifications. *Id*. ¶ 119. He had bought another used car but had to sell it to help make the payments. *Id*. ¶ 120. PHH knew or should have known that $1,625.22 was an unaffordable payment amount based on McGahey's submitted financial information. *Id*. ¶ 121.

In May 2015, McGahey reconnected with Alexandre and submitted another complete loss mitigation application, again seeking a HAMP modification. *Id*. ¶ 122. During the process of

working with Alexandre in 2015, McGahey had to travel approximately 45 miles round-trip at least two times from Saco to Sanford, paying gas and mileage expenses. *Id.* ¶ 123. Again, McGahey had changed circumstances in that he could not maintain the modification payments and had unexpected housing expenses, as outlined in his hardship letter submitted to PHH. *Id.* ¶ 124.

By letter dated June 4, 2015, PHH falsely stated that McGahey did not qualify for a HAMP modification because he did not "successfully complete a previous HAMP offer[.]" *Id.* ¶ 125. In June 2015, PHH offered McGahey a non-HAMP TPP with three monthly payments of $1,339.98 beginning July 1, 2015. *Id.* ¶ 126. Again, PHH knew or should have known McGahey was eligible to be evaluated for, if not offered, a HAMP at that time. *Id.* ¶ 127. Had PHH evaluated his application properly pursuant to Fannie Mae Guidelines, it would have found him eligible for a HAMP modification and would have had to offer him a HAMP trial plan. *Id.* ¶ 128. McGahey would have been able to afford and pay the HAMP trial payments. *Id.* ¶ 129. Again, PHH knew or should have known the modification payment offered was unaffordable based on McGahey's submitted financial information. *Id.* ¶ 130. Based on PHH's repeated misrepresentations that he was ineligible for a better HAMP modification, McGahey again forewent taking steps to pursue the HAMP option, believing that if he did not take the modification offered, he would lose his home. *Id.* ¶¶ 131-33.

As of June 1, 2015, McGahey was eligible for a HAMP modification with a monthly payment of about $1,177.70 based on his SSD income of $1,374 and a $1,665 per month contribution from his father. *Id.* ¶ 134. Pursuant to Fannie Mae Guidelines, PHH was required to evaluate McGahey for a HAMP modification and communicate its decision to him. *Id.* ¶¶ 135-36.

On June 12, 2015, McGahey delivered a letter to PHH characterized as a Notice of Error ("NOE") in which he sought to appeal PHH's wrongful denial of a HAMP modification and obtain

proper review for such a modification.  *Id.* ¶ 138 & Exh. 31 (ECF No. 16-31) thereto at Page ID # 829.[5]  He submitted a similar complaint on June 12, 2015, to the Consumer Financial Protection Bureau ("CFPB").  First Amended Complaint ¶ 139.

PHH responded to the CFPB complaint, not the NOE, by letter dated July 10, 2015, acknowledging McGahey's successful completion of the 2009 HAMP TPP but falsely stating that he was offered a HAMP modification agreement and was ineligible for a further HAMP modification because he had defaulted on that agreement.  *Id.* ¶¶ 140-41 & Exh. 2 (ECF No. 16-2) thereto.

By letter dated August 3, 2015, PHH offered McGahey a non-HAMP permanent modification (the "2015 Loan Modification") with a monthly payment of $1,336.91 beginning November 1, 2015.  First Amended Complaint ¶ 144.  The interest rate was 4 percent, with a 40-year term.  *Id.*  This resulted in a reduction in McGahey's principal and interest payment from $1,179.76 to $851.89.  *Compare* Exh. 25 (ECF No. 16-25) to First Amended Complaint at Page ID # 781 *with* Exh. 33 (ECF No. 16-33) to First Amended Complaint at Page ID # 884.  The 2015 Loan Modification was not a HAMP modification.  First Amended Complaint ¶ 145.  The new capitalized principal balance on the 2015 modification was $203,832.61.  *Id.* ¶ 146.  The fair market value of the Property in about October 2015 ranged from $208,000 to $259,500.  *Id.* ¶ 147. The increase in the principal balance cut into the equity that McGahey had in the Property.  *Id.* ¶ 148.  A total of $8,372.61 was added to the principal balance for escrow advances and accrued interest, including $6,866.23 in interest that accrued at the prior rate of 6.67 percent.  *Id.* ¶ 149. Based on PHH's repeated misrepresentations that he was ineligible for a better HAMP

---

[5] McGahey alleges that the letter also constituted a QWR, First Amended Complaint ¶ 138, although he did not characterize it as such in his letter, Exh. 31 at Page ID # 829.

modification, McGahey again forewent taking steps to pursue the HAMP option, believing that if he did not take the modification offered, he would lose his home.  *Id*. ¶¶ 150-51.

On August 12, 2015, McGahey delivered a complaint to Fannie Mae regarding the wrongful HAMP denial.  *Id*. ¶ 143.

McGahey made several payments pursuant to the terms of the 2015 Loan Modification. *Id*. ¶ 152.  A portion of those payments went to cover (i) attorney fees incurred by PHH and Fannie Mae in the 2012 foreclosure action, (ii) interest that accrued at a higher rate than would have been charged pursuant to a HAMP loan modification, (iii) interest on interest that accrued from September 25, 2012, through June 1, 2013, (iv) "recoverable advance" fees, as well as interest on those fees that accrued during that period, and (v) interest at a higher rate than would have been charged pursuant to a HAMP loan modification plus interest on the interest accrued pursuant to the 2013 loan modifications that was capitalized into the 2015 loan modification balance.  *Id*. ¶ 152.  McGahey would not have had to pay these costs if PHH had properly managed his loan, including following Fannie Mae Guidelines and accurately evaluating him for eligibility for a HAMP modification in 2012.  *Id*. ¶ 153.

In emails in September and October 2015 between Alexandre and Jack Maloney, Senior Business Manager of Fannie Mae, Maloney falsely stated that McGahey did not qualify for a HAMP modification because of a previous HAMP modification failure.  *Id*. ¶ 155.

On October 30, 2015, McGahey sent another letter to PHH, characterized as a QWR pursuant to RESPA, requesting five categories of documents or information regarding his loan, particularly the 2009-10 TPP and modification.  *Id*. ¶ 156 & Exh. 35 (ECF No. 16-35) thereto. PHH responded by letter dated December 1, 2015, stating that it was providing, either in the body of its letter or through enclosed documents, all of the requested documents/information.  Exh. 22

14

(ECF No. 16-22) to First Amended Complaint at Page ID # 623.  It stated that, while McGahey had been prequalified for a HAMP TPP on July 6, 2009, based on financial documentation he had submitted reflecting a monthly income of $3,386.67, he later provided financial documentation confirming monthly gross income of $979.33.  *Id*.  It stated that, as a result, he was ineligible for a HAMP modification but was provided with a standard loan modification.  *Id*.  PHH did not address or correct the 2012 and 2015 wrongful denials based incorrectly on the alleged unsuccessful completion of a HAMP.  First Amended Complaint ¶ 158.

McGahey again retained and paid counsel $100 to deliver another letter styled as an NOE and Request for Information ("RFI") to PHH on January 27, 2016.  *Id*. ¶ 159 & Exh. 36 (ECF No. 16-36) thereto at Page ID # 904.  McGahey's counsel asserted that PHH had erred in deeming McGahey ineligible for HAMP modifications in both 2009-10 and thereafter, requesting that, to correct its error, PHH provide him with a HAMP modification retroactive to February 1, 2010, waiving any additional interest, fees, and costs that had accrued.  Exh. 36 at Page ID ## 905-06.  She also requested that PHH provide four categories of information.  *Id*. at Page ID # 906.

PHH responded by letter dated March 7, 2016, stating that after investigating the issues raised in McGahey's January 27, 2016, correspondence, it had determined that no error had occurred.  Exh. 3 (ECF No. 16-3), attached to First Amended Complaint, at Page ID # 510.  It repeated the rationale it had provided in its December 1, 2015, letter that McGahey was ineligible for a HAMP modification in 2009-10 based on his changed (lower) income.  *Compare* Exh. 3 at Page ID ## 510-11 *with* Exh. 22 at Page ID ## 623-24.  However, it did not address McGahey's counsel's argument that subsequent denials of HAMP modifications were wrongful.  First Amended Complaint ¶ 161 & Exh. 3 at Page ID ## 510-11.

On March 24, 2016, McGahey, through counsel, delivered a demand letter to PHH pursuant to the Maine Unfair Trade Practices Act ("UTPA"), 5 M.R.S.A. § 213.  First Amended Complaint ¶ 162.  PHH responded by letter dated April 8, 2016, that, because the issues were the same as those raised in previous letters to which it had responded, it would take no action regarding the account.  *Id*. ¶ 163.

As of August 4, 2016, the date he filed his First Amended Complaint, McGahey was again struggling to make his monthly payment under the current modification.  *Id*. ¶ 164.  On July 14, 2016, through counsel and with YCCA's help, he submitted a new loan modification application seeking a HAMP modification.  *Id*. ¶ 165.  As of August 4, 2016, he had not received a response to the application.  *Id*.

PHH engaged in persistent misprocessing and mismanagement of McGahey's loan, including failing to follow Fannie Mae Guidelines, failing to evaluate him properly for a HAMP modification, and persistently making false representations that he was not eligible for a HAMP modification.  *Id*. ¶ 166.

Had PHH properly serviced and managed McGahey's loan, it would have found him eligible for, and would have offered him, a HAMP loan modification in September 2012.  *Id*. ¶ 167.  Instead, he made payments toward increased interest each month due to higher interest rates, interest on interest that accrued from September 2012 to June 2013, interest on the interest arrears added to the 2015 modification, PHH and Fannie Mae's attorney fees to pursue the 2012 foreclosure plus interest on those fees, fees and costs from September 2012 to June 2013, and interest on those fees and costs.  *Id*. ¶ 168.  McGahey also had to pay his own attorney to defend against the 2012 foreclosure action, which would have been unnecessary had he been given a HAMP modification.  *Id*.

16

PHH and Fannie Mae benefited financially from the increased payments toward interest, fees, and costs that McGahey made from 2012 to 2016. *Id*. ¶ 169. In addition, through the non-HAMP loan modifications, with interest, fees, and costs accruing at a higher rate than would have been the case with a HAMP modification, the principal balance grew to strip McGahey's equity in the Property. *Id*. ¶ 170. McGahey also suffered harm to his credit because of his inability to sustain the inflated monthly payments offered. *Id*. ¶ 171.

PHH does not have proper policies and procedures in place to process and properly report on a loan when a HAMP TPP is completed but a non-HAMP modification is then offered to a borrower. *Id*. ¶ 172. PHH and Fannie Mae do not have proper policies and procedures in place to evaluate and correct wrongful denials of loan modifications. *Id*. ¶ 173. PHH was repeatedly informed by McGahey of the misprocessing of his loan modification applications but failed to take any corrective action. *Id*. ¶ 174.

PHH's wrongful conduct caused McGahey's home to be at risk. *Id*. ¶ 179. The stress and pressure of potentially losing his home and having to make inflated mortgage payments each month was extreme and severe. *Id*. He could not understand why PHH kept misrepresenting that he had failed a HAMP modification, telling him that he did not qualify for a more affordable loan payment, as a result of which he had to pay up to $500 extra per month, and declining to adjust the loan even when PHH admitted that he never had a HAMP modification. *Id*.

McGahey struggled each month to come up with the money to make the payment, cut back on everything he could – groceries, heat, hot water, gifts, and going out – and felt worthless and overcome by the fact that he could not make the house payments. *Id*. He saw that his mother suffered from anxiety over potentially losing the home, as a result of which he felt increased guilt and shame. *Id*. He tried to keep the situation from his aging, ailing father. *Id*. He was always

irritable and impatient and fought with his father and two sons. *Id*. He became reclusive because of lack of money and depression and, over time, grew distant from all of his friends. *Id*. He would only leave the house to buy groceries. *Id*. At his lowest point, in about August 2014, his sense of failure and distress over potentially losing the home became intolerable and he began to have suicidal ideations. *Id*. He continues to suffer from anxiety and distress over the fact that his home is at risk and his continued ownership of it depends on his ability to make an unaffordable mortgage payment each month. *Id*. He constantly fears that he will lose the home, displacing his elderly father who now suffers from dementia. *Id*.

## C. Discussion

As a threshold matter, PHH and Fannie Mae move to dismiss this case in its entirety because it is based on the incorrect underlying premise that McGahey has standing to enforce Fannie Mae Guidelines pertaining to HAMP modifications. *See* Motion To Dismiss at 1; *see also id*. at 9 ("At its core, the [First Amended] Complaint is an attempt to bootstrap entitlement to a loan modification when none exists under Maine or federal law."). They argue, in the alternative, that each claim fails as a matter of law because:

1.      As to the UTPA claim (Count I), McGahey does not allege independent unfair or deceptive trade practices or demonstrate a loss of money or property. In addition, he cannot plead that he has paid more than he would have pursuant to a HAMP modification in 2012 or that he relied to his detriment on a representation by PHH or Fannie Mae. *See id*. at 13-19.

2.      As to the RESPA claim (Count II), (i) the letters at issue were not QWRs, (ii) PHH responded to each letter, and (iii) McGahey alleges no actionable damages. *See id*. at 19-28. McGahey invokes so-called "Regulation X" to stave off dismissal, *see* Plaintiff's Objection to Defendants' Renewed Motion To Dismiss ("Objection") (ECF No. 21) at 14-18; however, PHH and Fannie Mae argue that Regulation X is irrelevant, both because McGahey failed to invoke it

18

in his First Amended Complaint and because the sections on which he relies confer no private right of action, *see* Defendants' Reply in Support of Motion To Dismiss ("Reply") (ECF No. 22) at 4-7.

3.     As to the fraud and misrepresentation claims (Counts III and IV, respectively), McGahey cannot plausibly allege that he relied to his detriment on any representation by PHH or Fannie Mae. *See* Motion To Dismiss at 28-30.

I conclude that, on the showing made, PHH and Fannie Mae fail to demonstrate that McGahey lacks standing to press the claims at issue. However, I agree with their alternative arguments that, as to each claim, he fails to allege a requisite element of damages or harm flowing from the conduct of which he complains, independently warranting dismissal of the First Amended Complaint. Accordingly, I do not consider their additional alternative arguments.

### 1. Threshold Issue of Standing

As a threshold matter, PHH and Fannie Mae seek dismissal of all of McGahey's claims on the basis that he lacks standing to "enforce" HAMP. *Id.* at 12. The First Circuit has noted:

> It goes without saying – but we say it anyway – that federal courts are courts of limited jurisdiction, limited to deciding certain cases and controversies, for example. A key component of the case-or-controversy requirement is that a suing party demonstrate standing to sue. And to show standing in this sense, the party invoking federal jurisdiction . . . must show the following: (a) an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (b) a causal connection – what the high Court occasionally calls traceability – between the injury and the challenged conduct; and (c) redressability – that the injury will likely be redressed by a favorable decision.

*Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13, 21 (1st Cir. 2016) (citations and internal punctuation omitted). PHH and Fannie Mae argue that:

1.     The First Circuit has made clear that borrowers lack standing to enforce HAMP's terms. *See* Motion To Dismiss at 10-11 (citing *MacKenzie v. Flagstar Bank, FSB*, 738 F.3d 486,

490-93 (1st Cir. 2013) (rejecting borrowers' bid for redress for alleged HAMP violations on theories that they were third-party beneficiaries of agreements between servicer and government, servicer breached implied covenant of good faith, and servicer breached good-faith duty to modify loan to avoid foreclosure).

2.      That reasoning is equally applicable in cases in which a borrower attempts to "enforce" HAMP through reference to Fannie Mae Guidelines.  *See id*. at 11-12 (citing *Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp.2d 172, 179-86 (D. Mass. 2011) (rejecting borrower's bid for redress of alleged HAMP violations on third-party beneficiary, breach of good-faith covenant, negligence, and Massachusetts Consumer Protection Act ("chapter 93A") theories); *Clay v. First Horizon Home Loan Corp.*, 392 S.W.3d 72, 74, 79-80 (Tenn. Ct. App. 2012) (rejecting borrower's bid for redress of alleged HAMP violations through third-party beneficiary, negligent HAMP implementation, and wrongful foreclosure theories).

3.      Each of McGahey's claims "is based on the faulty premise that [he] was at some point legally entitled to a modification under the HAMP program and that PHH and Fannie Mae were obligated to offer him one." *Id*. at 12.  However, because "the borrower lacks a private right of action to enforce the HAMP program, the Court must reject his various attempts to 'enforce' the terms of Fannie Mae's servicing guide." *Id*.

In response, McGahey distinguishes *MacKenzie* on the basis that he deliberately avoided raising third-party beneficiary or breach of good-faith covenant claims.  *See* Objection at 4.  He adds that PHH and Fannie Mae mischaracterize his First Amended Complaint as claiming that he was entitled to, and they were obliged to offer him, a HAMP modification.  *See id*. at 4-5.  He points out that he instead alleges that he was eligible to be evaluated for a HAMP modification and that, had his application been properly evaluated, he would have been found eligible, and PHH

would have been obliged to offer him a HAMP modification pursuant to the Fannie Mae Guidelines. *See id*. at 5.

PHH and Fannie Mae rejoin that the fact that McGahey admits he was not entitled to a HAMP modification, and they were not obliged to offer him, is fatal to his case. *See* Reply at 1-2. They argue that, in the circumstances, they cannot be found as a matter of law to have done anything unfair or deceptive when they offered him non-HAMP modifications or to have made misrepresentations regarding his entitlement to HAMP modifications, and PHH cannot be found to have failed in its obligations pursuant to RESPA by not "correcting" the "error" of not previously providing a HAMP modification. *Id*. at 2.

On the showing made, PHH and Fannie Mae fall short of meeting their burden of demonstrating that McGahey lacks standing to bring the claims at issue. Unlike the borrowers in *MacKenzie*, *Markle*, and *Clay*, McGahey does not seek *direct* redress for HAMP violations through third-party beneficiary, breach of good-faith covenant, wrongful foreclosure, or negligent HAMP implementation theories. *See MacKenzie*, 738 F.3d at 490-93, *Markle*, 844 F. Supp.2d at 179-85; *Clay*, 392 S.W.3d at 74, 79-80. While McGahey, like the borrower in *Markle*, does bring a UTPA claim, the *Markle* court recognized that "even though no private right of action exists under HAMP, a violation of the HAMP guidelines may nonetheless, under some circumstances, provide a basis for a claim under chapter 93A." *Markle*, 844 F. Supp.2d at 185. As McGahey points out, *see* Objection at 6, chapter 93A served as a prototype for the Maine UTPA, *see, e.g., Hoglund ex rel. Johnson v. Daimlerchrysler Corp*., 102 F. Supp.2d 30, 31 (D. Me. 2000).

Accordingly, it is necessary to examine whether each of McGahey's counts states a claim upon which relief can be granted. In that context, assuming the truth of all well-pleaded facts in the First Amended Complaint and drawing all reasonable inferences in McGahey's favor, and

taking into account his clarifications of the nature of his claims, I find persuasive PHH and Fannie Mae's alternative arguments that McGahey's claims founder because he does not plausibly plead an essential element of each: that he suffered harm traceable to the conduct of which he complains. On that basis, I recommend that the court grant the defendants' Motion To Dismiss.

### 2.  UTPA Claim Against PHH (Count I)

The UTPA provides, in relevant part:

> Any person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 207 or by any rule or regulation issued under section 207, subsection 2 may bring an action either in the Superior Court or District Court for actual damages, restitution and for such other equitable relief, including an injunction, as the court determines to be necessary and proper.

5 M.R.S.A. § 213(1).

The UTPA proscribes, *inter alia*, "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" *Id*. § 207.  "To justify a finding of unfairness, the act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition." *State v. Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200, 206.  "An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances." *Id*. at ¶ 17, 868 A.2d at 206.

In his First Amended Complaint, McGahey alleges that PHH engaged in a number of unfair or deceptive acts in violation of the UTPA, namely, (i) failing to follow Fannie Mae Guidelines pertaining to HAMP, (ii) persistently misprocessing and mismanaging his loan, (iii) repeatedly making false and misleading representations regarding his eligibility for a HAMP modification when it knew he was eligible to be evaluated for, if not offered, a modification, (iv) failing to take

any corrective action after being repeatedly informed of the misconduct, (v) filing a foreclosure action in 2012 after incorrectly denying his HAMP application and then ignoring his appeal of the denial, (vi) failing to provide him with a HAMP TPP offer in 2012 and 2015, (vii) providing modifications that were less advantageous than a HAMP modification, with inflated monthly payments that included increased interest and costs, (viii) charging and applying part of his monthly payments to increased interest, interest on interest, fees, and interest on fees, (ix) charging and applying his payments toward PHH and Fannie Mae's attorney fees for pursuing the 2012 foreclosure action, (x) offering him multiple TPPs in 2013 all containing different amounts, (xi) setting him up for failure by providing him with loan modification options it knew were unaffordable, and (xii) offering a permanent modification in 2013, accepting his signed offer, signing the offer, and then requiring him to sign a new permanent modification months later with different amounts and terms.  First Amended Complaint ¶ 181.

McGahey does not dispute PHH's determination that he was not eligible for a permanent HAMP modification due to his reduction in income when he successfully completed a HAMP TPP in 2009.  *See* Objection at 7.  However, he contends that PHH engaged in unfair and deceptive acts when it represented to him that he was not eligible even to be considered for a HAMP modification in 2012, 2013, or 2015 when it knew, or should have known, that, as a result of changed circumstances, he was eligible for such consideration.  *See id*. at 7-11.  He asserts that there are only two circumstances in which a borrower who obtains a HAMP TPP is precluded from review for a later HAMP modification, and the denial of a permanent HAMP modification due to a reduction in income is not one of them.  *See id*. at 8.

As noted above, PHH seeks dismissal of McGahey's UTPA claim on the bases that he fails to allege unfair or deceptive trade practices independent of Fannie Mae Guideline violations or

demonstrate a loss of money or property and cannot plausibly plead that he paid more than he would have pursuant to a HAMP modification in 2012 or that he relied to his detriment on a representation by PHH or Fannie Mae.  *See* Motion To Dismiss at 13-19.

Even assuming *arguendo* that McGahey sufficiently pleads conduct on the part of PHH independent of Fannie Mae Guidelines violations, PHH persuasively argues that he fails to plead the requisite "loss of money or property" as a result of its allegedly unfair and deceptive acts. Motion To Dismiss at 15-18 (quoting 5 M.R.S.A. § 213(1)); *see also* Reply at 4.

As PHH observes, *see* Motion To Dismiss at 16, a consumer must show a substantial injury to make out a violation of the UTPA, *see, e.g., Poulin v. Thomas Agency*, 746 F. Supp.2d 200, 206 (D. Me. 2010) ("The Law Court . . . has made clear that merely speculative harms are not substantial enough to merit a violation of the UTPA.") (citations and internal quotation marks omitted); *Tungate v. MacLean-Stevens Studios, Inc*., 1998 ME 162, ¶ 13, 714 A.2d 792, 797-98 ("To be entitled to the remedial measures authorized by the UTPA, the plaintiff must show a loss of money or property as a result of the UTPA violation.  The plain language of the statute denies relief for plaintiffs who do not demonstrate injury from the alleged deceptive or unfair practice.") (citations and internal punctuation omitted).

McGahey protests that he alleges that he suffered substantial actual damages as a result of PHH's conduct, including (i) paying increased interest, (ii) paying PHH and Fannie Mae's attorney fees for the 2012 foreclosure action that never should have been brought, (iii) incurring and paying late fees and costs when he inevitably fell behind, (iv) paying interest on the capitalized interest, fees, attorney fees, and costs at a higher rate, (v) paying for his attorney to prevent the 2012 foreclosure, (vi) suffering harm to his credit, (vii) incurring gas and mileage costs, and

(viii) suffering a loss of equity in the Property.  *See* Objection at 11 (citing First Amended Complaint ¶¶ 36, 62, 95, 106, 117, 123, 148, 152, 168, 170-71, 186, 189 & Exh. 24).

All of those items of damages flow from the denial of McGahey's applications for a HAMP modification from 2012 onward.[6]  Yet, consistent with the First Circuit's holding in *MacKenzie*, McGahey does not claim that he was entitled to obtain, or that PHH was obligated to offer him, a HAMP modification.  *See* Objection at 4-5; *MacKenzie*, 738 F.3d at 490-93.  In the circumstances, he cannot plausibly plead that PHH's alleged UTPA violations caused the harm of which he complains.  *See, e.g., Young v. Wells Fargo Bank, N.A.*, 828 F.3d 26, 34-35 (1st Cir. 2016) (affirming summary judgment for servicer on borrower's chapter 93A claim that servicer engaged in unfair and deceptive conduct in denying HAMP modification in part on basis that borrower failed "to demonstrate economic injury" when she cited "increased fees and interest" but provided no evidence that those damages stemmed from servicer's alleged misconduct, *versus* "the interest and fees due under her preexisting mortgage") (footnote omitted); *McAfee v. Select Portfolio Servicing, Inc.*, No. 71995-5-I, 2016 WL 884868, at *4-*5 (Wash. Ct. App. Mar. 7, 2016) (affirming dismissal of borrower's claim that respondents unfairly and deceptively prevented her from obtaining a HAMP modification in violation of Washington's consumer protection statute

---

[6] As noted above, in his First Amended Complaint, McGahey also alleged that PHH engaged in unfair and deceptive conduct, in violation of the UTPA, when it (i) offered him multiple TPPs in 2013 all containing different amounts and (ii) offered him a permanent modification in 2013, accepted his signed offer, and then required him to sign a new permanent modification months later with different amounts and terms.  *See* First Amended Complaint ¶ 181.  While this alleged conduct is distinct from the alleged wrongful denial of a HAMP modification, McGahey does not rely on it in opposition to the Motion To Dismiss.  *See* Objection at 11-13.  In any event, insofar as appears, he suffered no loss of money or property as a result of it.  The well-pleaded allegations of his First Amended Complaint reveal that he accepted and completed the most favorable TPP offered in 2013 (that for a monthly payment of $1,501.68, *versus* those for monthly payments of $1,625.19 and $1,591.63) and that the revised permanent modification agreement provided for a monthly payment of $1,625.22 and the capitalization of $27,756.55 in attorney fees, advances, and interest, *versus* a monthly payment per the original agreement of $1,630.73 and the capitalization of $28,678.  *See* First Amended Complaint ¶¶ 84-87, 90-93, 113-15.

when she identified no obligation on their part to provide such a modification and, as a matter of law, "courts have consistently held that HAMP does not create a private right of action").

McGahey cites *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp.2d 342, 354 (D. Mass. 2011), for the proposition that he adequately pleads damages for purposes of the UTPA. *See* Objection at 12-13. In *Bosque*, the court deemed a borrower's allegations of "several injuries resulting from defendant's allegedly deceptive representations about HAMP, including wrongful foreclosures, increased fees, costs incurred to avoid foreclosure, loss of opportunities to pursue refinancing or loss mitigation strategies, and emotional distress . . . sufficient to state a claim under" chapter 93A. *Bosque*, 762 F. Supp.2d at 354. However, as PHH rejoins, *see* Reply at 3, *Bosque* is materially distinguishable in that the borrowers in that case alleged breach of separate TPP contracts to provide them with HAMP modifications, *see Bosque*, 762 F. Supp.2d at 349, 353-54.

McGahey also generally cites *In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, Civil Action No. 10-md-02193-RWZ, 2011 WL 2637222, at *5 (D. Mass. July 6, 2011), and *Blackwood v. Wells Fargo Bank, N.A.*, Civil Action No. 10-10483-JGD, 2011 WL 1561024, at *3 (D. Mass. Apr. 22, 2011), in addition to *Bosque*, for the proposition that the absence of a private right of action to enforce HAMP guidelines does not preclude recovery for unfair and deceptive practices pursuant to the UTPA. *See* Objection at 6. However, as PHH argues, *see* Reply at 3, *In re HAMP* and *Blackwood* also are distinguishable in that the borrowers in those cases alleged separate breaches of promise in connection with HAMP modifications, *see In re HAMP*, 2011 WL 2637222, at *2 (borrowers alleged that servicer breached binding trial plan contracts); *Blackwood*, 2011 WL 1561024, at *2, *4 (borrower alleged that servicer breached a separate promise not to foreclose on his home while his HAMP application was pending).

As PHH suggests, there can be no substantial injury in circumstances in which the servicer has no obligation to offer a defaulting borrower a loan modification of any kind and, yet, offers a series of such modifications, enabling the borrower to keep his home. *See* Motion To Dismiss at 17 ("Despite having no legal duty or obligation to modify the Loan under HAMP or otherwise, PHH has offered and Plaintiff has accepted three standard loan modification agreements since 2009, each of which has provided Plaintiff with an interest rate and monthly payment lower than the rate agreed upon in the original Loan.").[7]

PHH, accordingly, demonstrates its entitlement to dismissal of Count I on this basis.

### 3.  RESPA Claim Against PHH (Count II)

Congress enacted RESPA, "a consumer protection statute that regulates the real estate settlement process[,] . . . to insure that customers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from . . . certain abusive practices." *Joussett v. Bank of Am., N.A.*, CIVIL ACTION No. 15-6318, 2016 WL 5848845, at *1 (E.D. Pa. Oct. 6, 2016) (citations and internal quotation marks omitted).

Prior to a 2010 amendment of RESPA pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), the principal method for a borrower to obtain information from a servicer or request the correction of any error was through a QWR, or "qualified written request." *Sutton v. Citimortgage, Inc.*, 16 Civ. 1778 (KPF), 2017 WL 122989, at *4-*5 (S.D.N.Y. Jan. 12, 2017); 12 U.S.C. § 2605(e)(1).

---

[7] Moreover, PHH observes that McGahey cannot plead that he paid more pursuant to the loan modifications that he accepted than he would have paid pursuant to a September 2012 HAMP modification. *See* Motion To Dismiss at 17-18. PHH asserts, and McGahey does not dispute, that documents attached to the First Amended Complaint reveal that he made a total of $41,953 in monthly principal, interest, and escrow payments from August 31, 2012, through November 30, 2015, less than the approximately $44,987 in monthly principal, interest, and escrow payments he would have made during the same period pursuant to a September 2012 HAMP modification. *See* Motion To Dismiss at 17-18; Objection at 5-14; Reply at 4.

However, pursuant to the Dodd-Frank Act, the CFPB promulgated Regulation X (codified at 12 C.F.R. § 1024), which, effective January 10, 2014, set forth, *inter alia*, separate procedures for responding to borrowers' RFIs and NOEs.  *See Wilson v. Bank of Am., N.A.*, 48 F. Supp.3d 787, 799-800 (E.D. Pa. 2014); 12 C.F.R. §§ 1024.35 (NOEs), 1024.36 (RFIs).

Regardless of whether a borrower proceeds by way of Regulation X, "[t]o prevail under 12 U.S.C. § 2605, a plaintiff must allege actual damages resulting from a violation of § 2605." *Kelmetis v. Federal Nat'l Mortg. Ass'n*, No. 1:16-CV-00246(MAD/CFH), 2017 WL 395120, at *8 (N.D.N.Y. Jan. 27, 2017) (citation and internal quotation marks omitted).  "Simply saying that, for example, the servicer's failure to respond to a QWR caused damages without specifying how those damages were caused . . . is not enough to survive a motion to dismiss." *Id.* (citation and internal punctuation omitted).  *See also, e.g., Hopson v. Chase Home Fin. LLC*, 14 F. Supp.3d 774, 788 (S.D. Miss.), *aff'd*, 605 Fed. Appx. 267 (5th Cir. 2014) (dismissing complaint when borrowers alleged generally that they had sustained reduction in property value, harm to credit scores, threat of foreclosure, and mental and emotional distress damages but nothing in complaint linked any of those alleged damages to RESPA violation).

As noted above, PHH sought the dismissal of the RESPA claim on the bases that (i) the letters at issue were not QWRs, (ii) PHH responded to each letter, and (iii) McGahey alleged no actionable damages.  *See* Motion To Dismiss at 19-28.  In response, McGahey argued that his communications qualified as RFIs and NOEs pursuant to Regulation X, 12 C.F.R. §§ 1024.35 and 1024.36, that PHH did not adequately respond, and that he suffered actual damages as a result. *See* Objection at 14-18.  PHH disputed the relevance of Regulation X, reiterating its request for dismissal on any of the three bases set forth in its Motion To Dismiss.  *See* Reply at 4-7.  With leave of the court, *see* ECF Nos. 24, 27, McGahey filed a surreply disputing PHH's relevancy

argument, *see* Plaintiff's Surreply to Defendants' Reply in Support of Motion To Dismiss (ECF No. 28).

Even assuming *arguendo* that Regulation X applies and that McGahey adequately alleges violations of that regulation, PHH demonstrates its entitlement to dismissal of Count II on the basis of McGahey's failure to plead actionable damages.

McGahey argues that, in violation of RESPA/Regulation X, PHH failed to: (i) provide information requested in his August 28, 2013, QWR, (ii) correct errors alleged in his June 12, 2015, QWR/NOE regarding the wrongful denial of a HAMP modification in 2012-13, (iii) correct errors alleged in his June 12, 2015, QWR/NOE regarding the wrongful denial of a HAMP modification in 2015-16, (iv) provide information requested in his January 27, 2016, QWR/NOE on the modified loan and calculations of the principal on the loan account, (v) properly investigate and correct the errors alleged in his January 27, 2016, QWR/NOE regarding the wrongful denial of a HAMP modification in 2012-13, and (vi) properly investigate and correct the errors alleged in his January 27, 2016, QWR/NOE regarding the wrongful denial of a HAMP modification in 2015-16.  *See* Objection at 17-18 (citing First Amended Complaint ¶¶ 193-94, 196).

He claims "specific damages directly resulting from PHH's RESPA violations" in the form of attorney fees to correct the error and inflated monthly interest, fees, and costs.  Objection at 18 (citing First Amended Complaint ¶ 198).

Yet, as in the case of McGahey's UTPA claim, these alleged damages stem from PHH's asserted wrongful denial of HAMP modifications.  First Amended Complaint ¶ 198 ("Had PHH provided the information requested, investigated the issues and corrected the account, Mr. McGahey would not have had to incur fees with counsel to help fix the error and he would have been evaluated and approved for a HAMP modification which PHH would have had to offer him

under the Fannie Mae Servicing Guide in 2012 instead of having to sacrifice to pay inflated monthly interest, fees, and costs as detailed repeatedly above.").  As PHH argues, *see* Reply at 1-2, it cannot have failed in its obligation to correct the error of not previously providing McGahey a HAMP modification when, as McGahey admits, it was not obliged to provide him one.

Moreover, as PHH suggests, *see* Reply at 7, Regulation X does not impose an affirmative duty on a loan servicer to provide a borrower with a modification, *see* 12 C.F.R. § 1024.41(a) (Loss mitigation procedures) ("Nothing in § 1024.41 imposes a duty on a servicer to provide any borrower with any specific loss mitigation option.").  While McGahey relies on 12 C.F.R. § 1024.35 (Error resolution procedures), rather than section 1024.41, in support of his assertion that PHH erred in failing to correct the error of wrongful denial of his HAMP modification applications, *see* Objection at 15, the wrongful denial of a loan modification application is not within the scope of errors requiring resolution pursuant to section 1024.35, *see* 12 C.F.R. § 1024.35(b).[8]

That McGahey also seeks statutory damages for PHH's alleged pattern and practice of RESPA violations, *see* First Amendment Complaint ¶¶ 197, 200, does not salvage his RESPA claim.  "Although RESPA permits recovery of both actual and statutory damages, proof of actual damages is mandatory to recover on a § 2605(e) violation, and a § 2605(e) claim cannot stand on

---

[8] Beyond this, as noted above, insofar as McGahey claims to have paid inflated monthly interest, fees, and costs, PHH asserts, and McGahey does not dispute, that documents attached to the First Amended Complaint reveal that he made a total of $41,953 in monthly principal, interest, and escrow payments from August 31, 2012, through November 30, 2015, less than the approximately $44,987 in monthly principal, interest, and escrow payments he would have made during the same period pursuant to a September 2012 HAMP modification.  *See* Motion To Dismiss at 17-18; Objection at 5-14; Reply at 4.  In addition, while, as the parties' briefs reflect, courts are split on whether attorney fees constitute actual damages for purposes of RESPA, *compare* Objection at 18 *with* Reply at 6-7, the better-reasoned view is that they do not, given that RESPA separately provides for their recovery, *see* 12 U.S.C. § 2605(f)(3) (in addition to "actual damages" and any statutory damages, a successful RESPA litigant is entitled to "the costs of the action, together with any [reasonable] attorneys fees incurred in connection with such action"); *Giordano v. MGC Mortg., Inc.*, 160 F. Supp.3d 778, 783 (D.N.J. 2016) (noting that "a contrary finding would render the portion of the statute directly addressing 'costs of the action' (§ 2605(f)(3)) superfluous").

statutory damages alone." *Kelmetis*, 2017 WL 395120, at *8 (citation and internal punctuation omitted); *see also* 12 U.S.C. § 2605(f)(1) (providing for damages to individual borrowers for each failure to comply with section 2605 in the sum of "any actual damages to the borrower as a result of the failure; and . . . any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000").

### 4.  Fraud, Misrepresentation Claims Against PHH, Fannie Mae (Counts III and IV)

An individual "is liable for fraud or deceit if he 1) makes a false representation, 2) of a material fact, 3) with knowledge of its falsity or in reckless disregard of whether it is true or false" and induces another to rely on the misrepresentation to his or her damage. *Francis v. Stinson,* 2000 ME 173, ¶ 38, 760 A.2d 209, 217.

Pursuant to 9-A M.R.S.A. § 9-401, "[a] creditor or a person acting for him may not induce a consumer to enter into a consumer credit transaction by misrepresentation of a material fact with respect to the terms and conditions of the extension of credit." 9-A M.R.S.A. § 9-401.  The statute provides that "[a] consumer so induced may rescind the sale, lease or loan or recover actual damages, or both." *Id.*

McGahey alleges in Count III that PHH and Fannie Mae made false statements about material facts when they represented that he was not eligible for a HAMP modification based on a prior HAMP failure and offered him more expensive, less affordable modification options instead.  First Amended Complaint ¶ 203.  He alleges in Count IV that, in violation of 9-A M.R.S.A. § 9-401, PHH and Fannie Mae induced him to accept the 2013 and 2015 loan modifications by misrepresenting that he was not eligible for a HAMP modification. *See id.* ¶ 217.

PHH and Fannie Mae assert that the only alleged fraudulent statements or misrepresentations to which McGahey points are statements that he did not qualify for a HAMP modification.  *See* Motion To Dismiss at 29.  Yet, they argue, his acceptance of a series of three standard loan modifications in reliance on those statements could not have been detrimental reliance in circumstances in which he disclaims that he was entitled to, or that they were obliged to offer him, a HAMP modification and, as a matter of law, he had no such entitlement.  *See id*. at 29-30; Reply at 7.  Instead, they reason, the three standard loan modifications offered McGahey conferred a benefit in the form of avoidance of foreclosure and the provision of lower monthly payments and interest rates than he had been obligated to pay pursuant to his original note.  *See id*.

McGahey disputes that the only falsehoods or misrepresentations on which he relies concern his qualification for a HAMP modification.  *See* Objection at 19.  He points to his allegation that PHH and Fannie Mae "represented that [he] was not eligible for HAMP based on a prior HAMP failure[,]" *see id*. (quoting First Amended Complaint ¶ 203) (boldface omitted), as well as "additional allegations of false or misrepresented statements" set forth in paragraphs 70, 87, 102, 115, 125, 131, 142, 150, and 155 of the First Amended Complaint and Exhibits 2 (ECF No. 16-2), 26 (ECF No. 16-26), and 34 (ECF No. 16-34) thereto, *see id*.  However, each of the cited paragraphs and exhibits is a variation on the theme that PHH and Fannie Mae falsely represented that McGahey was ineligible for a HAMP modification, as a result of which he accepted less beneficial standard loan modifications and forewent taking steps to secure a HAMP modification.  *See* First Amended Complaint ¶¶ 70, 87, 102, 115, 125, 131, 142, 150, 155, 203 & Exhs. 2, 26, & 34.

McGahey argues that, for purposes of his fraud claim, he demonstrates detrimental reliance in the form of his acceptance of "more expensive loan modifications, thus paying fees, interest,

and costs well above and beyond his original obligation[.]"  Objection at 19.  He adds that he alleges that he suffered emotional, as well as financial, harm as a result of the alleged fraud.  *See id*. at 20.  Yet, as PHH and Fannie Mae observe, *see* Reply at 7, acceptance of a standard, in lieu of a HAMP, modification could only be detrimental if McGahey were entitled to something better, and he acknowledges that he was not.

With respect to his section 9-401 claim, McGahey correctly notes that PHH and Fannie Mae rely on citations to caselaw addressing claims of fraudulent misrepresentation, rather than claims pursuant to section 9-401.  *See* Objection at 20; *see also* Motion To Dismiss at 28-29.  He contends that he adequately alleges the elements of a section 9-401 claim in that (i) PHH and Fannie Mae represented to him multiple times that he was not eligible for a HAMP modification, (ii) his purported ineligibility was a material fact inducing him to accept more expensive loan modifications, and (iii) as a result he suffered damages in the form of increased interest, fees, costs, interest upon the interest, fees, and costs, loss of equity, harm to his credit, costs for travel and legal representation with respect to the foreclosure that never should have been filed, and emotional harm.  *See* Objection at 20 (citing First Amended Complaint ¶¶ 216-20).

PHH and Fannie Mae rejoin that reliance is an essential element of section 9-401 claims, as well, in that a plaintiff must show that the misrepresentation "induced" him or her to enter into a consumer credit transaction.  *See* Reply at 7 n.3.  They reiterate that McGahey cannot plausibly plead that he relied on the alleged misrepresentations to his detriment.  *See id*. at 7.  I agree that section 9-401 incorporates the concept of detrimental reliance, in that a consumer must show that a material misrepresentation induced him or her to enter into the consumer credit transaction, entitling him or her to "rescind the sale, lease or loan or recover actual damages, or both."  9-A M.R.S.A. § 9-401.  Yet, as in the case of McGahey's fraud claim, acceptance of a series of standard

loan modifications could only be detrimental if McGahey were entitled to something better, and, as he acknowledges, he was not.

PHH and Fannie Mae, accordingly, are entitled to the dismissal of Counts III and IV.

## II.  Motion To Amend

### A.  Applicable Legal Standards

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Leave to amend should be granted in the absence of reasons "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. . . . ."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The First Circuit has explained:

> A motion to amend a complaint will be treated differently depending on its timing and the context in which it is filed. . . .  As a case progresses, and the issues are joined, the burden on a plaintiff seeking to amend a complaint becomes more exacting.  Scheduling orders, for example, typically establish a cut-off date for amendments (as was apparently the case here).  Once a scheduling order is in place, the liberal default rule is replaced by the more demanding "good cause" standard of Fed. R. Civ. P. 16(b).  This standard focuses on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent.  Where the motion to amend is filed after the opposing party has timely moved for summary judgment, a plaintiff is required to show "substantial and convincing evidence" to justify a belated attempt to amend a complaint.

*Steir v. Girl Scouts of the USA*, 383 F.3d 7, 11-12 (1st Cir. 2004) (citations, internal quotation marks, and footnotes omitted).

As McGahey notes, *see* Motion To Amend at 2, no scheduling order has yet issued in this case given the pendency of motions to dismiss, and, therefore, the liberal default rule applies.

An amendment is futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted."  *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.

1996).  "In assessing futility, the district court must apply the standard which applies to motions to dismiss under [Federal Rule of Civil Procedure] 12(b)(6)." *Adorno v. Crowley Towing & Trans. Co.,* 443 F.3d 122, 126 (1st Cir. 2006).

### B.  Factual Background

McGahey seeks to amend his complaint a second time to add facts based on events that occurred after the filing of his First Amended Complaint, or that he discovered afterward, and to bring his UTPA and RESPA claims against Fannie Mae as well as PHH.  *See* Motion To Amend at 1.  He alleges:

On July 27, 2016, he delivered a demand letter pursuant to the UTPA to Fannie Mae. [Proposed] Plaintiff's Second Amended Complaint ("Proposed Complaint") (ECF No. 23-1), attached to Motion To Amend, ¶ 167.  Fannie Mae responded by letter dated August 26, 2016, but the parties did not reach settlement.  *Id*. ¶ 168.

By letter dated August 30, 2016, PHH denied McGahey's July 14, 2016, loan modification application and falsely and misleadingly represented that he did not qualify for a HAMP modification "due to your loan exceeding the maximum amount of modifications allowed by your Investor."  *Id*. ¶ 169.  The Investor is and was Fannie Mae.  *Id*.  McGahey appealed this denial by letter dated September 22, 2016, and, as of October 7, 2016, had not received a response.  *Id*. ¶¶ 170-71.  As PHH knew or should have known, McGahey was and is eligible to be evaluated for, if not offered, a HAMP modification in accordance with Fannie Mae Guidelines.  *Id*. ¶¶ 172-79.

Had PHH evaluated McGahey's application properly pursuant to Fannie Mae Guidelines, it would have found him eligible for a HAMP modification and would have had to offer him a HAMP trial plan.  *Id*. ¶ 180.  He would have been able to afford and pay the HAMP trial payments.

*Id*. ¶ 181.  Now, as a result of the wrongful denial, he remains in default on his mortgage, PHH

has refused his monthly payments, and interest and fees are accumulating on the loan.  *Id*. ¶ 182.

PHH was required to abide by the Fannie Mae Guidelines, evaluate McGahey for a HAMP

modification, and communicate that decision to him.  *Id*. ¶ 183.

At all relevant times, PHH was the agent of Fannie Mae with regard to the servicing of

McGahey's loan.  *Id*. ¶ 184.  PHH engaged in, and continues to engage in, persistent misprocessing

and mismanagement of McGahey's loan, including failing to follow Fannie Mae Guidelines,

failing to evaluate him properly for a HAMP modification, and persistently making false and

misleading representations that he was and is not eligible for a HAMP modification.  *Id*. ¶ 186.

## C.  Discussion

PHH and Fannie Mae oppose the Motion To Amend on the basis that the Proposed

Complaint relies on the same legal theory as the First Amended Complaint and is futile for the

same reasons.  *See* Defendants' Opposition to Plaintiff's Motion for Leave To Amend the

Complaint (ECF No. 25) at 1.  I agree.

McGahey seeks to add allegations bearing on PHH's allegedly wrongful denial of a more

recent HAMP application and to bring claims against Fannie Mae, as well as PHH, on Counts I

and II, based in part on a new theory of Fannie Mae's vicarious liability for PHH's actions.  *See*

Motion To Amend at 4-8.

The proposed new allegations do not cure the defect identified above with respect to the

First Amended Complaint: McGahey cannot plausibly plead that he suffered actionable damages

as a result of PHH or Fannie Mae's conduct.  His vicarious liability theory founders because

McGahey fails to state a plausible claim that PHH, Fannie Mae's alleged agent, is liable on Counts

I and II.  *See, e.g., Crawford v. Signet Bank*, 179 F.3d 926, 929 (D.C. Cir. 1999) (in absence of agent liability, none can attach to principal).[9]

### III.  Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the Motion To Dismiss and **DENY** the Motion To Amend.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 26th day of March, 2017.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[9] McGahey complains that, in opposing the Motion To Amend, PHH and Fannie Mae "continue to misconstrue that [he] 'admits' he does not have standing to enforce HAMP and seek enforcement of the HAMP program[,]" as a result of which they claim the proposed amendments are futile.  Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Leave To Amend the Complaint (ECF No. 26) at 3.  He states: "To clarify, [he] has not claimed standing to enforce HAMP, and has not claimed that he was entitled to a HAMP modification *per any private right of action under HAMP*.  Rather, [he] properly asserts his eligibility to be evaluated for a HAMP modification, as he did not fail the 2009 HAMP TPP and therefore was not precluded from subsequent evaluation for HAMP."  *Id.* (citations omitted) (emphasis in original).  He adds that he "further asserts that had he been properly evaluated he would have been found eligible and PHH would have had to offer him a Fannie Mae HAMP trial plan per the Fannie Mae Guidelines."  *Id.* (citations omitted).  Yet, McGahey's claims continue to hinge on a finding that he suffered damages as a result of the wrongful denial of evaluations for HAMP modifications to which he had no entitlement.