## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **WALTER McGAHEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **2:16-cv-00219-JDL** |
| | ) | |
| **FEDERAL NATIONAL** | ) | |
| **MORTGAGE ASSOCIATION,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER ON RECOMMENDED DECISION ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFF'S MOTION TO AMEND

Walter McGahey's Amended Complaint against Federal National Mortgage Association ("Fannie Mae") and PHH Mortgage Corporation ("PHH") alleges violations of the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A *et seq.* (2017), and the Real Estate Settlement Procedures Act, 12 U.S.C.A. § 2605 *et seq.* (2017), as well as claims for fraud and for misrepresentation in violation of Maine's Consumer Credit Code, 9-A M.R.S.A. § 9-401 (2017). ECF No. 16. Defendants moved to dismiss all claims against them. ECF No. 19 at 6. McGahey subsequently moved for leave to amend his Complaint a second time. ECF No. 23. The United States Magistrate Judge recommended that the Motion to Dismiss be granted and the Motion for Leave to Amend be denied, ECF No. 30 at 37, and McGahey objected, ECF No. 31; ECF No. 32. I have carefully reviewed and considered the Magistrate Judge's recommended decision and the parties' briefs, and have made a *de novo* determination of the matters

objected to, in accordance with 28 U.S.C.A. § 636(b)(1) (2017). For the reasons discussed below, I conclude that the Defendants' Motion to Dismiss should be denied, and the Plaintiff's Motion for Leave to Amend should be granted.

## I.   FACTUAL BACKGROUND

I accept—and repeat—the Magistrate Judge's recitation of the facts relevant to the pending motions, which is based on the factual allegations in the First Amended Complaint and the documents appended thereto and referenced by the parties.

At all relevant times, Fannie Mae owned, and PHH serviced, McGahey's mortgage loan on property located at 42 McKenney Road in Saco, Maine (the "Property"). Fannie Mae retained PHH to service the loan under Fannie Mae's direction, control, and authority. PHH is required to follow Fannie Mae regulations and guidelines, particularly the Fannie Mae Servicing Guide, including the Fannie Mae Single Family Servicing Guides (the "Fannie Mae Guidelines"). PHH was and is required to participate in the Home Affordable Modification Program ("HAMP") for Fannie Mae loans.[1]

McGahey owns the Property by virtue of a deed from his parents, George L. McGahey and Helen I. McGahey, dated April 20, 2006, and recorded in the York County Registry of Deeds on April 27, 2006, at Book 14818, Page 53. McGahey bought

---

[1] According to the website of the Federal Housing Finance Agency, HAMP "is part of the Making Home Affordable® Program (MHA)® to help homeowners get mortgage relief and avoid foreclosure. Through HAMP, homeowners who are not unemployed but struggling to make their monthly mortgage payments, may lower their monthly payments and make them more affordable and sustainable for the long-term." *HAMP*, Federal Housing Finance Agency website, http://www.fhfa.gov/Homeownersbuyer/MortgageAssistance/Pages/HAMP.aspx (last visited July 10, 2017).

the home from his parents and moved in so that they could live in the home for the remainder of their lives.

On May 22, 2006, McGahey executed and delivered to TD Banknorth, N.A. ("TD Bank") a promissory note in the original principal amount of $170,000 (the "Note"). The Note provided for repayment at a fixed annual interest rate of 7.868 percent. To secure repayment of the Note, McGahey executed and delivered to Mortgage Electronic Registration Systems, Inc., as nominee for TD Bank, its successors and assigns, a mortgage in the amount of $170,000 (the "Mortgage"), which was recorded on June 7, 2006, in the York County Registry of Deeds at Book 14860, Page 847.

## A.  2010 Loan Modification

In 2009, due to medical issues and job loss, McGahey fell behind on payments on the Note and applied for loss mitigation. At that time, his monthly income was $3,387.67, and his monthly payment for principal, interest, taxes, and insurance was less than $1,500. In or about July 2009, PHH offered McGahey a HAMP modification contingent on his successful completion of a Trial Payment Plan ("TPP") and income verification. The TPP required McGahey to make payments in the amount of $1,031.79 on August 5, September 1, and October 1, 2009. McGahey timely signed and returned the TPP and timely made the required payments. He successfully completed the HAMP TPP.

On or about December 21, 2009, PHH delivered a loan modification agreement to McGahey, which he signed in early 2010 (the "2010 Loan Modification"). The 2010

Loan Modification, which called for a monthly principal, interest, and escrow payment of $1,456.49, was not provided pursuant to HAMP.  Pursuant to that modification, the principal and interest portion of McGahey's monthly payment dropped from $1,231.80 to $1,175.80.  At the time, McGahey's income was $979.33 monthly due to a recent job loss.  The 2010 Modification Agreement required an initial contribution of $1,987.07.  Believing that this was the only way to save his home, McGahey signed and returned the agreement and provided the contribution payment.

## B.  2013 Loan Modifications

With the help of his parents, and by selling his car, McGahey made the monthly payments until December 2011, after which it was too difficult to come up with the unaffordable amount.  In June 2012, PHH delivered a notice of intention to foreclose to McGahey.  Shortly thereafter, McGahey retained counsel to help him apply for a more affordable loan modification to prevent the foreclosure.  On August 31, 2012, he submitted a complete loss mitigation application to PHH requesting to be reviewed for a HAMP modification.  He explained that he had experienced a change in circumstances since 2009-10 in that he was receiving Social Security Disability ("SSD") income rather than wages and was unable to make the modified monthly payment. As of August 12, 2012, the estimated fair market value of the Property was between $180,000 and $200,000.  McGahey's income, as submitted to PHH, together with his father's contribution, totaled about $3,819 per month when adding a multiplier of 1.25 as required by Fannie Mae for non-taxed income.

On September 25, 2012, PHH sent McGahey a letter stating that it was unable to offer a HAMP modification but providing no reason for the denial. PHH knew or should have known that McGahey was eligible to be evaluated for, if not offered, a HAMP modification as it possessed the original non-HAMP modification and McGahey's complete loss mitigation packet. PHH was required to evaluate McGahey's loan first for a HAMP modification and, if he was found ineligible, then for a Fannie Mae standard mortgage loan modification.

On September 25, 2012, McGahey met all of the criteria to be eligible for a HAMP modification pursuant to the Fannie Mae Guidelines. Even though McGahey was evaluated for a HAMP modification in 2009-10 and was not offered one after he completed the HAMP TPP due to his change in income, he could still request and be provided reconsideration for a HAMP modification at a future time if he had a change in circumstances. McGahey had neither failed a HAMP TPP nor received a HAMP permanent modification and lost good standing per the Fannie Mae Guidelines. Pursuant to those guidelines, PHH was obligated to evaluate McGahey's application for a HAMP modification.

Had PHH evaluated McGahey's application properly, it would have found him eligible for a HAMP modification and would have had to offer him a HAMP trial plan. McGahey would have been able to afford and pay the HAMP trial payments. For purposes of a Fannie Mae HAMP, a loan can be modified by capitalizing arrears, reducing the interest rate to a floor of 2 percent, extending the term to 40 years, and/or forbearing principal to reach the target ratio of 31 percent of the borrower's

gross monthly income.  As of September 25, 2012, a HAMP modification would have provided a monthly principal, interest, and escrow payment of about $1,183.89, a new capitalized principal balance of about $182,500, and an initial modified interest rate of 2 percent.  McGahey would have been able to sustain that monthly payment.

Apart from its September 25, 2012, letter, PHH provided no other written response regarding evaluation or eligibility for any other loss mitigation program besides HAMP from August 31, 2012, through January 1, 2013.

In a letter dated September 28, 2012, PHH, through counsel, stated that it would continue with the foreclosure on the loan.  McGahey paid his counsel more than $1,000 to prevent the foreclosure and eventually appear in the foreclosure action, including participating in the foreclosure diversion program.  Through counsel, McGahey appealed the HAMP denial on October 2, 2012.  On October 4, 2012, through counsel, he requested that PHH escalate his appeal of the HAMP denial and cease further foreclosure activity on the loan.  PHH did not respond to either the appeal or the request to escalate the appeal and cease foreclosure efforts, and did not reevaluate McGahey's application for a HAMP modification or review his loan for other loss mitigation options.

McGahey, in collaboration with his counsel, sought assistance from York County Community Action ("YCCA") regarding the denial of his application for a HAMP modification.  A YCCA housing counselor contacted PHH with McGahey on October 26, 2012.  PHH falsely stated that McGahey did not complete a HAMP in 2009 and, therefore, was not eligible for another HAMP modification offer.  PHH

represented that it was going to seek an exception through Fannie Mae for another modification.  On November 2, 2012, McGahey, through counsel, emailed PHH to check on the status of his appeal but received no response.

On or about November 4, 2012, PHH filed a complaint for foreclosure against McGahey in the Maine District Court in Biddeford, Maine.  PHH and Fannie Mae charged McGahey's account for their attorney's fees related to the foreclosure action.  McGahey answered the complaint and requested to be placed in the Maine Foreclosure Diversion Program.  In a November 7, 2012, call between the YCCA housing counselor and PHH, PHH again falsely stated that McGahey did not qualify for a HAMP modification and informed the housing counselor that the denial would stand.  In a letter dated December 3, 2012, PHH misrepresented that McGahey "for some reason" was not eligible for a HAMP modification, but it provided no reason.  PHH offered McGahey a non-HAMP TPP with a monthly payment of $1,633.47 beginning on January 1, 2013.

In an effort to continue to try to save his home with an affordable monthly payment, McGahey submitted another complete loss mitigation application for a HAMP modification to both PHH and Fannie Mae on December 4, 2012.  PHH acknowledged receipt of the application in a letter dated January 31, 2013.  In the application, McGahey reported a change in income, which, combining his SSD payments and his father's contribution of retirement income plus food stamps and accounting for a 1.25 multiplier for non-taxed income, totaled $4,012.75.  McGahey was eligible at that time for a HAMP modification.  PHH knew or should have known

that he was eligible to be at least evaluated for, if not offered, a HAMP modification at that time as it possessed the original non-HAMP modification and McGahey's complete loss mitigation packet.

PHH delivered McGahey a notice dated February 13, 2013, offering a TPP in the amount of $1,501.68 per month beginning March 1, 2013.  In a second letter dated February 13, 2013, PHH offered McGahey a TPP with a monthly payment of $1,625.19.  Neither letter indicated that the TPP offers were provided pursuant to HAMP.  Based on PHH's repeated misrepresentations that he was ineligible for a HAMP modification, McGahey forewent taking steps at that time to pursue a HAMP modification, such as furthering an appeal, submitting another HAMP application, sending a demand letter, or pursuing litigation, and he accepted the first February 13, 2013, offer of a monthly payment of $1,501.68 and made a timely first TPP payment. [2]  McGahey was led to believe that if he did not take the modification offered, he would lose his home because he was not eligible for a better modification offer: HAMP.

By letter dated February 18, 2013, PHH offered McGahey yet another TPP with monthly payments of $1,591.63 beginning April 1, 2013.  He continued to send timely payments per the prior offer of a monthly payment of $1,501.68 and completed that TPP.  By letter dated June 5, 2013, PHH offered McGahey a permanent loan modification with a monthly principal, interest, and escrow payment of $1,630.73 beginning June 1, 2013 (the "2013 Loan Modification").  The interest rate remained

---

[2] This recitation corrects a typographical error in the date, February 13, "2012." *See* ECF No. 16 at ¶ 87.

6.67 percent, and the term of the loan was extended to 40 years. A total of $28,678 in escrow advances, attorney fees and costs, recoverable advances, and interest was added to the modified loan balance, creating a new capitalized principal balance of $198,216.01.

The 6.67 percent interest rate was a higher rate than McGahey would have had pursuant to a HAMP offer. McGahey was not offered a permanent HAMP modification in June 2013. Although PHH again knew or should have known that McGahey was eligible to be evaluated for, if not offered, a HAMP modification at that time, it failed to evaluate him for such a modification as required by the Fannie Mae Guidelines. Had PHH evaluated McGahey's application properly, it would have found him eligible for a HAMP modification and would have had to offer him a HAMP trial plan. Based on PHH's repeated misrepresentations that he was ineligible for a better HAMP modification, McGahey again forewent taking steps to pursue the HAMP option, believing that if he did not take the modification offered, he would lose his home. He signed and returned the 2013 Loan Modification agreement to PHH, which signed and returned it to him on July 16, 2013.

McGahey made at least 20 payments pursuant to the 2013 Loan Modification (as later revised). A portion of those payments went to cover (i) attorney's fees incurred by PHH and Fannie Mae in the 2012 foreclosure action, (ii) higher interest (6.67 percent) than would have been charged pursuant to a HAMP loan modification, (iii) interest on that interest accruing from September 25, 2012, through June 1, 2013, and (iv) "recoverable advance" fees, as well as interest on those fees accruing during

that period.  McGahey would not have had to pay these costs if PHH had properly managed his loan, including following Fannie Mae Guidelines and accurately evaluating his eligibility for a HAMP modification.

On August 27, 2013, PHH called McGahey, stating that the permanent loan modification was not effective because it was signed in the wrong place and that it would send a new modification agreement for him to sign.  On August 28, 2013, McGahey's counsel delivered a letter to PHH, characterized as a Qualified Written Request pursuant to RESPA, requesting information regarding McGahey's loan, including any modifications made to it.  The letter stated:

> In order to determine the amount due and owing on my client's account, I need all information about the costs, accounting, escrow procedures, and application of payments in connection with this loan. Due to the complicated nature of mortgage account servicing, accounts frequently contain errors in the form [of] misapplied payments, excess fees, or unwarranted/unauthorized charges. I have reason to believe that this account may contain such errors.

ECF No. 16-23 at 1. The letter made 10 demands for documents or information.

PHH responded by letter dated September 10, 2013, but did not provide information regarding the 2010 Loan Modification.  PHH disputed that the August 28, 2013, letter was a Qualified Written Request in that it failed to identify an actual error in McGahey's account.  However, it provided copies of McGahey's Mortgage, Note, HUD-1 Settlement Statement, Truth in Lending ("TIL") disclosures, Assignment Notice, Payment History, and a key to interpret the Payment History, and provided the contact information of a PHH employee.

In September 2013, PHH asked McGahey to execute a revised modification agreement with similar terms with a monthly payment of $1,625.22 and capitalization of $27,756.55 in attorney fees, recoverable advances, advanced escrow, and interest (the "Revised 2013 Loan Modification"). This was not a HAMP modification. Again, based on PHH's misrepresentations regarding his HAMP eligibility, McGahey timely signed and returned the Revised 2013 Loan Modification agreement. Again, PHH knew or should have known McGahey was eligible to at least be evaluated for, if not offered, a HAMP modification at that time.

Again, a portion of the payments made pursuant to the Revised 2013 Loan Modification agreement went to cover (i) attorney's fees incurred by PHH and Fannie Mae in the 2012 foreclosure action, (ii) higher interest (6.67 percent) than would have been charged pursuant to a HAMP loan modification, (iii) interest on that interest accruing from September 25, 2012, through June 1, 2013, and (iv) "recoverable advance" fees, as well as interest on those fees accruing during that period. McGahey would not have had to pay these costs if PHH had properly managed his loan, including following Fannie Mae Guidelines and accurately evaluating his eligibility for a HAMP modification.

## C. 2015 Loan Modification

McGahey struggled for over two years to make the monthly payments on the 2013 TPP and loan modifications. He had bought another used car but had to sell it to help make the payments. PHH knew or should have known that $1,625.22 was an unaffordable payment amount based on McGahey's submitted financial information.

In May 2015, McGahey reconnected with the YCCA housing counselor and submitted another complete loss mitigation application, again seeking a HAMP modification. During the process of working with the housing counselor in 2015, McGahey had to travel approximately 45 miles round-trip at least two times from Saco to Sanford, paying gas and mileage expenses. Again, McGahey had changed circumstances in that he could not maintain the modification payments and had unexpected housing expenses, as outlined in his hardship letter submitted to PHH.

By letter dated June 4, 2015, PHH falsely stated that McGahey did not qualify for a HAMP modification because he did not "successfully complete a previous HAMP offer." ECF No. 16 at ¶ 125. In June 2015, PHH offered McGahey a non-HAMP TPP with three monthly payments of $1,339.98 beginning July 1, 2015. Again, PHH knew or should have known McGahey was eligible to be evaluated for, if not offered, a HAMP at that time. Had PHH evaluated his application properly pursuant to Fannie Mae Guidelines, it would have found him eligible for a HAMP modification and would have had to offer him a HAMP trial plan. McGahey would have been able to afford and pay the HAMP trial payments. Again, PHH knew or should have known the modification payment offered was unaffordable based on McGahey's submitted financial information. Based on PHH's repeated misrepresentations that he was ineligible for a better HAMP modification, McGahey again forewent taking steps to pursue the HAMP option, believing that if he did not take the modification offered, he would lose his home.

As of June 1, 2015, McGahey was eligible for a HAMP modification with a monthly payment of about $1,177.70 based on his SSD income of $1,374 and a $1,665 per month contribution from his father.  Pursuant to Fannie Mae Guidelines, PHH was required to evaluate McGahey for a HAMP modification and communicate its decision to him.

On June 12, 2015, McGahey delivered a letter to PHH characterized as a Notice of Error in which he sought to appeal PHH's wrongful denial of a HAMP modification and obtain proper review for such a modification.  He submitted a similar complaint on June 12, 2015, to the Consumer Financial Protection Bureau ("CFPB").

PHH responded to the CFPB complaint, not the Notice of Error, by letter dated July 10, 2015, acknowledging McGahey's successful completion of the 2009 HAMP TPP but falsely stating that he was offered a HAMP modification agreement and was ineligible for a further HAMP modification because he had defaulted on that agreement.

By letter dated August 3, 2015, PHH offered McGahey a non-HAMP permanent modification (the "2015 Loan Modification") with a monthly payment of $1,336.91 beginning November 1, 2015.  The interest rate was 4 percent, with a 40-year term.  This resulted in a reduction in McGahey's principal and interest payment from $1,179.76 to $851.89.  The 2015 Loan Modification was not a HAMP modification.  The new capitalized principal balance on the 2015 modification was $203,832.61.  The fair market value of the Property in about October 2015 ranged

from $208,000 to $259,500.  The increase in the principal balance cut into the equity that McGahey had in the Property.  A total of $8,372.61 was added to the principal balance for escrow advances and accrued interest, including $6,866.23 in interest that accrued at the prior rate of 6.67 percent.  Based on PHH's repeated misrepresentations that he was ineligible for a better HAMP modification, McGahey again forewent taking steps to pursue the HAMP option, believing that if he did not take the modification offered, he would lose his home.

On August 12, 2015, McGahey delivered a complaint to Fannie Mae regarding the wrongful HAMP denial.

McGahey made several payments pursuant to the terms of the 2015 Loan Modification.  A portion of those payments went to cover (i) attorney's fees incurred by PHH and Fannie Mae in the 2012 foreclosure action, (ii) interest that accrued at a higher rate than would have been charged pursuant to a HAMP loan modification, (iii) interest on interest that accrued from September 25, 2012, through June 1, 2013, (iv) "recoverable advance" fees, as well as interest on those fees that accrued during that period, and (v) interest at a higher rate than would have been charged pursuant to a HAMP loan modification plus interest on the interest accrued pursuant to the 2013 loan modifications that was capitalized into the 2015 loan modification balance. McGahey would not have had to pay these costs if PHH had properly managed his loan, including following Fannie Mae Guidelines and accurately evaluating him for eligibility for a HAMP modification in 2012.

In emails in September and October 2015 between the YCCA housing counselor and Jack Maloney, Senior Business Manager of Fannie Mae, Maloney falsely stated that McGahey did not qualify for a HAMP modification because of a previous HAMP modification failure.

On October 30, 2015, McGahey sent another letter to PHH, characterized as a Qualified Written Request pursuant to RESPA, requesting five categories of documents or information regarding his loan, particularly the 2009-10 TPP and modification.  PHH responded by letter dated December 1, 2015, stating that it was providing, either in the body of its letter or through enclosed documents, all of the requested documents/information.   It stated that, while McGahey had been prequalified for a HAMP TPP on July 6, 2009, based on financial documentation he had submitted reflecting a monthly income of $3,386.67, he later provided financial documentation confirming monthly gross income of $979.33.  It stated that, as a result, he was ineligible for a HAMP modification but was provided with a standard loan modification.  PHH did not address or correct the 2012 and 2015 wrongful denials based incorrectly on the alleged unsuccessful completion of a HAMP.

McGahey again retained and paid counsel $100 to deliver another letter styled as an Notice of Error and Request for Information to PHH on January 27, 2016.  McGahey's counsel asserted that PHH had erred in deeming McGahey ineligible for HAMP modifications in both 2009-10 and thereafter, requesting that, to correct its error, PHH provide him with a HAMP modification retroactive to February 1, 2010,

waiving any additional interest, fees, and costs that had accrued.  She also requested that PHH provide four categories of information.

PHH responded by letter dated March 7, 2016, stating that after investigating the issues raised in McGahey's January 27, 2016, correspondence, it had determined that no error had occurred.  It repeated the rationale it had provided in its December 1, 2015, letter that McGahey was ineligible for a HAMP modification in 2009-10 based on his changed (lower) income.  However, it did not address McGahey's counsel's argument that subsequent denials of HAMP modifications were wrongful.

On March 24, 2016, McGahey, through counsel, delivered a demand letter to PHH pursuant to the Maine Unfair Trade Practices Act ("UTPA"), 5 M.R.S.A. § 213.  PHH responded by letter dated April 8, 2016, that, because the issues were the same as those raised in previous letters to which it had responded, it would take no action regarding the account.

As of August 4, 2016, the date he filed his First Amended Complaint, McGahey was again struggling to make his monthly payment under the current modification.  On July 14, 2016, through counsel and with YCCA's help, he submitted a new loan modification application seeking a HAMP modification.  As of August 4, 2016, he had not received a response to the application.

PHH engaged in persistent misprocessing and mismanagement of McGahey's loan, including failing to follow Fannie Mae Guidelines, failing to evaluate him properly for a HAMP modification, and persistently making false representations that he was not eligible for a HAMP modification.

16

Had PHH properly serviced and managed McGahey's loan, it would have found him eligible for, and would have offered him, a HAMP loan modification in September 2012. Instead, he made payments toward increased interest each month due to higher interest rates, interest on interest that accrued from September 2012 to June 2013, interest on the interest arrears added to the 2015 modification, PHH and Fannie Mae's attorney fees to pursue the 2012 foreclosure plus interest on those fees, fees and costs from September 2012 to June 2013, and interest on those fees and costs. McGahey also had to pay his own attorney to defend against the 2012 foreclosure action, which would have been unnecessary had he been given a HAMP modification.

PHH and Fannie Mae benefited financially from the increased payments toward interest, fees, and costs that McGahey made from 2012 to 2016. In addition, through the non-HAMP loan modifications, with interest, fees, and costs accruing at a higher rate than would have been the case with a HAMP modification, the principal balance grew and thereby decreased McGahey's equity in the Property. McGahey also suffered harm to his credit because of his inability to sustain the inflated monthly payments offered.

PHH does not have proper policies and procedures in place to process and properly report on a loan when a HAMP TPP is completed but a non-HAMP modification is then offered to a borrower. PHH and Fannie Mae do not have proper policies and procedures in place to evaluate and correct wrongful denials of loan

modifications.  PHH was repeatedly informed by McGahey of the misprocessing of his loan modification applications but failed to take any corrective action.

PHH's wrongful conduct caused McGahey's home to be at risk.  The stress and pressure of potentially losing his home and having to make inflated mortgage payments each month was extreme and severe.  He could not understand why PHH kept misrepresenting that he had failed a HAMP modification, telling him that he did not qualify for a more affordable loan payment, as a result of which he had to pay up to $500 extra per month, and declining to adjust the loan even when PHH admitted that he never had a HAMP modification.

McGahey struggled each month to come up with the money to make the payment, cut back on everything he could – groceries, heat, hot water, gifts, and going out – and felt worthless and overcome by the fact that he could not make the house payments.  He saw that his mother suffered from anxiety over potentially losing the home, as a result of which he felt increased guilt and shame.  He tried to keep the situation from his aging, ailing father.  He was always irritable and impatient and often fought with his father and two sons.  He became reclusive because of lack of money and depression and, over time, grew distant from all of his friends.  He would only leave the house to buy groceries.  At his lowest point, in about August 2014, his sense of failure and distress over potentially losing the home became intolerable and he began to have suicidal ideations.  He continues to suffer from anxiety and distress over the fact that his home is at risk and his continued ownership of it depends on his ability to make an unaffordable mortgage payment each month.  He constantly

fears that he will lose the home, displacing his elderly father who now suffers from dementia.

## II. LEGAL STANDARD

### A. Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks and alterations omitted). The court should accept all well-pleaded facts as true, while ignoring conclusory legal allegations. *Id.* All reasonable inferences should be drawn in favor of the non-moving party. *Id.* at 16. The complaint must contain facts that support a reasonable inference "that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Determining the plausibility of a claim is a context-specific task that requires the court "to draw on its judicial experience and common sense." *Saldivar*, 818 F.3d at 18 (quoting *Iqbal*, 556 U.S. at 679) (quotation marks omitted). The burden of demonstrating that the complaint does not state a claim for which relief can be granted is on the Defendants. *See* 5B Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 1357 (3d ed. 2017 Update).

Allegations of fraud are subject to the higher pleading standard of Federal Rule of Civil Procedure Rule 9(b). *See* Fed. R. Civ. P. 9(b). The complaint must "be specific about the 'time, place, and content of an alleged false representation[.]'" *Murtagh v. St. Mary's Reg'l Health Ctr.*, 2013 WL 5348607, at *6 (D. Me. Sep. 23, 2013) (quoting

*Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985)).   Mere conclusory allegations will not satisfy the particularity requirement.   *See Hayduk*, 775 F.2d at 444.   Rule 9(b) also requires that plaintiffs identify a basis for inferring scienter on the part of the defendant.   *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009).

## B. Motion to Amend

After the time for amendments as a matter of course has passed, a party may amend its pleading with leave of the court, which should be freely given "when justice so requires."   Fed. R. Civ. P. 15(a)(2).   Accordingly, leave to amend should be granted where there is no "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility . . . ."   *Foman v. Davis,* 371 U.S. 178, 182 (1962); *see also Chiang v. Skeirik,* 582 F.3d 238, 244 (1st Cir. 2009).   If leave to amend is sought before discovery is complete and neither party has moved for summary judgment, a proposed amendment will be denied if the amendment fails to state a claim and is, therefore, futile.   *See Hatch v. Dept. for Children, Youth and Their Families,* 274 F.3d 12, 19 (1st Cir. 2001). "Futility" is gauged by the criteria of Rule 12(b)(6) governing motions to dismiss for failure to state a claim.   *Id.*

## III.   DISCUSSION

PHH and Fannie Mae assert numerous arguments in favor of dismissal of each count in McGahey's Complaint.  I will first address the parties' standing arguments, and will then address each count in turn.

### A. Standing

As a threshold matter, Defendants assert that McGahey lacks standing to assert the claims in his Complaint because each attempts to indirectly enforce the Fannie Mae guidelines pertaining to HAMP modifications.  While the First Circuit has held that borrowers do not have standing as third-party beneficiaries to enforce HAMP's terms, *see Mackenzie v. Flagstar Bank, FSB*, 738 F.3d 486, 490-93 (1st Cir. 2013), the Magistrate Judge correctly observed that McGahey does not seek direct redress for alleged HAMP violations under a third-party beneficiary or breach of good faith theory, *see* ECF No. 30 at 21.  Rather, McGahey asserts that the alleged HAMP guideline violations constitute separate violations of the Maine Unfair Trade Practices Act and Maine Consumer Credit Code, as well as fraud.  *See Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp. 2d 172, 185 (D. Mass. 2011) (recognizing that lack of private right of action under HAMP does not preclude a violation of HAMP guidelines from forming basis of a claim under Chapter 93A, the analogous Massachusetts consumer protection statute); *see also Gaul v. Aurora Loan Servs. LLC*, 2013 WL 1213065, at *9 (D. Mass. Feb. 7, 2013) (same).  If McGahey properly alleges a violation of the UTPA, the lack of third-party beneficiary standing or a private right of action under HAMP itself will not preclude his claim from going

forward. *See Blackwood v. Wells Fargo Bank, N.A.*, 2011 WL 1561024, at *4 (D. Mass. Apr. 22, 2011) (noting that consumer protection statute is "the appropriate avenue" for seeking remedy for violation of statute that does not provide for a private remedy). I therefore turn to evaluate whether the Complaint sufficiently states a claim under each individual count.

## B. Count I: Maine Unfair Trade Practices Act ("UTPA")

McGahey alleges that PHH violated the UTPA by failing to offer him a modification as required by the HAMP guidelines and by making false representations regarding his eligibility for a HAMP loan modification, which caused him to accept the more expensive standard modifications instead. PHH responds that McGahey does not sufficiently allege: any independent unfair or deceptive trade practices; damages in the form of a loss of money or property; greater total payments than he would have made pursuant to a HAMP modification; or detrimental reliance on a representation by the Defendants.

The UTPA gives a private right of action to consumers who are injured as a result of the use of unfair or deceptive business practices.[3]  *See* 5 M.R.S.A. §§ 207,

---

[3]  Section 207 of the UTPA provides, in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful.

 5 M.R.S.A. § 207 (2017).

Section 213, which establishes a private right of action, provides, again in relevant part:

> Any person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 207 or by any rule or

213(1) (2017).  To qualify as unfair under the statute, "the act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition." *State v. Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200. "An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances." *Id.* at ¶ 17.  A representation is material if it is "likely to affect [consumers'] choice of, or conduct regarding, a product." *Id.* (quotation omitted).  An act or practice may be deceptive within the meaning of the UTPA "regardless of a defendant's good faith or lack of intent to deceive." *Id.*

### 1.  Unfair or Deceptive Act or Practice

PHH's allegedly false representations that McGahey did not qualify for a HAMP modification were material representations that were likely to mislead a reasonable consumer, and therefore qualify as deceptive under the UTPA.  The representations are material because it is reasonable to infer that McGahey's decision to accept the standard modifications offered by PHH was influenced by his belief that he did not qualify for a more advantageous HAMP modification.  *See Weinschenk*, 2005 ME 28 at ¶ 17.  The representations were likely to mislead a reasonable consumer because PHH controlled all of the information regarding McGahey's

---

regulation issued under section 207, subsection 2 may bring an action either in the Superior Court or District Court for actual damages, restitution and for such other equitable relief, including an injunction, as the court determines to be necessary and proper.

5 M.R.S.A. § 213(1) (2017).

eligibility, repeatedly insisted that he was ineligible, and assured him that his applications had been "carefully considered," *see, e.g.*, ECF No. 16-6 at 1; ECF No. 16-26 at 1.  *See Weinschenk*, 2005 ME 28 at ¶ 17.

### 2.  Damages

Damages cognizable under the UTPA are limited to a loss of money or property that results from a violation.  *Noveletsky v. Metro. Life Ins. Co.*, 49 F. Supp. 3d 123, 151 (D. Me. 2014) (citing *William Mushero, Inc. v. Hull*, 667 A.2d 853, 855 (Me. 1995)).  Speculative harms do not constitute damages under the UTPA.  *Poulin v. Thomas Agency*, 746 F. Supp. 2d 200, 206 (D. Me. 2010) (citing *Tungate v. MacLean-Stevens Studios, Inc.*, 1998 ME 162, ¶¶ 9-10, 714 A.2d 792).

McGahey asserts that as a consequence of the alleged UTPA violations, he suffered damages in the form of: (1) paying increased interest; (2) paying Defendants' attorney's fees in connection with the 2012 foreclosure action; (3) incurring and paying late fees when he fell behind on the payments under the standard modification; (4) paying a higher rate of interest on the capitalized interest, fees, attorney's fees, and costs; (5) paying his attorney to prevent the 2012 foreclosure; (6) suffering harm to his credit; (7) paying gas and mileage expenses; and (8) suffering a loss of equity in the Property.  These alleged damages all constitute losses of money or property, with the exception of the harm to McGahey's credit, *see Poulin*, 746 F. Supp. at 206 (harm to credit score, without proof of resulting actual damage, is a speculative harm).

Defendants assert, and the Magistrate Judge agreed, that these harms are nonetheless not cognizable under the UTPA because they were not caused by an alleged unfair or deceptive act or practice.  Defendants' argument runs as follows.  McGahey admits that HAMP does not provide him with a private right of action, and that he has no third-party beneficiary standing to directly enforce the terms of Fannie Mae's HAMP-related servicer guidelines.  Because he cannot sue to obtain a HAMP modification, McGahey cannot establish that he was entitled to receive a HAMP modification.  Because McGahey was not entitled to receive a HAMP modification, he cannot establish that he would have been given a HAMP modification if PHH had not wrongfully denied his application and falsely told him that he was ineligible.  Put another way, Defendants assert that even if PHH had properly evaluated McGahey's HAMP application and correctly determined that he was eligible for a HAMP modification, it could nonetheless have refused to give him one—in violation of the Fannie Mae Guidelines—with impunity because McGahey lacks a legal mechanism to force PHH to provide the modification.  Because PHH could have refused to provide the HAMP modification even in the absence of a UTPA violation, Defendants assert, the damages McGahey claims to have suffered as a result of not receiving the HAMP modification were not caused by the UTPA violation.

The purpose of awarding actual damages to plaintiffs under the UTPA is to put those plaintiffs in the position they would have been in had the violation not occurred.  *See McKinnon v. Honeywell Intern., Inc.*, 2009 ME 69, ¶ 21, 977 A.2d 420 (UTPA's "primary purpose is to compensate an injured plaintiff").  Determining

damages is an exercise that requires the Court to engage in counterfactual speculation: "if X had not occurred, what would have happened?"  If PHH had not wrongfully denied McGahey's HAMP application and falsely told him he was ineligible for HAMP, one of two things would likely have occurred: either PHH would have offered McGahey a HAMP modification in accordance with the Fannie Mae Guidelines; or they would have refused to offer him a HAMP modification in violation of the Fannie Mae Guidelines.  If the former would have occurred, then McGahey has suffered damages; if the latter, then he has not.

An analogy may be useful in illuminating the issue at hand.  Imagine a homeowner with a leaking roof who hires a contractor to patch the hole in the roof. The contractor falsely tells the homeowner that a patch will not suffice, and instead the whole roof must be replaced.  After paying to have her roof replaced, the homeowner discovers the deception and brings a UTPA claim.  The measure of the homeowner's damages would be the difference in cost between the roof replacement and the patch job.  Despite the fact that the homeowner does not have a private right of action to force the contractor to patch her roof, it is reasonable to assume that if the deception had not occurred, and the contractor had informed the homeowner that nothing more than a patch job was required, the homeowner would have contracted for a patch job rather than a full roof replacement.

Defendants' emphasis on McGahey's lack of a private action to enforce HAMP is therefore misplaced.  Whether McGahey can sue to obtain the modification does not necessarily answer the question of whether or not he would have received the

26

modification had his application been handled properly.  That is, the fact that McGahey does not have a private cause of action to force PHH to give him a HAMP modification does not foreclose the possibility that he would nonetheless have been offered the modification if his application had been properly handled and approved. Presumably, PHH has offered HAMP modifications to qualified applicants in the past, despite the fact that none of those applicants had the ability to sue to obtain the modification.

At the motion to dismiss stage, I must accept as true all well-pleaded facts in the Complaint and draw all inferences in favor of McGahey.  *See Saldivar*, 818 F.3d at 16.  The parties' differing theories on damages rely on differing counterfactual scenarios.  Defendants say that McGahey would not have been offered a HAMP modification even if he had been correctly informed that he qualified for it because he had no private right of action to enforce HAMP.  McGahey says that he would have been offered a HAMP modification in accordance with the Fannie Mae Guidelines if his application had been properly handled.  To accept Defendants' proposed counterfactual scenario instead of McGahey's would be to improperly draw an inference in the moving parties' favor at the motion to dismiss stage.  McGahey has therefore adequately alleged that he suffered damages as a result of PHH's alleged UTPA violations.

### 3.  Total Payments Made

Defendants also argue that the documents attached to McGahey's Complaint establish that he has paid several thousand dollars less on his mortgage since 2012

than he would have paid under a HAMP modification if one had been offered to him in 2012. Defendants therefore assert that McGahey cannot claim to have suffered any damage as a consequence of the failure to offer him a HAMP modification. This argument ignores the increase in the principal balance of McGahey's loan due to the higher interest rates and the capitalized late payments, fees, and costs that resulted from McGahey's acceptance of the standard modification. The measure of McGahey's damages must take into account his overall economic position, and is not limited to the sum of the payments he has actually made since 2012. The loss of equity in McGahey's home resulting from the higher principal balance on his loan is an economic injury that constitutes a loss of money or property. *See Napolitano v. Green Tree Servicing, LLC*, 2016 WL 447451, at \*5, \*9 (D. Me. Feb. 4, 2016).

### 4. Detrimental Reliance

Defendants argue that McGahey's Complaint fails to demonstrate detrimental reliance because he cannot show that his acceptance of a standard loan modification was detrimental. This argument essentially restates the Defendants' argument regarding damages considered above, and fails for the same reasons. If McGahey accepted the standard modifications in reliance on Defendants' false statements that he was not eligible for HAMP, and suffered damages as a result, then he has adequately pleaded detrimental reliance.

## C. Count II: Real Estate Settlement Procedures Act ("RESPA")

McGahey alleges that PHH violated RESPA by failing to adequately respond to Qualified Written Requests[4] and Notices of Error[5] sent by McGahey and his counsel in connection with his mortgage account, and by failing to correct the allegedly erroneous denials of McGahey's HAMP applications. Defendants respond that the correspondence sent did not qualify as Qualified Written Requests or Notices of Error, that PHH adequately responded, and that McGahey cannot establish that he was damaged by any violation.

RESPA aims to promote transparency and communication between borrowers and lenders. *See Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1135 (11th Cir. 2014). To that end, the statute requires that servicers of mortgage loans respond to inquiries from borrowers regarding their loans within a set amount of time. *See* 12 U.S.C.A. § 2605(e) (2017). To establish a violation of RESPA, McGahey must show that PHH failed to comply with the statute's requirements, and that he suffered actual damages as a result. *See O'Connor v. Nantucket Bank*, 992 F. Supp. 2d 24, 35 (D. Mass. 2014).

McGahey asserts that 12 C.F.R. § 1024—so-called Regulation X—expands the responsibilities of servicers with respect to RESPA. Regulation X was promulgated

---

[4] A Qualified Written Request is any written correspondence that includes the name and account of the borrower and includes a statement of reasons that the borrower believes his or her account to be in error, or provides sufficient detail to the servicer regarding other information sought by the borrower. 12 U.S.C.A. § 2605(e)(1)(B) (2017).

[5] A Notice of Error is "any written notice from a borrower that asserts an error and includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred." 12 C.F.R. § 1024.35(a).

in 2014 by the Bureau of Consumer Financial Protection pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act. *See Wilson v. Bank of America*, 48 F. Supp. 3d 787, 799 (E.D. Pa. 2014). Regulation X is the implementing regulation of RESPA, and creates an error resolution process that defines servicers' obligations under the statute. *See* 12 C.F.R. § 1024.1; *see also* Arthur B. Axelson & Heather C. Hutchings, *Mortgage Servicing Developments*, 69 Bus. Law. 527, 532 (2014).

Defendants claim that McGahey did not reference Regulation X in his Complaint, and therefore it should not be considered in evaluating his RESPA claim. The First Amended Complaint does reference Regulation X, however, when describing the Qualified Written Requests and Notices of Error sent to PHH, and the notices themselves—which were incorporated into the Complaint—explicitly reference Regulation X. *See, e.g.,* ECF No. 16 at ¶¶ 138, 159; ECF No. 16-36 at 2. Moreover, Defendants do not cite any case law supporting their position that failure to mention an implementing regulation by name in a complaint renders the regulation inapplicable to a claim under the statute being implemented. *Cf. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) (regulations issued by agency in exercise of delegated authority are to be given controlling weight in interpreting a statute).

### 1.  Requirements for Qualified Written Requests or Notices of Error

Defendants argue that the communications sent by McGahey's attorney do not qualify as Qualified Written Requests under RESPA because they do not identify errors relating to loan servicing as defined by the statute. McGahey responds that

the Defendants' argument is faulty because it is based on pre-Regulation X RESPA. Regulation X specifically enumerates a "[f]ailure to provide accurate information to a borrower regarding loss mitigation options" as a covered error that may be the subject of a Qualified Written Request or Notice of Error.   12 C.F.R. § 1024.35(b)(7). McGahey has therefore sufficiently alleged that his communications regarding his HAMP application denials qualify under RESPA.  *See Wilson*, 48 F. Supp. 3d at 805 (declining to dismiss RESPA claim regarding communication about alleged HAMP error).

### 2.  PHH's Responses to McGahey's Communications

Defendants also argue that PHH's responses to McGahey's communications were sufficient to satisfy its obligations under RESPA.  Describing a servicer's duty as "limited," Defendants cite two cases interpreting RESPA before Regulation X went into effect for the proposition that in assessing a RESPA claim, the Court should "simply determine that the servicer responded with information."  ECF No. 19 at 27-29.  In one of the cases cited by Defendants, the Eleventh Circuit held that a servicer's letter providing a cursory explanation for the handling of a borrower's payments was sufficient to satisfy the servicer's obligations under RESPA, despite the fact that the explanation left the borrower "confused and/or unsatisfied."  *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1135 (11th Cir. 2014).  McGahey responds that this lenient standard no longer applies now that Regulation X is in effect.

There is no case law in the First Circuit addressing the change, if any, that Regulation X wrought in a servicer's obligations to respond under RESPA.  None of

the other circuit courts of appeal have explicitly analyzed Regulation X's effect in this regard either.  But two decisions out of the Eleventh Circuit that have been handed down since the *Bates* decision cited by defendants offer some guidance.  In each, the Eleventh Circuit cited Regulation X in reversing a district court's grant of a motion to dismiss a RESPA claim.  *See Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244-45 (11th Cir. 2016); *Nunez v. JPMorgan Chase Bank, NA*, 648 F. App'x 905, 910 (11th Cir. 2016).  In *Renfroe*, the court held that the borrower had plausibly alleged that a servicer's response, which was similar to the one considered by the same court in *Bates*, failed to satisfy Regulation X's requirements that the servicer conduct a reasonable investigation and provide the borrower with a written explanation of the reasons for its determination.  *Renfroe*, 822 F.3d at 1244-45.  It is reasonable to infer from the different outcomes in *Bates*, on the one hand, and *Renfroe* and *Nunez*, on the other, that the Eleventh Circuit interprets Regulation X as having expanded a servicer's obligations with respect to responding to borrower inquiries under RESPA.

*Wilson v. Bank of America, N.A.*, 48 F. Supp. 3d 787 (E.D.P.A. 2014), a 2014 decision of the Eastern District of Pennsylvania, does squarely address the issue of Regulation X's effect on a servicer's obligation to respond under RESPA.  *See id.* at 804.  Remarking that Regulation X had "altered the landscape" of a servicer's obligations to respond under RESPA, the *Wilson* court held that Regulation X imposes a substantive obligation on servicers where the statute had merely imposed a procedural one.  *Id*.  Regulation X requires that a servicer conduct a "reasonable investigation" in response to a Qualified Written Request or Notice of Error, while

RESPA itself only requires "an investigation." *Compare* 12 C.F.R. § 1024.35(e)(1)(i)(B) *with* 12 U.S.C.A. § 2605(e)(2)(B). The *Wilson* court reasoned that the addition of the word "reasonable" was intended to impose a substantive obligation on servicers "that is not satisfied by the mere procedural completion of some investigation." *Wilson*, 48 F. Supp. 3d at 804; *see also Renfroe*, 822 F.3d at 1244 (quoting Regulation X and emphasizing phrase "reasonable investigation").

The reasoning in *Wilson*—especially to the extent it comports with the Eleventh Circuit's apparent approach in *Renfroe* and *Nunez*—is persuasive. Because Regulation X was promulgated to implement the Dodd-Frank Wall Street Reform and Consumer Protection Act, it is reasonable to interpret the regulation's added qualification that investigations be "reasonable" as expanding the substantive obligations of servicers under RESPA. *Cf.* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (purpose of Act to improve "accountability and transparency in the financial system"). Under Regulation X, servicers have a duty to perform a reasonably thorough investigation in response to a borrower's Qualified Written Request or Notice of Error, and to provide a reasonably thorough response to a borrower's questions and concerns. *See Wilson*, 48 F. Supp. 3d at 804; *cf. Renfroe*, 822 F.3d at 1245.

McGahey alleges a number of specific violations of RESPA. On June 12, 2015, for example, McGahey sent a notice captioned as a Notice of Error to PHH, alleging that PHH had incorrectly stated that McGahey had failed to complete a previous HAMP offer, and therefore wrongfully denied his latest HAMP application. McGahey

alleges that he also submitted a complaint to the Bureau of Consumer Financial Protection (CFPB) at the same time.  PHH responded to the CFPB complaint, but not to the Notice of Error, on July 10, 2015.  PHH's July 10 response alleges that McGahey was offered a HAMP modification in 2009.  The response did not advise McGahey of his right to request the records on which PHH's determination was based, as required by 12 C.F.R. § 1024.35(e)(1)(i)(B).  In a letter dated December 1, 2015, PHH apparently reversed itself, and stated that McGahey had been offered a standard modification, rather than a HAMP modification, in 2009.  It is reasonable to infer from these facts that the investigation conducted by PHH as a result of McGahey's June 12 Notice of Error was not sufficient to satisfy PHH's obligations under RESPA as defined by Regulation X, as it failed to uncover the fact that the modification offered to McGahey in 2009 was a standard modification, rather than a HAMP modification.  Further, it is reasonable to infer that this information was readily available to PHH, and a reasonable investigation would have discovered it. McGahey's Complaint therefore plausibly claims that PHH's responses to his Qualified Written Requests and Notices of Error were not sufficient to satisfy RESPA.

### 3. Damages

McGahey alleges that PHH's violations of RESPA caused him actual damages, including the increased interest, fees, and costs associated with his acceptance of a more expensive standard loan modification, as discussed in Section III.B.2, attorney's fees, and emotional damages.

RESPA allows for recovery of "any actual damages to the borrower," as well as statutory damages in the case of "a pattern or practice of noncompliance." 12 U.S.C.A. § 2605(f)(1) (2017). The First Circuit has stated that consumer protection statutes should be construed "liberally in favor of consumers." *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 171 (1st Cir. 2004). Courts in this circuit have relied on this directive to interpret the actual damages provision of RESPA to include emotional distress damages. *See Moore*, 848 F. Supp. 2d at 123; *see also Afridi v. Residential Credit Sols., Inc.*, 189 F. Supp. 3d 193, 200 (D. Mass. 2016).

McGahey alleges that PHH's failure to adequately respond to his communications regarding the loan caused him emotional distress. Specifically, he claims that his confusion regarding his eligibility for HAMP resulting from PHH's misrepresentations contributed to his stress. It is reasonable to infer that the misrepresentations that McGahey refers to in his Complaint include PHH's inconsistent responses to his Qualified Written Requests and Notices of Error, especially the communications regarding whether he was ever offered or had failed a HAMP modification. McGahey's allegations of emotional distress suffice to plausibly state actual damages under RESPA. *See Moore*, 848 F. Supp. 2d. at 123.

McGahey also alleges that he paid an attorney $100 to draft and deliver a Qualified Written Request/Notice of Error to PHH when he did not receive an adequate answer to his earlier RESPA communications. Defendants argue that attorney's fees do not constitute actual damages under RESPA because the statute separately provides for their recovery. The cases cited by Defendants, however, do

not support the position that attorney's fees a party incurs as a result of a RESPA violation, but unrelated to the RESPA litigation itself, are not recoverable.  In *Crow v. Ocwen Loan Servicing, LLC*, one of the cases cited by Defendants, the District of Hawai'i suggested that payment to an attorney to send a second Qualified Written Request when a servicer failed to respond to a first Qualified Written Request would qualify as actual damages, but held on the facts of that case that the plaintiff had failed to establish a causal connection because the response period for the first Qualified Written Request had not yet expired when the second was sent.  2016 WL 3557008, at *7-8 (D. Haw. June 24, 2016).  In *Kassner v. Chase Home Fin., LLC*, the other case cited by Defendants, the District of Massachusetts held that "attorney's fees *for bringing a RESPA suit* are not actual damages under the statute."  2012 WL 260392, at *7 (D. Mass. Jan. 27, 2012) (emphasis added).

Other courts have held that attorney's fees are recoverable as actual damages under RESPA if they are not incurred in connection with bringing a suit under the statute.  *See, e.g., Miranda v. Ocwen Loan Servicing, LLC*, 148 F. Supp. 3d 1349, 1355 (S.D. Fla. 2015); *Tanner v. Nationstar Mortg., LLC*, 2016 WL 3193715, at *3 (Me. Super. May 3, 2016).  This approach is consistent with RESPA's statutory provision for attorney's fees because the statute is limited to fees incurred in connection with an action brought under RESPA.  *See* 12 U.S.C.A. § 2605(f)(3) (2017).  If McGahey is successful in the instant suit, he will not be able to recover the $100 paid to his attorney to send the Qualified Written Request/Notice of Error to PHH under the statutory provision because that cost was not incurred in bringing this action.

Treating the $100 fee as actual damages therefore would not render the attorney's fees provision of RESPA superfluous. *Compare Giordano v. MGC Mortg., Inc.*, 160 F. Supp. 3d 778, 783 (D.N.J. 2016). The attorney's fees alleged in McGahey's Complaint therefore qualify as actual damages.

Because McGahey adequately alleged actual damages in support of his RESPA claim, in the form of emotional distress and attorney's fees, his claim for statutory damages due to a pattern or practice of noncompliance also survives dismissal. *See Renfroe*, 822 F.3d at 1247 (holding allegations of five RESPA violations sufficient to state a claim for pattern or practice of noncompliance).

McGahey additionally asserts that the increased interest, fees, and costs he incurred as a result of not being offered a HAMP modification constitute damages under RESPA because PHH should have corrected the wrongful HAMP denial identified in McGahey's Qualified Written Requests and Notice of Error, and offered him a HAMP modification. RESPA, however, does not impose an affirmative duty on a servicer to provide a modification. *See* 12 C.F.R. § 1024.41(a) (Section of Regulation dealing with loss mitigation, noting that Regulation X does not "impose[] a duty on a servicer to provide any borrower with a specific loss mitigation option."). The goal of RESPA, as noted above, is to encourage communication to provide borrowers with accurate information about, and transparency regarding, their loans. *See Bates*, 768 F.3d at 1135. The statute provides that an adequate response can either be a correction of the alleged error, or a reasonable investigation and statement of reasons why the servicer believes that the account is correct. *See* 12 U.S.C.A. § 2605(e)(2)

37

(2017).  PHH could therefore have fulfilled its statutory obligations without correcting the allegedly erroneous HAMP denial; RESPA requires that servicers provide borrowers with information, not that they necessarily accept a borrower's assertion of error and correct it.  It follows that damages stemming from the failure to offer McGahey a HAMP modification are not damages caused by the RESPA violation.

## D. Counts III and IV: Fraud and Misrepresentation

McGahey's claims for common law fraud and for misrepresentation under the Maine Consumer Credit Code closely resemble his claim under the UTPA.  In each, McGahey alleges that PHH and Fannie Mae's false representations that he did not qualify for a HAMP modification induced him to accept a more expensive standard modification instead.  McGahey alleges that as a result of the Defendants' fraud and misrepresentation, he suffered damages due to increased interest, costs, and fees as outlined in Section III.B.2, above.

To establish that the Defendants are liable for fraud, McGahey must show that they "(1) ma[de] a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it [was] true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) [McGahey] justifiably relie[d] upon the representation as true and act[ed] upon it to [his] damage."  *Francis v. Stinson*, 2000 ME 173, ¶ 38, 760 A.2d 209.  A claim of misrepresentation under the Maine Consumer Credit Code requires a showing that a creditor or person acting for him induced a consumer to enter a credit transaction by misrepresenting a material fact with respect to the terms and conditions of the

extension of credit.  *See* 9-A M.R.S.A. § 9-401 (2017).  Under Rule 9(b), allegations of fraud must be pleaded with particularity, meaning that they must specify the time, place, and content of the alleged false representation.  *See Murtagh*, 2013 WL 5348607, at *6.

McGahey's Complaint describes the alleged misrepresentations regarding his eligibility for HAMP with sufficient particularity to satisfy Rule 9(b).  *See, e.g.,* ECF No. 16 at ¶¶ 41, 47, 70, 77-78, 83, 87, 125, 155.  He alleges that Defendants knew or should have known that their representations regarding his eligibility were false, and that he relied on those representations in accepting more expensive standard loan modifications.

Defendants argue that McGahey cannot show that he relied on any misrepresentation to his detriment because he was not entitled to a HAMP modification.  This argument essentially restates their argument with respect to damages regarding McGahey's UTPA claim, and fails for the reasons explained earlier.  McGahey's claims in Count III and Count IV, for fraud and misrepresentation, state plausible claims, and will not be dismissed.

## E. Motion to Amend

In denying McGahey's motion to amend his Complaint, the Magistrate Judge concluded that the amendment would be futile because it did not cure any of the supposed defects in McGahey's First Amended Complaint.  ECF No. 30 at 36. Defendants do not advance any other arguments as to why the motion to amend should be denied.  *See* ECF No. 33 at 9-10.  Because I conclude that the First Amended

Complaint is sufficient to survive dismissal, I also conclude that McGahey's proposed amendment is not futile and his motion to amend should be granted.

## IV.   CONCLUSION

For the foregoing reasons, I do not accept the Recommended Decision (ECF No. 30).  It is ORDERED that Defendants' Motion to Dismiss (ECF No. 19) is **DENIED**. McGahey's Motion to Amend (ECF No. 23) is **GRANTED**.


**SO ORDERED.**

**Dated this 17th day of July 2017**


_____/s/ JON D. LEVY_____
**U.S. DISTRICT JUDGE**
